**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

Yunseo CHUNG,

        *Plaintiff-Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States of America; Marco
RUBIO, in his official capacity as Secretary of
State, U.S. Department of State; Pamela BONDI,
in her official capacity as Attorney General, U.S.
Department of Justice; Kristi NOEM, in her
official capacity as Secretary of Homeland
Security, U.S. Department of Homeland Security;
Todd M. LYONS, in his official capacity as
Acting Director, U.S. Immigration and Customs
Enforcement; and William P. JOYCE, in his
official capacity as Acting Field Office Director of
the New York Immigration and Customs
Enforcement Office,

        *Defendants-Respondents*.

Case No. 25-cv-2412

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF-PETITIONER'S PROPOSED ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

CLEAR Project - Main Street Legal Services, Inc.
Emery Celli Brinckerhoff Abady Ward & Maazel LLP
Human Rights First
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
Law Office of Matthew Bray
Jonathan Hafetz, Esq.

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

LEGAL STANDARD..............................................................................................7

ARGUMENT ........................................................................................................8

    I.     MS. CHUNG IS LIKELY TO SUCCEED ON THE MERITS.............................8

         A.    Ms. Chung's Imminent Detention Would Violate the First Amendment....8

              1.    Ms. Chung's detention would violate her right to be free from First Amendment retaliation..................................................................8

              2.    Ms. Chung's detention would constitute unconstitutional viewpoint discrimination. ..............................................................11

         B.    Ms. Chung's Imminent Detention Would Violate Due Process ...............14

              1.    Ms. Chung's detention would serve no constitutionally permissible purpose..........................................................................14

              2.    Ms. Chung's detention would violate the constitutional prohibition on enforcing vague rules.............................................14

         C.    Ms. Chung's Imminent Detention Would Violate the INA.....................16

    II.    MS. CHUNG WOULD SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.......................................................................19

    III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF INJUNCTIVE RELIEF.................................................................19

CONCLUSION....................................................................................................20

TABLE OF AUTHORITIES

PAGE NO(s)

**Cases**

*Black v. Decker*,
    103 F.4th 133 (2d Cir. 2024) ....................................................................... 14

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002) ...................................................................... 9

*Boos v. Barry*,
    485 U.S. 312 (1988) ...................................................................................... 13

*Bridges v. Wixon*,
    326 U.S. 135 (1945) .......................................................................... 10, 13, 18

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ........................................................................................ 15

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988) ...................................................................................... 15

*Clark v. Martinez*,
    543 U.S. 371 (2001) ...................................................................................... 18

*Coronel v. Decker*,
    449 F. Supp. 3d 274 (S.D.N.Y. 2020) .......................................................... 20

*Dorsett v. County of Nassau*,
    732 F.3d 157 (2d Cir. 2013) .......................................................................... 9

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ...................................................................................... 15

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) .................................................................................... 9

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...................................................................................... 14

*Hardy v. Fischer*,
    701 F. Supp. 2d 614 (S.D.N.Y. 2010) .......................................................... 19

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) .......................................................................................... 9

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ........................................................................................ 13

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018)................................................................................................ 12

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)..................................................................................... 19

*LaRouche v. Kezer*,
    20 F.3d 68 (2d Cir. 1994)....................................................................................... 11

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018)................................................................... 20

*Matal v. Tam*,
    582 U.S. 218 (2017)........................................................................................ 11, 12

*Massieu v. Reno*,
    915 F. Supp. 681 (D.N.J. 1996) .............................................................................. 5

*Meyer v. Grant*,
    486 U.S. 414, (1988)............................................................................................... 9

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984)................................................................................... 19

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)................................................................................... 20

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)........................................................................................ 10, 13

*Parcham v. INS*,
    769 F.2d 1001 (4th Cir. 1985) ............................................................................... 10

*Pham v. Ragbir*,
    141 S. Ct. 227 (2020)............................................................................................... 9

*Ragbir v. Homan*,
    923 F.3d 53 (2d Cir. 2019)......................................................................... 9, 10, 20

*Red Earth LLC v. United States*,
    657 F.3d 138 (2d Cir. 2011).............................................................................. 8, 18

*Reno v. ACLU*,
    521 U.S. 844 (1997)............................................................................................... 15

*Rosales-Mireles v. United States*,
    138 S. Ct. 1897 (2018)........................................................................................... 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................................................................ 11, 12, 16

*Sajous v. Decker*,
    18-CV-2447, 2018 WL 2357266 (S.D.N.Y. May 23, 2013) ...................................... 19, 20

*Sindicato Puertorriqueno de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012) ................................................................................................ 20

*Smith v. Campbell*,
    782 F.3d 93 (2d Cir. 2015) ................................................................................................ 9

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................................ 9, 10, 13

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*,
    190 F. Supp. 2d 577 (S.D.N.Y. 2002) ................................................................................ 8

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*,
    2024 WL 4631301, (W.D. Tex. Oct. 28, 2024) ................................................................ 6

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949) ............................................................................................................ 12

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................................................................ 12

*United States v. Loy*,
    237 F.3d 251 (3d Cir. 2001) ............................................................................................ 16

*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020) .......................................................................................... 16

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977) ........................................................................................................ 11

*United States v. Rundo*,
    990 F.3d 709 (9th Cir. 2021) .......................................................................................... 16

*Velesaca v. Decker*,
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ............................................................................ 19

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................................................ 12

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018) .............................................................................................. 12

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ............................................................................ 13

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................................ 14

**Statutes**

5 U.S.C. § 706 ............................................................................................ 16

8 U.S.C. § 1182 ............................................................................ 1, 4, 5, 6, 17

8 U.S.C. § 1227 ................................................................................ 1, 3, 4, 18

8 U.S.C. § 1324 ............................................................................................ 7

28 U.S.C. § 1651 ........................................................................................ 11

**Other Authorities**

Exec. Order 13899,
    *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 11, 2019) ........................................ 6

Exec. Order 14188,
    *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025) ......... 6

H.R. Conf. Rep. No. 101-955,
    101st Cong., 2nd Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6794 ............. 5, 17

*How a Columbia Student Activist Landed in Federal Detention*,
    N.Y. Times (Mar. 17, 2025) ................................................................ 11

Katherine Faulders et al., *DHS Agents Search 2 Student Rooms at Columbia University,*
    ABC News (Mar. 14, 2025) ................................................................ 11

Knight First Amendment Institute at Columbia University, *Newly Released ICE Memos Explain Why Recent Proposals to Revoke Student Protesters' Visas Are Likely Unconstitutional*,
    (Nov. 6, 2023) ................................................................................ 9

Laura Romero, *Judge blocks deportation of Georgetown fellow detained by immigration authorities*, ABC News (Mar. 20, 2025) ................................................ 11

Margaret Garnett, Comm'r, N.Y.C. Dep't of Investigation, *Investigation into NYPD Response to the George Floyd Protests* 9 (Dec. 2020) ("DOI Report") ................................. 3

NYPD, Custodial Offenses Instructor Guide,
    ch. 12, at 5 ................................................................................ 3

# INTRODUCTION

Plaintiff-Petitioner Yunseo Chung respectfully seeks an immediate temporary restraining order, pending adjudication of this request for a preliminary injunction, to prevent her unlawful detention and transfer to a detention site beyond this District before the Court can hear her claims. Because that is precisely what the U.S. Department of Homeland Security (DHS) has recently done in each of two publicly reported cases premised on the same statutory authority upon which Defendants-Respondents now seek to detain and deport Ms. Chung, the urgent relief she seeks here is necessary.

Several meritorious lawsuits (including this one) broadly seek to invalidate a new policy of detaining and deporting otherwise non-removable noncitizens under a seldom used statute because the Secretary of State believes or has determined that their very presence or activities, including their speech in support of Palestinian human rights, could or would jeopardize U.S. foreign policy. 8 U.S.C. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii). This motion, however, does not challenge the statute or the policy or even their invocation in pursuit of deportation. Rather, it urgently seeks interim relief, on narrower grounds, for which the underlying facts are not in genuine dispute.

Namely, Ms. Chung seeks an order preventing DHS from summarily detaining her based on protected speech supporting Palestinian rights and criticizing her university's punitive policies related to campus protest. Whatever justifications the government may offer in defense of the policy writ large (as to which Ms. Chung makes no concession), DHS detention of Ms. Chung would be unlawful on multiple counts, outrageously violating her First Amendment and due process rights, as well as the Immigration and Nationality Act (INA). And, whatever jurisdictional objections the government might interpose in this action, none bars review of the narrow issue of the constitutionality of incarcerating Ms. Chung pending further litigation.

1

Accordingly, to prevent irreparable harm pending adjudication of her request for a preliminary injunction, Ms. Chung respectfully moves the Court for a temporary restraining order preventing her detention.

## BACKGROUND

**Yunseo Chung.** Plaintiff-Petitioner is a twenty-one-year-old lawful permanent resident and national of South Korea who has lived in the United States since the age of seven. Compl. ¶¶ 10, 21-23. She is now a junior at Columbia University, where she has worked for the Columbia Undergraduate Law Review and has taken on internships in the legal field in pursuit of her ambition to become a lawyer. *Id.* ¶¶ 27-29.

Like many students who learn about international injustices and gain exposure to new perspectives through their college courses and experiences, over the past few years in college, Ms. Chung has developed her political beliefs. As relevant here, she feels called to stand up and speak out for the human rights of Palestinians. *Id.* ¶ 29. Along with hundreds of her peers, during her time at Columbia she has participated in discussions and demonstrations in support of Palestinian human rights, including at the "Gaza Solidarity Encampment" on Columbia's South Lawn. *Id.* ¶ 31. She did not, however, lead or plan demonstrations, issue statements to the press or the university, or otherwise assume a high-profile role in any of the aforementioned activities. *Id.* She was, rather, one of a large group of students expressing support for Palestinian rights through verbal and symbolic speech. *Id.*

In response to campus protests, Columbia University has pursued disciplinary actions against many students, including previously (with no discipline ultimately imposed) against Ms. Chung in May 2024 for alleged involvement in affixing flyers to campus buildings accusing university trustees of complicity in genocide. *Id.* ¶¶ 32-33. In the wake of that experience, and in light of Columbia's escalating disciplinary actions against her peers, Ms. Chung's advocacy

2

evolved toward opposing disciplinary actions against her fellow students that she believed were unnecessarily punitive. *Id.* ¶¶ 34, 39.

On March 5, 2025, students and others staged a sit-in at an academic building on campus, demonstrating against the recent expulsion of three Barnard College students. *Id.* ¶ 40. Ms. Chung did not organize the protest, speak to the media about it, or otherwise play a leading role in it. *Id.* Rather, she was one participant among many protesting Columbia University's handling of student discipline over Palestine-related speech. *Id.* A series of events beyond her control led to her and several other protesters being arrested outside the academic building and receiving a citation for obstruction of governmental administration. *Id.* ¶¶ 41-42. In short, when the protesters were forced to disperse after the New York City Police Department (NYPD) arrived in response to an anonymous bomb threat, Ms. Chung's movement was restricted as she was pushed from both sides and trapped. *Id.* The NYPD issues thousands of obstruction citations each year, often in the context of protests.[1]

In sum, no different from generations of American students before her, Ms. Chung is a college activist who has associated with her peers to express heartfelt political beliefs, in line with long and deeply held traditions and values. Until two weeks ago, it would have been preposterous to suggest or even imagine that the Secretary of State, invoking an obscure and rarely used law, would take the view that Ms. Chung's very presence or activities, including her speech in support of Palestinian human rights or of students facing disciplinary proceedings, could or would jeopardize U.S. foreign policy writ large. 8 U.S.C. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii). It is no

---

[1] *See, e.g.*, Margaret Garnett, Comm'r, N.Y.C. Dep't of Investigation, *Investigation into NYPD Response to the George Floyd Protests* 9 (Dec. 2020) ("DOI Report") (finding that, in sample under study, 32% of protest-related arrests involved an obstruction "top charge"), *available at* https://perma.cc/3NES-Z4TY; NYPD, Custodial Offenses Instructor Guide, ch. 12, at 5 (document obtained through records request instructing police students that obstruction charge may be brought upon "[u]ncooperative actions alone" that "would not support a charge of resisting arrest"), 24 (instructing that a "protest[er]" can be charged with obstruction for "lying down in the street" and "refusing to move").

less absurd today, yet evidently the Secretary of State has made that determination, and on the heels of it, DHS seeks to arrest and detain Ms. Chung.

**The Statutory authority at issue.** Lawful permanent residents generally have the right to live in the United States permanently, unless they are ordered removed after DHS proves a ground of deportability (most commonly based in criminality) in immigration court. Against Ms. Chung, the government relies on a "foreign policy" ground of deportation, under which "[a]ny alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." 8 U.S.C. § 1227(a)(4)(C)(i). Evincing its awareness of the potential for abuse of this provision, Congress further commanded that deportation based on foreign policy consequences "shall not be" even partly "because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii).[2] There is, however, an exception to that command that opens up the potential for abuse, by delegating to the Secretary of State authority to enable deportation "because of the alien's past, current, or expected [lawful] beliefs, statements, or associations" if he "personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest." *Id.* A House Conference Report explained the conferees' intent that this exception "be used sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies" and that "the 'compelling foreign policy interest' standard be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'" H.R. Conf. Rep. No. 101-955, 101st

---

[2] This provision applies pursuant to a cross-reference in the subsection setting out the foreign policy deportability ground. *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

Cong., 2nd Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6794. The conferees offered as illustrative examples "the former Shah of Iran, or when an alien's entry would violate a treaty." *Id.* Counsel is aware of no example of a Secretary of State previously applying this exception to subject any person to deportation for engaging in First Amendment protected speech.[3]

**The government's policy of targeting pro-Palestinian advocates for detention and deportation.** Senior federal officials have openly stated that the government aims to use the foreign policy deportation ground to deport noncitizen speakers who support one side of an ongoing political debate. Thus, where Congress contemplated rare, specific, one-off uses of the exceptional authority at 8 U.S.C. § 1182(a)(3)(C)(iii), Secretary of State Rubio by contrast sees a blank check to censor noncitizens and retaliate against speakers who espouse views contrary to President Trump's administration. He has pledged: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Compl. ¶ 107 n.48. This follows through on Mr. Rubio's previous statement, as a Senator, that noncitizens "marching at universities, and in the streets of our country . . . calling for intifada, celebrating what Hamas has done, justifying what Hamas has done . . . need to go." *Id.* ¶ 71 n.17.[4] Moreover, DHS Deputy Secretary Troy Edgar, commenting on the reason for his agency's recent detention of Mahmoud Khalil (another activist detained under the new policy), has stated that Mr. Khalil "put himself in

---

[3] While Ms. Chung does not press the point in this motion, she expressly preserves all arguments that this statute—which vests arguably unfettered discretion in the Secretary and seemingly blesses First Amendment retaliation by positioning speech as the but-for cause of detention and deportation—is unconstitutional in multiple respects. *Cf. Massieu v. Reno*, 915 F. Supp. 681, 702 (D.N.J. 1996) ("If the Constitution was adopted to protect individuals against anything, it was the abuses made possible through just this type of unbounded executive authority."), *rev'd on exhaustion grounds*, 91 F.3d 416 (3d Cir. 1996).

[4] *Also available at*: https://perma.cc/L3MD-L5XL.

the middle of the process of basically pro-Palestinian activity." Ex. C.[5] Edgar stated that had Mr. Khalil reported during his visa application process that he would "go and protest" after entering the United States, "[w]e would never have let him in the country." *Id.* And President Trump, through multiple Executive Orders, has expressed his intent to deport noncitizens who participated in pro-Palestine campus protests. *See* Compl. ¶¶ 74-77.[6]

Beyond these public statements, the charges DHS has filed against Mr. Khalil in immigration court further prove that DHS seeks his deportation because of his protected expression. In relevant part, DHS states: "The Secretary of State has determined that your activities and presence in the United States . . . would compromise a compelling U.S. foreign policy interest." Ex. O. Such a determination would be superfluous if DHS were not seeking Mr. Khalil's deportation "because of [his protected] past, current, or expected beliefs, statements, or associations." 8 U.S.C. § 1182(a)(3)(C)(iii).

**The government's intention to imminently detain Yunseo Chung.** In a March 7 letter to DHS, Secretary Rubio identified two lawful permanent residents who were to be placed in removal proceedings based on the foreign policy ground because of their political speech. Ex. L. One was Mr. Khalil, and the events that followed indicate that the second was Ms. Chung. On March 9, DHS agents visited Ms. Chung's parents' home and told her parents that they were

---

[5] All citations to "Ex." refer to the exhibits of the Declaration of Sonya Levitova, filed in support of Plaintiff-Petitioner's request for a Temporary Restraining Order and Preliminary Injunction, filed contemporaneously with this Memorandum of Law.

[6] *Also available at* https://perma.cc/2BYW-9G84. These executive orders adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* Exec. Order 13899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "claiming that the existence of a State of Israel is a racist endeavor"); Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025). A district court has found that public universities' incorporation of this specific definition of antisemitism in its speech policies constitutes impermissible viewpoint discrimination in violation of the First Amendment. *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 2024 WL 4631301, at *10 (W.D. Tex. Oct. 28, 2024).

looking for Ms. Chung. Compl. ¶ 48; Ex. M ¶ 4. Shortly thereafter, a DHS agent told lawyers assisting Ms. Chung that "due to the situation with the protesting, the State Department was at liberty to revoke [Ms. Chung's] LPR status." Ex. M ¶ 8. The agent stated there was an administrative warrant for her arrest. *Id.* ¶ 7. Minutes later, Columbia Public Safety emailed Ms. Chung the following message:

> "Dear [Ms. Chung], The U.S. Attorney's Office for the Southern District of New York has asked us to inform you that Homeland Security Investigations agents are seeking to make contact with you in connection with an administrative warrant for your arrest. Consistent with the University's practice, we wanted to share this information and their request with you. If you are represented by counsel, it may make sense for your lawyer to speak directly with DHS."

Ex. P. Then, on the morning of March 10, Ms. Chung's counsel communicated with the U.S. Attorney's Office for the Southern District of New York. Ex. N ¶ 4. That office sent Ms. Chung's counsel a copy of a DHS administrative arrest warrant naming Ms. Chung, dated March 8, 2025. *Id.* ¶ 14; Ex. J. On the evening of March 13, DHS agents executed judicial search warrants at two Columbia-owned residences, including Ms. Chung's dorm room, ostensibly seeking documents as part of an investigation targeting Columbia University under the harboring statute, 8 U.S.C. § 1324, including any occupancy or lease agreements, travel records, and immigration records. Ex. K.

Absent prompt intervention by this Court, at any moment DHS is poised to arrest and detain Ms. Chung on the basis of her protected speech, statements, beliefs, or associations.

## LEGAL STANDARD

To obtain the relief sought herein, Ms. Chung must show "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the

plaintiff[s'] favor; and (3) that the public's interest weighs in favor of granting the injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (setting forth preliminary injunction standard); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and a preliminary injunction . . . are identical.").

## ARGUMENT

Ms. Chung, a twenty-one-year-old college student who has lawfully lived in the United States since childhood and is now a permanent resident, faces the imminent prospect of unconstitutional detention for doing what generations of American college students have done before her—exercising her First Amendment rights. A temporary restraining order preventing such an outcome is warranted in light of Ms. Chung's likelihood of success on the merits, the irreparable harm she will experience absent injunctive relief, and the balance of hardships, which overwhelmingly favors Ms. Chung.

## I.    MS. CHUNG IS LIKELY TO SUCCEED ON THE MERITS

### A.    Ms. Chung's Imminent Detention Would Violate the First Amendment

#### 1.    Ms. Chung's detention would violate her right to be free from First Amendment retaliation.

In contrast to a typical First Amendment retaliation case, where the plaintiff must shoulder the burden of smoking out retaliatory animus against the defendant's claim of a facially legitimate reason for its action, here Defendants-Respondents openly aim to deprive Ms. Chung of her liberty because of her exercise of First Amendment rights. To protect against such blatant and injurious retaliation, the Court should grant injunctive relief.

To succeed on her First Amendment retaliation claim, Ms. Chung must show that: "(1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or

substantially caused by [her] exercise of that right; and (3) the defendant's actions caused [her] some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (quoting *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)). Ms. Chung is likely to demonstrate each of those elements here.

First, Ms. Chung's expressive activity lies at the core of First Amendment protection. Speech on matters of "public concern is at the heart of the First Amendment[]" and is entitled to "special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (internal quotations omitted). Similarly, "[s]peech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). Ms. Chung's speech and symbolic expression supporting Palestinian rights, criticizing U.S. government support for Israel, and opposing her university's punitive actions towards students for their protest-related activity all relate to a matter of widespread public concern. And because this "speech concerns 'political change,' it is also 'core political speech' and thus 'trenches upon an area in which the importance of First Amendment protections *is at its zenith*.'" *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425, (1988)), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020).[7]

---

[7] Even accepting *arguendo* Secretary Rubio's baseless view that speech supporting Palestinian rights automatically aligns with Hamas goals, such speech is nonetheless protected. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 39 (2010) ("[W]e in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations."); *accord Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1026 (7th Cir. 2002) (explaining that individuals who "become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas" are engaged in protected speech, not material support for terrorism); *see also* Knight First Amendment Institute at Columbia University, *Newly Released ICE Memos Explain Why Recent Proposals to Revoke Student Protesters' Visas Are Likely Unconstitutional*, (Nov. 6, 2023), https://knightcolumbia.org/content/newly-released-ice-memos-explain-why-recent-proposals-to-revoke-student-protesters-visas-are-likely-unconstitutional (discussing internal ICE legal memoranda obtained through Freedom of Information Act requests which confirm "proposals to use the [INA]'s security related ground of inadmissibility to remove individuals who express support for Hamas" would be "subject to strict scrutiny and almost certainly held unconstitutional").

Ms. Chung's status as a noncitizen does not alter this analysis. "Freedom of speech and press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945); *see also Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing in this country enjoy the protection of the First Amendment, [including] the right to peaceful expression of views through public demonstration."). Indeed, the speech of a noncitizen on an issue central to "current political debate among American citizens and other residents" lies "'at the heart of First Amendment protection' and 'occupies the highest rung of the hierarchy of First Amendment values.'" *Ragbir*, 923 F.3d at 69–70 (cleaned up) (quoting *Snyder*, 562 U.S. at 451–52). Limiting speech rights to citizens would betray our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). While the federal government's basis for its outrageous actions here and in other cases may be difficult to comprehend or even downright puzzling, what is abundantly clear is that, under existing law, Ms. Chung is likely to succeed.

The second prong—usually the subject of heated disagreement in a First Amendment retaliation case—is not in dispute here. As described above, federal officials have enthusiastically broadcast that they are identifying noncitizen activists such as Ms. Chung for detention and deportation based on their speech and associations. Mr. Khalil's immigration court charges bear that out. Ex.  O. And were there any doubt about why DHS specifically seeks to detain Ms. Chung, a DHS agent stated directly to an attorney working with Ms. Chung that it was "due to the situation with the protesting." Ex. M ¶ 8.

With respect to the third prong, depriving Ms. Chung of her liberty plainly would inflict grievous harm. Moreover, DHS has spirited away every other pro-Palestinian noncitizen activist it has detained based on their speech to detention sites in Louisiana or Texas, far from their counsel

and the evidence and events giving rise to their expression-based detention.[8] An injunction preventing Ms. Chung's detention thus guards against DHS actions to deprive this Court of jurisdiction to review her case.[9] Finally, granting a temporary restraining order and injunctive relief would enable Ms. Chung to defend against her deportation (*i.e.*, absent vacatur of the policy at issue) without having to weigh whether to submit to removal to a country where she has not lived since she was a young child or endure the dangerous conditions associated with ICE detention.

2.    *Ms. Chung's detention would constitute unconstitutional viewpoint discrimination.*

"It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995)). "Such discrimination based on viewpoint is an egregious form of content discrimination, which is presumptively unconstitutional." *Id.* (cleaned up).

While there has been intense political debate and protest on all sides regarding Israel's ongoing military campaign in Gaza and its devastating human toll on Palestinians, the government

---

[8] Laura Romero, *Judge blocks deportation of Georgetown fellow detained by immigration authorities*, ABC News (Mar. 20, 2025), https://perma.cc/7KQE-AM33 (detention of Georgetown fellow Dr. Badar Khan Suri in Louisiana); Michael Wilson, Michael Rothfeld, Ana Ley, *How a Columbia Student Activist Landed in Federal Detention*, N.Y. Times (Mar. 17, 2025), https://www.nytimes.com/2025/03/16/nyregion/mahmoud-khalil-columbia-university.html (detention of Columbia student Mahmoud Khalil in Louisiana); Katherine Faulders et al., *DHS Agents Search 2 Student Rooms at Columbia University,* ABC News (Mar. 14, 2025), https://perma.cc/P2V8-APJZ (detention of student Leqaa Kordia in Louisiana).

[9] Article III of the Constitution vests courts with inherent powers, supplemented by the All Writs Act, 28 U.S.C. § 1651, to take steps to protect their jurisdiction. *See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction . . . ."); *see also LaRouche v. Kezer*, 20 F.3d 68, 74 (2d Cir. 1994) ("To preserve the status quo a court may require the parties to act or to refrain from acting.").

is explicitly targeting for reprisal only speakers supporting Palestinian rights. That is textbook viewpoint discrimination. It "targets not subject matter, but particular views taken by speakers on a subject," *Rosenberger*, 515 U.S. at 829, and it does so "because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018) (quoting *Rosenberger*, 515 U.S. at 829). Such discrimination "is presumed to be unconstitutional.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 828). The government is not empowered to pick and choose which sides of an issue will be aired publicly and which will be suppressed. *See, e.g.*, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion.") (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

Moreover, the communicative impact of Ms. Chung's protected expression—*i.e.*, the fact that some might find her advocacy in support of Palestinian rights uncomfortable, offensive, or upsetting—does not diminish its protection under the First Amendment. *See Matal*, 582 U.S. at 244; *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). Indeed, "a function of free speech under our system of government is to invite dispute," and it may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The First Amendment therefore protects "even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 461. This protection extends to "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times*, 376 U.S. at 270.

The First Amendment's protection for controversial speech applies just as robustly to speech that offends foreign audiences, including foreign government officials, as speech that offends domestic ones. *See Boos v. Barry*, 485 U.S. 312, 322 (1988) ("[W]e have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment.' . . . We are not persuaded that the differences between foreign officials and American citizens require us to deviate from these principles here." (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988))). The First Amendment's protections for free expression are well known the world over, and foreign audiences are not likely to mistake the government's constitutionally compelled tolerance of dissent for endorsement of the views expressed by dissidents. *Cf. Widmar v. Vincent*, 454 U.S. 263, 271 n.10 (1981) ("[B]y creating a forum the University does not thereby endorse or promote any of the particular ideas aired there. Undoubtedly many views are advocated in the forum with which the University desires no association.").

These bedrock principles apply with full force to noncitizens. The First Amendment freedoms of speech and press do not "acknowledge[] any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority." *Bridges*, 326 U.S. at 161 (Murphy, J., concurring). Granting injunctive relief against detention would prevent the most coercive, chilling, and immediately harmful effect of the government's viewpoint-discriminatory targeting of Ms. Chung.

B.     Ms. Chung's Imminent Detention Would Violate Due Process

      *1.    Ms. Chung's detention would serve no constitutionally permissible purpose.*

The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."). There are only two legitimate purposes for immigration detention: mitigating flight risk and preventing danger to the community. *See id.* Ms. Chung presents neither concern. She is a twenty-one-year-old lawful permanent resident of the United States, who has lived in this country since moving here with her parents and sibling when she was only seven years old, and who is now pursuing an Ivy League degree and interning at local organizations (both in New York City). Her only arrest was in connection with her aforementioned desk appearance ticket on a minor charge that carries no immigration consequences, arising from a campus demonstration. Should the government proceed with removal proceedings against her, she has every reason not to abscond and poses no threat to the community.

      *2.    Ms. Chung's detention would violate the constitutional prohibition on enforcing vague rules.*

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A policy can be vague if the government fails to "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or if it would "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). When speech is involved, particularly "rigorous adherence to [due process] requirements is

necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–55 (2012). And the requirement for rigorous scrutiny is only heightened when enforcement would entail severe consequences, such as detention. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (noting that the "severity of criminal sanctions may well cause speakers to remain silent").

Even to this day—let alone at the time of her past expression—the government has failed to give Ms. Chung sufficient notice of what expressive activity could lead to her sudden detention. Secretary Rubio has stated that he plans to use the foreign policy ground against any "Hamas supporters in America so they can be deported." Compl. ¶ 107 n.48. But he has not defined who might qualify as a so-called "Hamas supporter" and, based on the facts of this case, it appears that any advocate for Palestinians' dignity and their right to live, and any vocal critic of Israeli or U.S. policy towards Palestinians, would fit the description in Secretary Rubio's view. Moreover, various additional statements by other Trump Administration officials have provided no greater clarity about what constitutes proscribed "pro-Hamas" speech or beliefs. Indeed, when asked by NPR to provide any specifics on what would constitute deportable expressive activity, the Deputy Secretary of DHS could give not give an intelligible answer beyond objecting to noncitizens who seek to engage in "protest." Ex. C.

None of this is sufficient to give Ms. Chung notice or to constrain Secretary Rubio's unfettered "use of shifting or illegitimate criteria." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988). The word "support" is highly subjective: Does mere presence at a protest in support of Palestinian rights qualify as impermissible "support"? What about engaging in scholarship about the history of Palestine? And what of working for solutions to end the conflict in Gaza? Courts have recognized that terms akin to "support" are susceptible to a "wide range of

meanings depending on context." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (prohibition on "encourage[ing]" or "promot[ing]" a riot was overbroad); *see also United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (same, explaining that "encourage" and "promote" could mean "to recommend, advise"), *cert denied*, 142 S. Ct. 865 (2022); *Rosenberger* 515 U.S. at 836 (emphasizing "vast potential reach" of term "promote[]"). Such broad language sweeps across a range of constitutionally protected speech and activities, making it impossible for individuals to know if and when penalties will be enforced. *See United States v. Loy*, 237 F.3d 251, 264-65 (3d Cir. 2001) (explaining that where individuals can "hardly be expected to discern, in advance, which [speech is] prohibited," a policy risks "chill[ing] protected conduct" and is therefore unconstitutionally vague"). Thus, any DHS detention of Ms. Chung would violate the constitutional prohibition on enforcing vague rules.

C.    <u>Ms. Chung's Imminent Detention Would Violate the INA</u>

The Administrative Procedure Act provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2). The government's targeting of Ms. Chung for detention violates the Constitution, as set forth above. It also is not in accordance with statutory law. Both by its plain terms and constitutionally construed, the INA does not and could not confer authority on the government to banish—in the name of avoiding harm to foreign policy—a college junior for participating in discussions and demonstrations on her college campus. And, as relevant to the instant motion, because DHS has no authority to remove Ms. Chung, it has no lawful basis to detain her.

By its very design, the statutory scheme where the foreign policy ground of deportation is found evinces congressional concern for its potential abuse to suppress disfavored speech. To

guard against that possibility, Congress instructed that deportation based on asserted foreign policy consequences caused by an individual's presence or activities in the United States "*shall not* be . . . because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii) (emphasis added). The only exception to that prohibition is where the Secretary of State "personally determines" that allowing the person to remain "would compromise a compelling United States foreign policy interest." *Id.* That exception was meant to "be used sparingly"—for example, when an individual's continued presence would result in "imminent harm to the lives or property of United States persons abroad," but not "merely because there is a likelihood that an alien will make critical remarks about the United States or its policies." H.R. Conf. Rep. No. 101-955. The exception is meant to require a "significantly higher" standard than the "reasonable ground to believe" standard for sustaining the foreign policy ground of deportation based on non-expressive activities. *Id.*

Ms. Chung's participation in campus demonstrations, taken together with the rest of her expressive activity, would not meet even the lower standard required for sustaining a foreign policy ground of deportation, let alone the "significantly higher" standard necessary to base her deportation on her beliefs, statements, or associations. The government may demand deference to Secretary Rubio's contrary determination, however implausible it may be. But no provision of law requires such blind deference, and the implications of that construction of the INA would be staggering and would raise the gravest of constitutional problems. It would enable the government to wield deportation as a sword of Damocles over all noncitizens, rendering hollow the assurance that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges*, 326 U.S. at 148. The *in terrorem* effect of such unbounded power would doom vast swaths of

noncitizen political speech in the United States. The Supreme Court has instructed, time and again, that any interpretation raising such constitutional problems should be avoided where another interpretation is possible. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 381-82 (2001).

Secretary Rubio's determination that Ms. Chung's continued presence would compromise a compelling foreign policy interest is arbitrary and capricious and fails to meet the requirements of the statute. Moreover, the Secretary of State lacks any "reasonable ground to believe" that there could be any even "*potentially* serious adverse foreign policy consequences," 8 U.S.C. § 1227(a)(4)(C)(i) (emphasis added), stemming from Ms. Chung's expressive activity as a college junior protesting on her campus. Because the government lacks any valid basis to remove Ms. Chung, her detention would serve no lawful purpose.

Thus, and as detailed above, Plaintiff-Petitioner is likely to succeed on the merits of the claims she has pled, ECF No. 1. However, even if the Court were to assess Ms. Chung's likelihood of success differently, there can be no doubt that she presents at least "a serious question going to the merits to make them a fair ground for trial," alongside "a balance of hardships tipping decidedly in [her] favor." *Red Earth LLC*, 657 F.3d at 143. Indeed, the constitutional concerns delineated above are of the weightiest order, are beyond colorable, and are appropriate for adjudication. As for hardships, Ms. Chung stands to lose her very freedom, as further detailed below, as well as her ability to pursue her studies and work opportunities, which would stunt her personal and family life, along with her education and professional development. The government, on the other hand, would suffer little to no harm from not detaining Ms. Chung, as it would still be able to vindicate its interests by pursuing both litigation on the merits of this matter in addition to any removal proceedings it chooses to initiate.

## II.    MS. CHUNG WOULD SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

In addition to the harm to her First Amendment and other rights, in the absence of injunctive relief, Ms. Chung faces irreparable injury to her liberty in the form of unconstitutional detention. "'Several courts in this circuit have,' quite properly I would add, 'concluded that the deprivation of an alien's liberty is, in and of itself, irreparable harm.'" *Velesaca v. Decker*, 458 F. Supp. 3d 224, 240–41 (S.D.N.Y. 2020) (quoting *Sajous v. Decker*, 18-CV-2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2013)); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) ("Any amount of actual jail time is significant[] and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." (cleaned up)). A constitutional violation, moreover, constitutes irreparable harm. *See Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) (noting that "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm") (emphasis in original); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (cleaned up); *see also Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) ("Alleged violations of constitutional rights are commonly considered irreparable injuries for the purposes of a preliminary injunction.").

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF INJUNCTIVE RELIEF

"Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020). Here, the balance of hardships overwhelmingly favors Ms. Chung. She, as well as the public at large, faces irreparable injury if an injunction is not granted. The public interest is "best served by ensuring the constitutional rights of persons

19

within the United States are upheld." *Id.* (quoting *Sajous*, 2018 WL 2357266, at *13). Conversely, the government cannot assert any legitimate interest in carrying out retaliatory, viewpoint-discriminatory detention. *Cf. L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) ("[T]his Court is hard-pressed to see how setting aside [a policy preventing release from immigration detention] could be against the public interest[, as the government] cannot suffer any harm from an injunction that terminates an unlawful practice.").

Beyond the public's interest in ensuring detention is justified, which weighs overwhelmingly in favor of granting the requested injunction, courts routinely emphasize that "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Where suppression of speech is at issue, government action "harms not only the speaker, but also the public to whom the speech would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012); *cf. Ragbir*, 923 F.3d at 71 ("[T]o allow this retaliatory conduct to proceed would broadly chill protected speech, among not only [noncitizen] activists . . . but also . . . citizens and other residents."). The public interest thus weighs heavily in favor of relief enjoining the government's retaliatory and viewpoint-discriminatory detention of Ms. Chung.

## CONCLUSION

For the foregoing reasons, Ms. Chung respectfully requests that the Court grant her motion and, pending resolution of her request for a preliminary injunction, issue a temporary restraining order barring the government from detaining her based on her protected speech and in the absence of independent, legitimate grounds.[10]

---

[10] As reflected in the Proposed Order filed herewith, Ms. Chung also requests that the Court require Defendants-Respondents to provide sufficient advance notice to the Court and counsel, should they seek to detain Ms. Chung on any other asserted basis pending the Court's decision on a preliminary injunction, to enable Ms. Chung an opportunity

Dated:  March 24, 2025
       New York, NY

Respectfully submitted,

**CLEAR PROJECT**
**MAIN STREET LEGAL SERVICES, INC.**
_____/s/_____
Naz Ahmad
Ramzi Kassem
Tarek Z. Ismail*
Mudassar Hayat Toppa
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101
(718) 340-4558

*Admitted to practice in the Eastern
District of New York; application to waive
into the Southern District of New York
pending.*

**EMERY CELLI BRINCKERHOFF ABADY**
**WARD & MAAZEL LLP**
_____/s/_____
Jonathan S. Abady
Katherine Rosenfeld
Sonya Levitova
One Rockefeller Plaza, 8th Floor
New York, NY 10020
(212) 763-5000

**HUMAN RIGHTS FIRST**
_____/s/_____
Joshua Colangelo-Bryan
121 West 36th Street, PMB 520
New York, NY 10018
(212) 845-5243

**LAWYERS' COMMITTEE FOR CIVIL**
**RIGHTS OF THE SAN FRANCISCO BAY**
**AREA**
_____/s/_____
Jordan Wells
131 Steuart Street # 400

---

to be heard regarding whether any such asserted basis for detention constitutes a pretext for First Amendment retaliation or raises other, related constitutional problems.

21

San Francisco, CA 94105
(415) 543-9444

**LAW OFFICE OF MATTHEW BRAY**
_____/s/_____
Nathan Yaffe
119 West 23rd Street, Suite 900
New York, NY 10011
(646) 253-0580

**JONATHAN HAFETZ, ESQ.**
_____/s/_____
Jonathan Hafetz
1109 Raymond Blvd.
Newark, NJ 07102
(917) 355-6896

*Attorneys for Plaintiff-Petitioner*