**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

Yunseo CHUNG,

        *Plaintiff-Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States of America; Marco
RUBIO, in his official capacity as Secretary of
State, U.S. Department of State; Pamela BONDI, in
her official capacity as Attorney General, U.S.
Department of Justice; Kristi NOEM, in her official
capacity as Secretary of Homeland Security, U.S.
Department of Homeland Security; Todd M.
LYONS, in his official capacity as Acting Director,
U.S. Immigration and Customs Enforcement; and
William P. JOYCE, in his official capacity as
Acting Field Office Director of the New York
Immigration and Customs Enforcement Office,

        *Defendants-Respondents*.

Case No. 25-cv-_____

**COMPLAINT AND
PETITION FOR
WRIT OF HABEAS CORPUS**

---

## INTRODUCTION

1.     This action challenges the government's shocking overreach in seeking to deport a college student, Plaintiff-Petitioner Yunseo Chung, who is a lawful permanent resident of this country, because of her protected speech. The government's actions are an unprecedented and unjustifiable assault on First Amendment and other rights, one that cannot stand basic legal scrutiny. Simply put, immigration enforcement—here, immigration detention and threatened deportation—may not be used as a tool to punish noncitizen speakers who express political views disfavored by the current administration.

2.     Yunseo Chung is a twenty-one-year-old permanent resident of the United States—the only home she has known since coming here at the age of seven with her family from South

1

Korea—and a promising junior at Columbia University. She was the valedictorian of her high school class and has since thrived at college, academically and otherwise, participating in a campus literary magazine, an undergraduate law journal, and other student activities.

3.      Since 2023, along with hundreds of her peers, Ms. Chung has also participated in some student protests and demonstrations on Columbia University's campus related to Israel's military campaign in Gaza and the devastating toll it has taken on Palestinian civilians. Ms. Chung has not made public statements to the press or otherwise assumed a high-profile role in these protests. She was, rather, one of a large group of college students raising, expressing, and discussing shared concerns.

4.      On March 5, 2025, a student sit-in and protest was held at Columbia which garnered significant public attention.[1] Media reports identified Ms. Chung, along with other students, as among the protesters arrested outside of an academic building on campus. Ms. Chung was outside the building on that day to protest what she believed to be the excessive punishments meted out by the Columbia administration to student protesters facing campus disciplinary proceedings. She herself had previously faced a university disciplinary process (which resulted in a finding that Ms. Chung was not in violation of any university policy) and wanted to support her fellow students by attending the protest. Ms. Chung was arrested and given a Desk Appearance Ticket by the New York City Police Department for "obstruction of governmental administration," a common citation issued by the police at protests. That ticket will be adjudicated by the New York City court system in the normal course.

---

[1] Spencer Davis & Tulasi Cherukuri, *Columbia suspends four students who were arrested following Milstein sit-in*, Colum. Spectator (Mar. 7, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/07/columbia-suspends-four-students-who-were-arrested-following-milstein-sit-in/.

5.     Mere days later, however, the federal government began a series of unlawful efforts to arrest, detain, and remove Ms. Chung from the country because of her protected speech. It now appears that an ICE official signed an administrative arrest warrant for Ms. Chung on March 8, 2025. On March 9, 2025, Immigration and Customs Enforcement (ICE) showed up at Ms. Chung's parents' residence seeking her. On March 10, 2025, a federal law enforcement official advised Ms. Chung's counsel that her lawful permanent resident status is being "revoked." On Thursday, March 13, 2025, federal law enforcement agents executed a judicial search warrant at two Columbia-owned residences, including Ms. Chung's dormitory, seeking documents, including any occupancy or lease agreements, travel records, and immigration records—even though the warrant ostensibly targeted Columbia itself, not Ms. Chung.

6.     ICE's shocking actions against Ms. Chung form part of a larger pattern of attempted U.S. government repression of constitutionally protected protest activity and other forms of speech. The government's repression has focused specifically on university students who speak out in solidarity with Palestinians and who are critical of the Israeli government's ongoing military campaign in Gaza or the pro-Israeli policies of the U.S. government and other U.S. institutions.[2]

7.     Now, officials at the highest echelons of government are attempting to use immigration enforcement as a bludgeon to suppress speech that they dislike, including Ms. Chung's speech. To this end, Defendants-Respondents have adopted a policy ("the Policy") to retaliate against and punish noncitizens like Ms. Chung for their participation in protests. Under

---

[2] *See, e.g.*, Bianca Quilantan, Madine Touré, *'They need to see the institutions experiencing pain': The Trump administration wants Columbia University to change its admissions and disciplinary rules before research money gets turned back on.*, Politico (Mar. 15, 2025), *available at* https://www.politico.com/news/2025/03/15/colleges-federal-funding-shock-trump-antisemitism-00231160; Kate Bellows, *Can Trump Force Columbia U. to Expel Student Protesters?*, Chronicle of Higher Education (Mar. 14, 2025), *available at* https://www.chronicle.com/article/can-trump-force-columbia-u-to-expel-student-protesters; Kanishka Singh, Jonathan Allen, *Trump Threatens Funding Cut to Colleges Allowing 'Illegal Protests'*, Reuters (Mar. 4, 2025), *available at* https://www.reuters.com/world/us/trump-says-federal-funding-will-stop-colleges-schools-allowing-illegal-protests-2025-03-04/.

the Policy, if Defendant-Respondent Marco Rubio, the Secretary of State, claims reasonable ground to believe that a noncitizen protester's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States, or personally determines that their protected views, speech, or associations would compromise a compelling U.S. foreign policy interest, then such determinations—according to the government—permit the U.S. Department of Homeland Security (DHS) to seek to detain and deport the noncitizen protester.

8.      Pursuant to the Policy, and consistent with remarks made by Secretary Rubio and by law enforcement agents who recently arrested another student at Columbia University,[3] Secretary Rubio purportedly made such a determination as to Ms. Chung ("the Rubio Determination"). This determination was based on Ms. Chung's actual and perceived lawful activity protected by the First Amendment: participation in protests and statements regarding Palestine, Israel, and discipline of student protestors on campus. Pursuant to the Rubio Determination, ICE, a component of DHS, seeks to arrest Ms. Chung, detain her, and place her in removal proceedings, presumably to South Korea. Ms. Chung is now at active risk of being put in immigration detention and deported from the only country she has ever known.

9.      Defendants-Respondents' actions violate Plaintiff-Petitioner's rights under the First Amendment and Fifth Amendment of the U.S. Constitution, the Administrative Procedure Act, the Immigration and Nationality Act, and its own policies. This Court should vacate and set aside Defendants-Respondents' Policy and the Rubio Determination, declare Defendants-

---

[3] Armando Garcia, Mariama Jalloh, Aaron Katersky, and Meredith Deliso, *Judge blocks removal of Palestinian activist who was detained at Columbia University*, ABC News (Mar. 10, 2025), *available at* https://abcnews.go.com/US/ice-arrests-palestinian-activist-green-card-columbia-university/story?utm_source=facebook&utm_medium=social&utm_campaign=dhfacebook&utm_content=null&id=119616144 (quoting tweet by Secretary Rubio stating: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported.").

Respondents' actions unlawful, and enjoin Defendants-Respondents from detaining, transferring, or deporting Ms. Chung unless Defendants-Respondents establish that their actions are untainted by impermissible First Amendment retaliation and discrimination, and are otherwise lawful.

## PARTIES

10.    Plaintiff-Petitioner Yunseo CHUNG is a longtime resident of the United States. Since 2022, she has been a student at Columbia University, residing in New York, New York. Ms. Chung became a lawful permanent resident of the United States in 2021. Upon information and belief, Ms. Chung has always resided pursuant to lawful immigration status in the United States since her arrival, with her family, as a seven-year-old child from South Korea.

11.    Defendant-Respondent Donald J. TRUMP is named in his official capacity as the President of the United States of America. In this capacity, he is responsible for the policies and actions of the executive branch, including the U.S. Department of State and U.S. Department of Homeland Security. Defendant-Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

12.    Defendant-Respondent Marco RUBIO is named in his official capacity as the Secretary of State of the United States. In this capacity, he is responsible for determinations made pursuant to certain provisions of the immigration laws. Among other things, he has the authority to determine, as he purportedly did here, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have potentially serious adverse foreign policy consequences for the United States," or to "personally" determine that a noncitizen's protected expressive activity "would compromise a compelling United States foreign policy interest." Following such a determination, the government may initiate removal proceedings under 8 U.S.C. §§ 1227(a)(4)(C)(i), 1182(a)(3)(C)(iii) (the "Foreign Policy Ground"). In addition to his legal

responsibilities, he routinely transacts business in the Southern District of New York. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

13.    Defendant-Respondent Pamela BONDI is named in her official capacity as the Attorney General of the United States. In this capacity, she routinely transacts business in this District and is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g). Defendant-Respondent BONDI's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

14.    Defendant-Respondent Kristi NOEM is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a), and routinely transacts business in this District. Defendant-Respondent NOEM's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

15.    Defendant-Respondent Todd M. LYONS is named in his official capacity as the Acting Director of Immigration and Customs Enforcement. As the Acting Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and routinely transacts business in this District. He supervises Defendant-Respondent William P. JOYCE. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

16.    Defendant-Respondent William P. JOYCE is named in his official capacity as the Acting Field Office Director of the New York Field Office for ICE within the United States Department of Homeland Security. In this capacity, he is responsible for the enforcement of the immigration laws in New York City and surrounding counties within New York, including against

Ms. Chung. Defendant-Respondent JOYCE's address is New York ICE Field Office Director, 26 Federal Plaza, New York, New York 10278.

## JURISDICTION

17.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 2241; and U.S. Constitution, Article I, § 9, cl. 2 (the Suspension Clause).

18.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has authority under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, and additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

19.     Ms. Chung does not challenge an underlying order of removal or actions committed to unreviewable agency discretion. Ms. Chung is challenging Defendants-Respondents' pattern and practice of targeting individuals associated with protests for Palestinian rights for immigration enforcement in retaliation for their core protected political speech. This includes Defendants-Respondents' actions targeting Ms. Chung. No other forum exists to address these claims. Applying any statutory provision to curb jurisdiction in this case therefore would deprive Ms. Chung of any effective judicial review of her claims and a "serious constitutional question . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe,* 486 U.S. 592, 603 (1988).

## VENUE

20.     Venue is proper in this Court under 28 U.S.C. §§ 2241(a), 1391(b)(2), and 1391(e)(1) because a substantial part of the events giving rise to Plaintiff-Petitioner's claims occurred in this district; Plaintiff-Petitioner resides in this District; Respondent Joyce resides in

this District; and the New York ICE Field Office, located in this District, is the office seeking Plaintiff-Petitioner's detention.

## BACKGROUND

### Ms. Chung's History in the United States and at Columbia

21.    Ms. Chung is twenty-one years old and a junior at Columbia University.

22.    Ms. Chung moved to the United States from South Korea with her parents and sibling at the age of seven. At the time, her father was pursuing graduate education in the United States.

23.    In 2021, Ms. Chung adjusted her status to that of a lawful permanent resident.

24.    The United States is Ms. Chung's one and only home. Her immediate family lives here, her friends are here, and her plans for the future all include living in the United States.

25.    In fall 2022, Ms. Chung began her studies at Columbia University. Ms. Chung was ecstatic when she arrived on Columbia's campus. Her freshman fall semester went beyond her wildest expectations for her college experience.

26.    Since arriving at Columbia, Ms. Chung has joined various student activities and organizations, including social organizations and student-run publications, such as the Columbia Undergraduate Law Review and Quarto, a literary magazine.

27.    Ms. Chung has also pursued internships in the legal field, at The Urban Justice Center, The Innocence Project, and the Federal Defenders of New York.

28.    Ms. Chung has excelled academically as well, maintaining a 3.99 GPA and making it onto the Dean's List every semester since she enrolled at Columbia.

**Ms. Chung's Exercise of Free Speech Rights in Support of Palestinians**

29.    In addition to these other activities, over the past year and a half, Ms. Chung has felt moved to join efforts to advocate for Palestinian human rights.

30.    Ms. Chung has also felt compelled to criticize Columbia for its handling of student protests supporting Palestinian human rights, including the punitive measures imposed on certain students.

31.    In April 2024, like hundreds of her peers at Columbia, Ms. Chung visited the Gaza Solidarity Encampment on numerous occasions for discussions, events, community, and protest.[4] She did not make public statements to the press, liaise between student protesters and Columbia, or otherwise assume a high-profile role in any of the aforementioned activities. She was, rather, one of a large group of college students raising, expressing, and discussing shared concerns. Ms. Chung was not arrested or disciplined in relation to any events that took place during the Gaza Solidarity Encampment at Columbia.

32.    In May 2024, Columbia commenced disciplinary proceedings against Ms. Chung in relation to an incident involving posting flyers on campus. The university accused Ms. Chung and other students of vandalism for attaching posters to Columbia buildings. The posters included photos of members of the Board of Trustees with the words: "Wanted for Complicity in Genocide."

33.    Ms. Chung appeared at a disciplinary hearing to ask for an adjournment so she could obtain legal counsel. Columbia agreed to postpone the hearing that day but then did not reschedule. Columbia reviewed these allegations, and did not find Ms. Chung had violated any

---

[4] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Colum. Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

applicable policies. By all appearances, her tenure at Columbia continued normally, and she had enjoyed her junior year of college up until the recent events detailed here.

34.     Because of her experience with the disciplinary process, Ms. Chung had an interest in monitoring and speaking out about the university's response to pro-Palestine protests on campus, particularly insofar as the response was at times arbitrary and lacking in transparency.

35.     In early 2025, Barnard College, which is affiliated with Columbia University, instituted disciplinary measures against multiple students for their involvement in events associated with advocacy for Palestinian rights.

36.     First, on or before February 23, 2025, Barnard College expelled two students for their alleged participation in the disruption of a class on January 21, 2025.[5]

37.     Then, on or before March 3, 2025, Barnard College expelled a third student, allegedly over the student's involvement in the student occupation of Hamilton Hall in April 2024.[6]

**Ms. Chung Protests Columbia's Disciplinary Measures**

38.     By virtue of her experience with the disciplinary process and her discussions with other students, Ms. Chung was concerned about how Columbia was expelling and otherwise disciplining students, particularly for speech-related activities regarding Palestinian human rights, the very topic which had moved Ms. Chung to engage in speech-related activities, along with hundreds of other Columbia students.

39.     To Ms. Chung, the university's actions towards her fellow students were unnecessarily punitive. Given this and Ms. Chung's prior experience facing disciplinary

---

[5] Isha Banerjee & Apurva Chakravarty, *Barnard student expelled for occupation of Hamilton Hall, CUAD says*, Colum. Spectator (Mar. 3, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/03/barnard-student-expelled-for-occupation-of-hamilton-hall-cuad-says/.

[6] *Id.*

proceedings, she felt it was important to speak up publicly about the issue of discipline. Ms. Chung knew one of the students who had been expelled and felt personally invested in attending the protest.

40.    Students and other protesters staged a sit-in inside and a demonstration outside an academic building (Milstein) at Barnard College on March 5, 2025, to demand that Barnard reverse the expulsions of the three students.[7] Ms. Chung did not organize the protest, speak to the media about it, or otherwise play a leading role. Rather, she was one participant among many protesting the university's handling of student discipline over Palestine-related speech.

41.    At some point during the protest, in response to an apparent white supremacist bomb threat called in specifically to Milstein, New York City Police Department (NYPD) officers entered the Barnard campus.[8] The NYPD instructed protesters to exit the building and the courtyard. Ms. Chung happened to be at the front of the group of protesters outside of the Milstein building. Because she was at the front of the group while the NYPD was directing protesters to exit, she was pushed from both sides and was unable to follow police directives to move. The bomb threat was later determined to be fake.[9]

---

[7] Sarah Huddleston, *Pro-Palestinian protesters stage sit in in Milstein lobby*, Colum. Spectator (Mar. 5, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/05/pro-palestinian-protesters-stage-sit-in-in-milstein-lobby/.

[8] Jack Morphet, Amanda Woods, & Chris Nesi, *Anti-Israel protesters arrested at Barnard were mostly privileged youths, including woman whose family started Hamptons Jitney*, N.Y. Post (Mar. 6, 2025), *available at* https://nypost.com/2025/03/06/us-news/arrested-anti-israel-protesters-at-barnard-include-repeat-offender-woman-whose-family-started-hampton-jitney-bus-service/ (reporting that unknown individual emailed Barnard through anonymous dark web messaging service claiming to have placed pipe bomb inside college library targeting what sender referred to as "anti-white f—-t terrorist communist (sic)").

[9] Philip Marcelo, *Police responding to bomb threat clear pro-Palestinian protesters occupying Barnard College library*, Associated Press (Mar. 5, 2025), *available at* https://apnews.com/article/palestinian-protest-barnard-college-e16286f14d1265470c862b9f8b41c471.

42.     Ms. Chung and others like her who were caught between the crowd behind them and the police in front of them were arrested and charged with obstruction of governmental administration.

43.     During protests in New York City, it is common for police to arrest many protesters against whom charges are eventually dropped or dismissed.

44.     The NYPD frequently uses the charge of obstructing governmental administration, a misdemeanor, during large protests.[10]

45.     Ms. Chung had never been arrested before this event and has not been arrested since then. She did not participate in any unlawful activity on the day of her arrest or on any other day. The NYPD issued her a desk appearance ticket and released her that day.

46.     On Friday, March 7, 2025, Columbia University placed Ms. Chung on interim suspension due to the arrest and restricted her campus access.

47.     Ms. Chung's speech regarding the obligations that Columbia has under international law, the human rights of the Palestinian people, and university restrictions on speech is all protected by the First Amendment, including because it relates to matters of public concern. It is political speech at the core of the protection of the First Amendment.

**The Government's Adverse Actions Against Ms. Chung**

48.     On Sunday, March 9, 2025, in the early evening, law enforcement officers describing themselves as Department of Homeland Security agents visited Ms. Chung's parents'

---

[10] *See* Department of Investigation, Investigation into NYPD's Response to George Floyd Protests (Dec. 2020), 9, 10, *available* *at* https://www.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

home outside of this District. These agents told Ms. Chung's parents that they were looking for her.

49.    Nearly simultaneously, at approximately 7:02 p.m., Ms. Chung received a text message from a number previously unknown to her, saying: "Hi, Yunseo. This is Audrey from the police. My job is to reach out to you and see if you have any questions about your recent arrest and the process going forward. When are [sic] available for a phone call?"

50.    Shortly thereafter, before 8:00 p.m., an attorney, Nayantara Bhushan, called the number from which the text had been sent and spoke with an individual who identified herself as "Audrey," an agent with Homeland Security Investigations (HSI), a sub-component of ICE. She advised Attorney Bhushan that, "due to the situation with the protesting, the State Department was at liberty to revoke [Ms. Chung's] LPR status." The agent stated that there was an administrative warrant for Ms. Chung's arrest.

51.    At approximately 9:15 p.m. the same evening, Columbia Public Safety sent Ms. Chung an anonymous, unsigned email:

> "Dear [Ms. Chung], The U.S. Attorney's Office for the Southern District of New York has asked us to inform you that Homeland Security Investigations agents are seeking to make contact with you in connection with an administrative warrant for your arrest. Consistent with the University's practice, we wanted to share this information and their request with you. If you are represented by counsel, it may make sense for your lawyer to speak directly with DHS."

52.    After 9:30 p.m., Attorney Bhushan received a call and a text message from Perry Carbone, who identified himself as an Assistant United States Attorney (AUSA) in the U.S. Attorney's Office for the Southern District of New York.

53.    A different attorney for Ms. Chung, Naz Ahmad, then called AUSA Carbone at approximately 10:00 p.m. that evening, and left a voicemail, referencing Ms. Chung.

54.    The next day, Monday, March 10, 2025, between 11:00 a.m. and 12:00 p.m., Attorney Ahmad spoke with AUSA Carbone concerning Ms. Chung.

55.    AUSA Carbone explained that his office had been asked to assist HSI in "these matters." When asked, AUSA Carbone explained that his outreach was primarily in service of HSI's efforts rather than because of any contemplated prosecution against Ms. Chung. AUSA Carbone did not mention the existence of any judicial arrest warrant.

56.    AUSA Carbone stated that the Secretary of State had revoked Ms. Chung's visa. Attorney Ahmad explained that Ms. Chung is a U.S. permanent resident, and that she is not present in the United States on a visa.

57.    AUSA Carbone then stated that "the Secretary of State has revoked that," too.[11] Counsel for Ms. Chung offered that the Secretary of State does not have the unilateral authority to revoke permanent resident status. When Attorney Ahmad inquired further, AUSA Carbone could not explain the justification for the government's purported action.

58.    Later that same day, AUSA Carbone texted Attorney Ahmad a copy of an administrative arrest warrant naming Ms. Chung. The administrative arrest warrant did not specify under which provision of the immigration law Ms. Chung would be subject to deportation.

59.    The administrative warrant indicated that it was issued based upon a records check of databases and possibly other information.

60.    On Thursday, March 13, 2025, between 9:00 p.m. and 10:00 p.m., law enforcement agents executed search warrants at two residences on Columbia University's campus, including Ms. Chung's dormitory.

---

[11] This set of facts resembles what HSI agents told Mahmoud Khalil, a lawful permanent resident and student at Columbia University's School of International and Public Affairs. HSI agents arrested him on March 8, 2025. *See* Am. Pet. ¶¶ 47-52, ECF No. 38, *M.K. v. Joyce*, No. 25-1935 (S.D.N.Y. Mar. 13, 2025).

61.     The search warrants sought documents relating to Ms. Chung's affiliation with Columbia University, including any occupancy or lease agreements, travel records, and immigration records.[12]

62.     The search warrant cited 8 U.S.C. § 1324, commonly known as the "harboring" statute. Based on its citation to this statute and the records sought, the warrant ostensibly stemmed from an investigation targeting Columbia University for "harboring" two noncitizen students that ICE was looking to arrest. Public statements by a Department of Justice official confirmed as much.[13]

63.     Upon information and belief, these warrants were sought and obtained on false pretenses. The agents did not recover any documents from either search. The manner of execution suggests that the agents were searching for the two named students, including Ms. Chung, and needed a lawful basis to enter the residences in the hope of arresting the students on encounter.

**The Government's Bid to Silence Advocacy in Support of Palestinian Rights**

64.     The government's retaliation against Ms. Chung comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights. Officials at the highest levels of the federal government have made clear that they intend to use immigration enforcement to punish noncitizens who speak out in support of Palestinians and Palestinian rights, or who are perceived to have engaged in such speech.

---

[12] Another apartment was also searched that evening by law enforcement agents. A copy of the warrant left at this other apartment named Ms. Chung.

[13] Joseph Zuloaga, Daksha Pillai & Elliot Heath, *Department of Homeland Security agents search two University-owned residences, no arrests made*, Colum. Spectator (Mar. 14, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/14/department-of-homeland-security-agents-search-two-university-owned-residences-no-arrests-made/ (reporting Deputy Attorney General Todd Blanche's statement "that the warrants were executed as part of a separate probe into whether the University was 'harboring and concealing illegal aliens' on campus").

65.     Since fall 2023, communities across the United States began to mobilize in support of Palestinian human rights, including students on college campuses. Student demands have reflected criticism of U.S. government support for Israel's policies and military campaign in Gaza, and concern about the civilian death toll among Palestinians, particularly children and women. Many students also criticized their universities' involvement in the same, pushing for divestment from financial products or other investments associated with Israel.

66.     Some opponents of these protest activities, including President Donald J. Trump, frequently mischaracterize peaceful protest and any speech in favor of Palestinian rights as inherently supportive of Hamas or terrorism and anti-Semitic.

67.     When running for president in 2023 and 2024, then-candidate Trump repeatedly told his supporters that he would use immigration enforcement measures against noncitizen students engaged in protests supportive of Palestinians or critical of Israel's actions.

68.     For example, at a rally in Las Vegas on October 28, 2023, then-candidate Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[14]

69.     After the student movement to bring attention to atrocities in Gaza ramped up in spring 2024, then-candidate Trump promised campaign donors that he would deport student demonstrators supportive of Palestinian human rights. In response to the Gaza Solidarity Encampments, Trump spoke at an event in New York, stating: "One thing I do is, any student that

---

[14] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro- Palestinian protesters*, Reuters (Jan. 29, 2025), *available at* https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.

protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[15]

70.     Candidate Trump made clear that he intended to stifle advocacy for Palestinian rights, stating: "If you get me reelected, we're going to set that movement back 25 or 30 years."[16]

71.     At least one cabinet level official currently in the Trump Administration expressed similar views during this time. On October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. government should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[17]

72.     President Trump made clear his intent to deliver on these campaign promises within days of assuming office on January 20, 2025.

73.     On the day he assumed office, President Trump signed Executive Order 14161, titled, "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats."

74.     The Executive Order declares the Trump Administration's intent to target noncitizens who hold "hateful" views and noncitizens who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The Executive Order does not define "hateful." Moreover, the broad term "hostile attitudes" towards the U.S. government could encompass any form of political dissent, including opposing the U.S.

---

[15] Josh Dawsey, Karen DeYoung & Marianne LeVine, *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, (May 27, 2024), *available at* https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[16] *Id.*

[17] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), *available at* https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

government's diplomatic, financial, military, and other forms of support for Israel's actions in Gaza, the West Bank, and beyond.

75.    On January 29, 2025, President Trump signed Executive Order 14188. This Executive Order signaled clearly that the Administration would prioritize investigating "post-October 7, 2023 campus anti-Semitism." The order adopted a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[18] In a separate release accompanying Executive Order 14188, the White House described the measures it would undertake as specifically targeting "leftist, anti-American colleges and universities."[19] The White House stated that this Executive Order was a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you . . . and deport you."

76.    Relying on these executive orders, groups and organizations opposed to Palestinian rights protests began publicizing names of individuals they wanted the U.S. government to deport. The groups compiled lists of students who were publicly identifiable as having organized Palestine-related protests, engaged in Palestine-related advocacy, or otherwise appeared to voice opinions supportive of Palestinians, and upon information and belief, submitted these tips to ICE's tip line.[20]

---

[18] This Executive Order reaffirms the definition of antisemitism adopted by Executive Order 13899, signed by President Trump on December 11, 2019. *See* 84. Fed. Reg. 68779 (Dec. 11, 2019) (including as example of antisemitism "claiming that the existence of a State of Israel is a racist endeavor").

[19] *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, The White House (Jan. 30, 2025), *available at* https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

[20] Natasha Lennard & Akela Lacy, *The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protestors*, The Intercept (Feb. 15, 2025), *available at* https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/.

77.     For example, Betar USA,[21] an extremist group that has openly embraced Islamophobia and indicated a desire to work with the far-right extremist group the Proud Boys, has published lists of individuals, including Columbia students and faculty, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump Administration."[22] Betar USA's Executive Director has met with prominent lawmakers and claims credit for providing information that led to the arrest of another Columbia student who also held lawful permanent resident status.[23]

78.     Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" at Columbia University that it would like to see deported.[24]

79.     Other organizations, such as the Middle East Forum, have indicated they are proactively sharing information with the U.S. government about noncitizens, without publicly identifying the specific individuals.[25]

---

[21] Betar is a self-described "Zionist" movement. *See* https://betarus.org/. The Anti-Defamation League has labeled Betar USA an extremist group.

[22] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[23] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (March 14, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump.

[24] *Id.*

[25] Zolan Kanno-Youngs, Tyler Pager & Hamed Aleaziz, *As Trump Broadens Crackdown, Focus Expands to Legal Immigrants and Tourists*, N.Y. Times (Mar. 21, 2025), *available at* https://www.nytimes.com/2025/03/21/us/politics/trump-immigration-visa-crackdown.html.

80.     Predictably, this resulted in widespread fear of retaliation for pro-Palestine speech among noncitizen students. Reporting has shown that the executive orders "already appear to be chilling political activism."[26]

81.     On or before Wednesday March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens, including Ms. Chung, for their actual or perceived advocacy for Palestinian rights.

82.     Under the Policy, Respondent Rubio, the Secretary of State, and the Department of Homeland Security would seek to identify any noncitizen associated with protests supportive of Palestinian human rights. One way to target individuals would be to identify any noncitizen who had been arrested during protests associated with Palestinian rights advocacy on campuses, regardless of whether they had participated in the protest, their actual activity during any protest, the nature of any of the conduct charged, or the ultimate outcome or disposition of any of these arrests.[27]

83.     Under the Policy, the Secretary of State would also identify noncitizen students or faculty generally associated with pro-Palestine protests on campuses, or who espoused views supportive of Palestinian human rights.

84.     Under the Policy, Respondent Rubio is empowered to determine that a noncitizen's presence or activities in the United States would have potentially serious foreign policy

---

[26] Tovia Smith, *Foreign students say the threat of Trump's executive orders is getting real*, NPR (Mar. 3, 2025), *available at* https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel.

[27] *See, e.g.,* Esther Wang, *A New Yorker and His Dog Were Swept Up in the Violent Arrests at the City College Protest*, Hell Gate (May 9, 2024), *available at* https://hellgatenyc.com/omar-neptune-dog-swept-up-city-college-arrests/ (describing how individual who resides near City College campus was arrested while walking dog near City College on same night NYPD entered City College campus in response to encampment, and reporting that a friend from neighborhood dog walking group was also arrested that evening).

consequences for the United States or to "personally" determine that a noncitizen's protected expressive activity would compromise a compelling U.S. foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protester.

85.    On March 6, 2025, the Department of State confirmed the commencement of this Policy to the press.

86.    Specifically, on March 6, 2025, the Department of State informed Fox News that it had revoked the student visa of a noncitizen who was "cited for criminal behavior in connection with Hamas-supporting disruptions. This individual was a university student. ICE will proceed with removing this person from the country."[28]

87.    The Department of State confirmed it was planning to review internal databases to see whether any visa holders were arrested and had not been subjected to immigration enforcement.[29]

88.    Additionally, on March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups."[30]

89.    Government officials confirmed that they would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged

---

[28] Louis Casiano, Bill Melugin, *State Department revokes first visa of foreign student linked to "Hamas-supporting disruptions,"* Fox News (Mar. 6, 2025), *available at* https://www.foxnews.com/politics/state-department-revokes-first-visa-foreign-student-linked-hamas-supporting-disruptions.

[29] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), *available at* https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[30] *Id.*

terrorist sympathies."[31] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

90.    Government officials also said they would be reviewing civil lawsuits brought against organizations and individuals engaged in or perceived to be engaged in advocacy for Palestinian human rights that purport to "highlight foreign nationals allegedly engaged in antisemitic activity without consequence."[32]

### History of the Foreign Policy Ground

91.    Under the immigration laws, the Secretary of State has been granted wide latitude to refuse entry or deport noncitizens if he has "reasonable grounds to believe" that their presence or activities "would have potentially serious adverse foreign policy consequences for the United States." *See* 8 U.S.C. § 1227(a)(4)(C)(i) (referencing 8 U.S.C. § 1182(a)(4)(C)(i)).

92.    The statute expressly forbids the Secretary of State from issuing a policy or decision to deny entry or initiate deportation based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that admitting the individual or allowing them to remain in the United States would compromise a compelling U.S. foreign policy interest, 8 U.S.C. § 1182(a)(3)(C)(iii), and then notifies certain leaders in Congress of the person's identity and the reasons for the determination, 8 U.S.C. § 1182(a)(3)(C)(iv).

93.    Legislative history confirms that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. A Senate Committee report provides that for years "the United States has embarrassed itself by excluding prominent foreigners

---

[31] *Id.*

[32] *Id.*

from visiting the United States solely because of their political beliefs." The amendments which resulted in the current version of the law were intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States."[33]

94.     In a separate House Conference report, Congress made clear that the authority to use this provision should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that "the 'compelling foreign policy interest' standard [should] be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'"[34]

95.     As an example, the same House Report on the amendment shared the case of the Shah of Iran as an example where his "mere entry into the United States could [have resulted] in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad."[35]

**Existing DHS Guidance Concerning First Amendment Activity**

96.     In 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees specifically concerning First Amendment protected activities.[36] Per that memorandum, the prior Trump Administration directed that "DHS

---

[33] S. Rep. No. 100-75 at 11, 100th Cong., 1st Sess. (1987) (reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

[34] H.R. Conf. Rep. 101-955, at 6793-94, 101st Cong., 2nd Sess. (1990) (reprinted in 1990 U.S.C.C.A.N. 6784).

[35] *Id.* at 6793.

[36] See Memorandum from Kevin McAleenan, Sec'y, U.S. Dep't of Homeland Sec., to all DHS Employees (May 17, 2019), *available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019.pdf.

does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."[37]

97.     In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."[38]

98.     As of the date of filing, DHS has yet to rescind the Mayorkas 2021 Guidance, or issue new guidance that addresses consideration of First Amendment rights as a factor in enforcement actions.

**The Pattern of Government Retaliation Against Other Noncitizens**

99.     Since March 6, 2025, the Trump Administration has engaged in retaliatory immigration enforcement against individuals who, like Ms. Chung, engaged in protected First Amendment activity—more specifically, those engaged or perceived to have engaged in Palestinian rights advocacy or any criticism of Israel or of U.S. support for Israel's military campaign in Gaza.

*Mahmoud Khalil*

100.     On March 8, 2025, HSI agents arrested Mahmoud Khalil in the vestibule of his apartment building near Columbia University, at approximately 8:30 p.m.[39] Mr. Khalil is a U.S.

---

[37] *Id.*

[38] *See* Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), *available at* https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.

[39] McKinnon de Kuyper, *Mahmoud Khalil's Lawyers Release Video of His Arrest*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/video/us/politics/100000010054472/mahmoud-khalils-arrest.html.

lawful permanent resident and master's student at Columbia's School of International and Public Affairs.[40]

101.    During the arrest, HSI agents told Mr. Khalil's attorney that his student visa had been revoked.[41] His attorney informed the agents that he held a permanent resident card, and his wife showed the agents his permanent resident card.[42] The agents arrested Mr. Khalil anyway.

102.    Mahmoud Khalil has been an outspoken advocate for Palestinian human rights.[43]

103.    Mr. Khalil served as an advocate and negotiator on behalf of his fellow students at Columbia. Specifically, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment and the Columbia University administration.[44] Mr. Khalil's role as a student negotiator was widely reported.[45]

104.    After his arrest, multiple government officials made statements confirming that Mr. Khalil had been targeted for arrest for his speech and protest activity.

105.    On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President emphasized that Mr. Khalil's arrest was "the first of many to come," declaring that his Administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-

---

[40] *See* Am. Pet. ¶¶ 9, 20-21, ECF No. 38, *Khalil v. Joyce*, No. 25-cv-1935 (S.D.N.Y. Mar. 13, 2025).

[41] *Id.* ¶¶ 49, 51.

[42] *Id.* ¶¶ 22-28.

[43] *Id.*

[44] *Id.*

[45] Isa Irfan, *International students risk immigration status to engage in in Gaza protests*, Al Jazeera (May 17, 2024), *available at* https://www.aljazeera.com/news/2024/5/17/international-students-risk-immigration-status-to-engage-in-gaza-protests.

American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[46]

106.    The White House reposted President Trump's statement on the social media platform X, accompanied by a mugshot-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS."[47] The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.

107.    Defendant-Respondent Rubio stated: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[48]

108.    The same day, DHS issued a statement through its social media account on X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to [sic] Hamas, a designated terrorist organization," and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[49]

109.    On March 11, 2025, in response to an inquiry from The New York Times regarding Mr. Khalil's arrest, a spokesperson for the Administration reportedly stated that "United States'

---

[46]    Donald    J.    Trump,    Truth    Social    (Mar.    10,    2025,    1:05    p.m.),    *available    at* https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

[47]    The    White    House,    *X*    (Mar.    10,    2025,    1:34    p.m.),    *available    at* https://x.com/WhiteHouse/status/1899151926777749618.

[48] Marco Rubio, *X* (Mar. 9, 2025, 6:10 p.m.), *available at* https://x.com/marcorubio/status/1898858967532441945.

[49]    Dep't    of    Homeland    Sec.,    *X*    (Mar.    9,    2025,    9:29    p.m.),    *available    at* https://x.com/DHSgov/status/1898908955675357314; *see* Surina Venkat, *Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24*, Colum. Spectator (Mar. 10, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/.

foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[50]

110.    At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[51]

111.    In a press conference regarding Mr. Khalil on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities," and "if you end up having a green card . . . we're gonna kick you out."[52]

112.    On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not claim Mr. Khalil had broken any laws and instead asserted that Mr. Khalil was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," or if "protesting [is] a deportable offense," Edgar did not dispute those statements.[53] Edgar stated that had Mr. Khalil

---

[50] Minho Kim, *The U.S. Is Trying to Deport Mahmoud Khalil, a Legal Resident. Here's What to Know.*, N.Y. Times (Mar. 11, 2025, updated 11:09 a.m.), *available at* https://archive.ph/rD4sk#selection-1147.0-1159.428.

[51] *White House Daily Briefing*, C-SPAN (Mar. 11, 2025), *available at* https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022 (timestamp 10:16).

[52] *Secretary of State Marco Rubio Remarks to Press*, U.S. Dep't of State (Mar. 12, 2025), *available at* http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/.

[53] Michel Martin & Destinee Adams, *DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened*, NPR (Mar. 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

reported during his visa application process that he was "going to protest" after entering the United States, "We would never have let him in the country."[54]

113.    Defendants-Respondents, including Secretary Rubio and ICE, are using the Foreign Policy Ground for removability against Mr. Khalil because of his beliefs, speech, or associations.[55]

114.    Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally protected past, current, or expected beliefs, statements, or associations.

115.    Within hours of Mr. Khalil's arrest, ICE was arranging to move him to Jena, Louisiana, more than a thousand miles away from his home, his eight-months-pregnant U.S. citizen wife, his community, his lawyers, and the federal district court where he had promptly filed a habeas corpus petition challenging the constitutionality of his detention.

116.    Federal government officials also made clear that Mr. Khalil was not the only noncitizen they had acted against.

### *Ranjani Srinivasan*

117.    On March 5, 2025, the Department of State informed a graduate student at Columbia University, Ranjani Srinivasan, that her F-1 student visa had been cancelled. The U.S. Consulate in Chennai did not explain why her visa had been cancelled.[56]

---

[54] *Id.*

[55] *See* Ex. A, Renewed Motion to Dismiss or Transfer the Case, *Khalil v. Joyce*, No. 25-cv- 01963 (D.N.J.), ECF No. 90.

[56] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html.

118.    As noted above, on March 6, 2025, the Department of State confirmed to a news outlet that it had revoked the student visa of an individual who had been criminally cited in connection with a campus protest.[57]   Upon information and belief, Ms. Srinivasan is that individual.

119.    ICE agents visited Ms. Srinivasan's apartment the morning of March 7, 2025 and the evening of March 8, 2025.[58] Both times, Ms. Srinivasan's roommate refused the agents entry, as they did not have a valid judicial search warrant.[59] During the second visit, the agents emphasized that they would be back and that Ms. Srinivasan was "amenable to deportation."[60]

120.    On March 9, 2025, Columbia informed Ms. Srinivasan that DHS had terminated her student status.[61]

121.    On March 14, 2025, Secretary of Homeland Security Kristi Noem issued a post on X, accompanied by a video of Ranjani Srinivasan: "I'm glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self deport."[62]

122.    That same day, the Department of Homeland Security issued a press release, discussing Ms. Srinivasan and another individual ICE had arrested.

---

[57] *See supra* n.28.

[58] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Kristi Noem, *X* (Mar. 14, 2025, 11:01 a.m.), *available at* https://x.com/Sec_Noem/status/1900562928849326488.

123.    The DHS press release described Ms. Srinivasan as having "advocat[ed] for violence and terrorism" and as being "involved in activities supporting Hamas, a terrorist organization," without providing any description or information to support such a claim.[63]

124.    Later reporting confirmed that DHS's primary motivation for identifying and targeting Ms. Srinivasan was the agency's perception of her involvement in student protests at Columbia University, and critically that this perception was due to her arrest in April 2024, the same day that protesters who had taken over Hamilton Hall at Columbia were arrested, notwithstanding that she was not involved in the protest.[64] Ms. Srinivasan has since stated repeatedly that she was trying to return home after a departmental picnic that day, when she was caught between protesters and the police barricades.[65]

### *Leqaa Kordea*

125.    The March 14, 2025 DHS press release noted that the Newark ICE Field Office had detained another noncitizen, Leqaa Kordea. According to the press release, Ms. Kordea is from the West Bank, her student visa was terminated for lack of attendance at a university, and she had overstayed her expired visa.[66]

---

[63] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), *available at* https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

[64] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html ("The department did not state how the two summonses made her a terrorist sympathizer.").

[65] *Id.*

[66] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), *available at* https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

126.    DHS made clear in its statement that they had detained Ms. Kordea because of her presence at protests at Columbia University in April 2024.[67]

127.    While alluding to Ms. Kordea's arrest during the April 2024 protests, DHS did not address which criminal charges Ms. Kordea faced, the outcome of any charges, or whether she was meaningfully involved in the protest at all.

128.    The press release notes that Ms. Kordea was detained by the ICE Newark Field Office. Upon information and belief, like Mr. Khalil, Ms. Kordea was also sent far away from any family residing on the East Coast—to Prairieland, Texas.

129.    No government official has explained why Ms. Kordea, who presumably overstayed a student visa, must be detained and held hundreds of miles away from any family in the New Jersey area.

### *Dr. Badar Khan Suri*

130.    On March 17, 2025, ICE arrested a third individual, Dr. Badar Khan Suri, a post-doctoral fellow at Georgetown University. Agents arrested him outside his home in Arlington, Virginia, where he lives with his U.S. citizen wife and their three children.[68]

131.    Later, DHS Spokesperson Tricia McLaughlin claimed, without substantiation, that Dr. Suri, an Indian national, "was spreading Hamas propaganda and promoting antisemitism on social media."[69]

---

[67] *Id.*

[68] Kyle Cheney & Josh Gerstein, *Trump is seeking to deport another academic who is legally in the country, lawsuit says*, Politico (Mar. 19, 2025), *available at* https://www.politico.com/news/2025/03/19/trump-deportation-georgetown-graduate-student-00239754.

[69] *Id.*

132.    ICE has also reportedly invoked the Foreign Policy Ground for removal against Dr. Suri. However, no U.S. government official has explained how the presence or activities in the United States of a researcher on peacebuilding activities, who is married to a U.S. citizen with three children, and who has not engaged in any illegal activity, would have potentially serious adverse foreign policy consequences.

133.    Within twenty-four hours of his arrest, ICE moved Dr. Suri to a "staging" center at the Alexandria, Louisiana airport.[70] Reporting suggests that Dr. Suri will be sent to Prairieland, Texas. No government official has explained why Dr. Suri must be held in detention, nor why he should be detained hundreds of miles away from his wife and their young children.

### *Momodou Taal*

134.    The government's retaliatory campaign has impelled noncitizen students who may otherwise be exposed to the Policy to seek protection from the courts. These defensive efforts have themselves only given rise to further government retaliation.

135.    Momodou Taal, a doctoral student in Africana Studies at Cornell University came to the United States as an F-1 student visa holder. Beyond his academic work and other service at Cornell, Mr. Taal was active in student protests of U.S. foreign policy, particularly its military and financial support for Israel.[71]

136.    As Mr. Taal became more prominent in his advocacy, groups and organizations opposed to Palestinian rights began calling on ICE to target, arrest, and deport Mr. Taal for his

---

[70] *Id.*

[71] *See* Pet. ¶ 32, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 13, 2025).

participation in protest. On March 13, 2025, for example, Betar USA posted on X a "Deport Alert" that specifically named Mr. Taal as a target.[72]

137.    In response to these impending threats, on March 15, Mr. Taal and two others filed a Complaint and Motion for Temporary Restraining Order in the Northern District of New York seeking an injunction against implementation of Executive Order 14188 and Executive Order 14188, and the application of the aforementioned Policy with respect to himself.[73] The court issued an order setting an in-person hearing on March 25, 2025 to address the merits of the Complaint and Motion.[74]

138.    On the morning of March 19, as part of Defendants-Respondents' ongoing effort to enforce the Policy, and in response to Mr. Taal's efforts to seek the court's protection, two undercover law enforcement officers appeared in the parking lot of Mr. Taal's residence.[75] The same day, Mr. Taal filed an emergency motion, again seeking the court's protection via injunction.[76]

139.    In response to Mr. Taal's effort at self-protection against retaliation, the government doubled down. In the early hours of March 21, attorneys from the U.S. Department of

---

[72]    Betar USA (@Betar_USA), *X* (March 13, 2025, 10:38 a.m.), *available at* https://x.com/Betar_USA/status/1900194755050434943 ("Deport alert: Momodou Taal Affiliation: Cornell University Role: Graduate student Countries of Origin: Gambia and the United Kingdom"); *see also* Pet. ¶¶ 36-38, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 13, 2025) (describing concerted campaign targeting Mr. Taal for deportation under the Policy).

[73] *See* Pet., ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 13, 2025).

[74] *See* ECF No. 19, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025).

[75] Malcolm Ferguson, *The Sinister Way Trump's DOJ Tried to Deport Cornell Student Protester*, New Republic (Mar. 21, 2025), *available at* https://newrepublic.com/post/193038/justice-department-deport-cornell-palestine-student-protester-momodou-taal.

[76] *Id.*

Justice emailed counsel for Mr. Taal, informing counsel that ICE intended to arrest and detain Mr. Taal, and inviting Mr. Taal to surrender to HSI.[77]

140.    Later, government officials conceded in filings to the Northern District of New York that DHS agents had identified Mr. Taal by conducting a review of publicly available information in line with the directives of Executive Order 14188 on antisemitism. An HSI official confirmed to the Court that it had referenced this Executive Order when communicating with the State Department concerning Mr. Taal.[78]

**University Response to Protests in Support of Palestinian Human Rights**

141.    Since 2023, communities across the country have mobilized in response to events in Gaza. Students have formed an important part of that movement, as they have in other social movements in U.S. history.

142.    In April and May 2024, several Gaza Solidarity Encampments went up on dozens of campuses around the world. The encampments, and the students demands, often tied to divestment from financial products or other instruments connected to Israeli military actions in Gaza, received widespread news coverage.

143.    Additionally, campus responses to the encampments, including any discipline imposed on students, also received widespread news coverage.

144.    Federal government officials have made clear that they intend to punish colleges and universities for their handling of student protests.

145.    As noted above, Executive Order 14188, issued on January 29, 2025, signaled very clearly that the Trump Administration would prioritize investigating "post-October 7, 2023

---

[77] *See* Letter Br., ECF No. 25, *Taal et al. v. Trump et al*, No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025).

[78] *See* Dec. of Roy Stanley, Defendants' Opp'n to Motion for Preliminary Injunction and Temporary Restraining Order, ECF No. 30-2, *Taal et al. v. Trump et al.*, No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025).

campus anti-Semitism." A specific target would be "leftist, anti-American colleges and universities."

146.    On March 7, 2025, hours after ICE agents attempted to arrest Ms. Srinivasan, the Trump Administration announced it was cutting $400 million in grants to Columbia University, primarily in response to its handling of student protests.[79]

147.    On March 13, 2025, high level Trump Administration officials sent a letter to Columbia University, issuing a list of demands in order for Columbia to continue to receive federal funding. The demands primarily concern discipline of students, and student activities on campus.[80]

148.    On March 13, 2025, Columbia announced it had taken a wide range of disciplinary actions against students who had taken over Hamilton Hall in spring 2024.

149.    On March 21, 2025, Columbia announced it was acquiescing to the Trump Administration's demands.[81]

**Unlawful Use of the Foreign Policy Ground Against Ms. Chung**

150.    Upon information and belief, DHS and Respondent Rubio have invoked the Foreign Policy Ground for deportation against Ms. Chung.

---

[79] This specific amount, $400 million, may carry special significance to President Trump regarding a prior real estate transaction in that amount that Columbia University declined to pursue with him. *See* Matthew Haag & Katherine Rosman, *Decades Ago, Columbia Refused to Pay Trump $400 Million*, N.Y. Times (Mar. 21, 2025), *available at* https://www.nytimes.com/2025/03/21/nyregion/trump-columbia-university-400-million.html.

[80] Letter from Josh Gruenbaum, Comm'r of Fed. Acquisition Serv. for the Gen. Servs. Admin., Sean R. Keveney, Acting General Counsel for the U.S. Dep't of Health & Hum. Servs., & Thomas E. Wheeler, Acting General Counsel for the U.S. Dep't of Education, to Dr. Katrina Armstrong, Interim President of Columbia University (Mar. 13, 2025), *available at* https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

[81] Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia, Colum. Univ. (Mar. 21, 2025), *available at* https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

151.    HSI Agent "Audrey" told Ms. Bhushan that the Secretary of State had revoked Ms. Chung's LPR status.

152.    AUSA Carbone also told counsel that the Secretary of State had revoked Ms. Chung's LPR status.

153.    Additionally, other reporting indicates that the Secretary of State identified a second lawful permanent resident (aside from Mahmoud Khalil) to be deported pursuant to the same Foreign Policy Ground.[82]

154.    Upon information and belief, Ms. Chung is the second lawful permanent resident identified in this reporting.

155.    The Notice to Appear (NTA) initially issued to Mr. Khalil states that "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States," citing to 8 U.S.C. § 1227(a)(4)(C)(i) of the Immigration and Nationality Act (part of the Foreign Policy Ground). The NTA further states that "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States." And the I-261 form, which supplements the NTA, states that the Secretary of State "has determined that your activities and presence . . . would compromise a compelling US foreign policy interest."[83]

156.    As applied to Ms. Chung, the Rubio Determination is motivated by Ms. Chung's constitutionally protected past, current, or expected beliefs, statements, or associations. Public

---

[82] Nick Miroff, *There Was a Second Name on Rubio's Target List*, The Atlantic (Mar. 13, 2025), *available at* https://www.theatlantic.com/politics/archive/2025/03/trump-deportation-green-card-holder-mahmoud-khalil/682037/.

[83] *See* Ex. A, Renewed Motion to Dismiss or Transfer the Case, *Khalil v. Joyce*, ECF No. 90, No. 25-cv- 01963 (D.N.J.).

statements by government officials, up to and including the Secretary of State, establish that Respondents-Defendants seek to punish, detain, and silence Ms. Chung because of her constitutionally protected past, current, or expected beliefs, statements, or associations.

157.    The applicable statutes expressly prohibit removal based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that not removing the noncitizen would compromise a compelling U.S. foreign policy interest. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating 8 U.S.C. § 1182(a)(3)(C)(iii)). Upon information and belief, Secretary Mario Rubio has not provided any notification regarding a determination under the Foreign Policy Ground concerning Ms. Chung, or anyone else, to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

158.    The issuance of the administrative arrest warrant, pursuant to the Rubio Determination, is motivated by Ms. Chung's constitutionally protected past, current, or expected beliefs, statements, or associations.

### Injury to Ms. Chung

159.    Defendants-Respondents' actions have inflicted harm on Ms. Chung. The prospect of imminent detention, to be followed by deportation proceedings, has chilled her speech. Ms. Chung is now concerned about speaking up about the ongoing ordeal of Palestinians in Gaza as well as what is happening on her own campus: the targeting of her fellow students by the federal

government, the arbitrary disciplinary process she and others are undergoing, and the failure of the university to protect noncitizen students.[84]

160.    Ms. Chung's immediate family resides in the United States. Ms. Chung has not lived in her birth country, South Korea, since the age of seven.

161.    If Ms. Chung is detained and deported, she will be indefinitely separated from her family and community. Ms. Chung's parents reside in the continental United States, and her sister is set to start college in the United States in the fall.

162.    Ms. Chung's life is centered in the United States. She is engaged on campus in various social and academic endeavors. She associates directly with other students who speak out on campus on a variety of topics of public import. If Ms. Chung is further detained, transferred far from family or friends, or deported, her ability to advocate for other students, or support Palestinian rights advocacy, will be greatly harmed.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Retaliation, Discrimination, and Prior Restraint**
**(U.S. Constitution, First Amendment)**

163.    Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

164.    The Foreign Policy Ground laid out in 8 U.S.C. §§ 1227(a)(4)(C) and 1182(a)(3)(C)(iii) is unconstitutional as a facial matter, and also unconstitutional as applied to Yunseo Chung under the First Amendment.

---

[84] Murtaza Hussain, *Columbia University's Secret Disciplinary Process for Students Critical of Israel*, Drop Site News (Mar. 4, 2025), *available at* https://www.dropsitenews.com/p/columbia-university-gaza-student-disciplinary-office.

165.    The First Amendment to the U.S. Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

166.    The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("The first amendment protects speakers from threats of punishment that are designed to discourage future speech."); *Saleh v. City of New York*, No. 06 Civ. 1007(SHS), 2007 WL 4437167, at *3 (S.D.N.Y Dec. 17, 2007) (noting that First Amendment retaliation claims can be brought "alleging punishment for past speech and those complaining of suppression of future speech"). The First Amendment protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). The First Amendment applies to actions taken against people in custody, *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and those threatened with deportation, *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019) (internal citations omitted*), cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

167.    It is well-settled that the First Amendment protects against retaliation even where the government "mistakenly *thought* that the [individual] had engaged in protected speech" because "the government's reason . . . is what counts[.]" *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). This rule applies where the government's factual mistake pertains to participation in protest activity, *Hughes v. City of New York*, 680 F. App'x 8, 9–10 (2d Cir. 2017) (applying *Heffernan* to protected association claim arising from protest); *see also Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 30 (2d Cir. 2016) (applying *Heffernan* to associational activity), and even where that individual did not actually engage in protected conduct. *See McNichol v. Falco*, No. 16-cv-2119, 2020 WL 5802492, at *11 (S.D.N.Y. Sept. 28, 2020) ("[A] perceived

protected activity, in the absence of an actual protected activity, can nevertheless give rise to an actionable First Amendment [] claim."); *Burgess v. Banasike*, 636 F. Supp. 3d 351, 359 (W.D.N.Y. 2022) ("[A] plaintiff need not actually engage in protected conduct[.]").

168.    Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218, 234 (2017).

169.    "To state a First Amendment retaliation claim, a plaintiff must show that: '(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the plaintiff's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury.'" *Ragbir*, 923 F.3d at 66 (internal citations omitted).

170.    In addition, "the Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment . . . . Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley*, 578 F.3d at 525. To establish a claim of an unconstitutional "prior restraint" on future testimony, a plaintiff must show (1) that defendants presented "threats of punishment that are designed to discourage" the future testimony, (2) "that [plaintiff's] potential testimony . . . caused the . . .threats," and (3) that the defendants actions caused some injury. *Id.*

171.    Ms. Chung's speech is protected by the First Amendment. Ms. Chung's past speech pertains to matters of prominent public concern, including the ongoing Israeli military campaign

in Gaza, U.S. government support therefor, U.S. academic institutions' financial investments associated with Israel, and campus responses to advocacy for the rights of Palestinians.

172.    Defendants-Respondents are aware of Ms. Chung's speech and viewpoints. Defendants-Respondents are aware that Ms. Chung was arrested at a protest outside of a building at Barnard College relating to disciplinary proceedings for students involved in pro-Palestine protests. The arrests were covered in the press, and Ms. Chung was fingerprinted after the arrest, which would have alerted ICE to the arrest. Defendants-Respondents' actions come days after this protest and arrest.

173.    There is a substantial causal connection between Ms. Chung's protected speech and Defendants-Respondents' adverse actions and threats. Defendants-Respondents have taken adverse actions against Ms. Chung that are motivated by her past and future exercise, and perceived exercise, of First Amendment-protected speech, and have taken action to silence and discourage Ms. Chung from speaking out in the future.

174.    The Rubio Determination, the Policy, and the targeting of Ms. Chung violate the First Amendment because they:

    a.   Retaliate against and punish Ms. Chung for her past protected actual and perceived speech;

    b.   Prevent her from speaking now (through threat of detention and deportation);

    c.   Attempt to chill (through ongoing threat) or prevent (through eventual removal) her future speech in the United States;

    d.   Chill others from expressing views sympathetic to Palestinians or advocate for Palestinian rights.

175.    These speech-related consequences are the point of the Policy, the Rubio Determination, and the government's subsequent actions against Ms. Chung, and are, in their own telling, the result of their disagreement with her protected speech and the viewpoint it expresses.

176.    Defendants-Respondents' actions against Ms. Chung on the basis of Ms. Chung's protected speech do not serve a compelling state interest, and are not narrowly tailored to any legitimate government interest. Defendants-Respondents' actions operate as a prior restraint that will prevent Ms. Chung from engaging in protected speech.

**SECOND CLAIM FOR RELIEF**
**Violation of the Due Process Clause**
**(U.S. Constitution, Fifth Amendment)**

177.    Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

178.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

179.    The Foreign Policy Ground and its implementation through the Policy, the Rubio Determination, and Defendants-Respondents' attempts to detain Ms. Chung violate her due process rights under the Fifth Amendment as unconstitutionally vague and violative of Ms. Chung's substantive and procedural due process rights.

180.    The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

181.    The Foreign Policy Ground in the INA is unconstitutionally vague, both as a facial

matter and as applied specifically to Ms. Chung—a lawful permanent resident, living peacefully in the country, who has engaged and may engage in speech advocating for Palestinian rights, and speech relating to university discipline of protesters advocating for Palestinian rights.

182.    The arbitrary and wrongful Policy and Rubio Determination also violate Ms. Chung's substantive due process rights because they are so egregious and outrageous that they may be fairly said to shock the contemporary conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998). Ms. Chung has no national or international profile; has not published material advancing her views; has not made public speeches; has not given interviews to the press; and has not taken actions that attracted national much less international attention. She has engaged alongside hundreds of her peers in local activism perceptible only to those in her immediate physical surroundings. There is no conceivable foreign policy impact from her speech acts whatsoever, unless the Policy and Rubio Determination are predicated on a theory of collective punishment under which noncitizen members of campus-based protests are punished for the Secretary's view of the aggregate adverse effect of the entire Palestine solidarity campus protest movement. Such a collective punishment theory cannot comport with due process.

183.    The Fifth Amendment also requires fair, pre-deprivation process when a person's liberty hangs in the balance, another right Respondents-Defendants have so far denied Ms. Chung by attempting to detain her unlawfully.

184.    The government's attempts to detain Ms. Chung are wholly unjustified. The government has not demonstrated that Ms. Chung—a long-term permanent resident of the United States, with no criminal convictions, and with parents and a sibling who also are permanent residents—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further twin goals of (1) ensuring noncitizen's appearance during removal proceedings and

(2) preventing danger to the community). There is no credible argument for Ms. Chung's immigration detention, away from her friends and family.

### THIRD CLAIM FOR RELIEF
**Violation of the Immigration and Nationality Act, Administrative Procedure Act, and**
***Accardi* Doctrine**
**(5 U.S.C. § 706; 8 U.S.C. §§ 1227, 1182)**

185.    Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

186.    The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(A)-(B), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Ms. Chung's "presence or activities" would carry "potentially serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C). The Secretary of State's personal determination that Ms. Chung's protected past, current, or expected speech, beliefs, statements, or associations may form a basis to deport her because her presence "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

### FOURTH CLAIM FOR RELIEF
**Violation of the Non-Delegation Doctrine**

187.    Plaintiff-Petitioner incorporates the preceding paragraphs as if fully set forth herein.

188.    Congress has not provided the Executive Branch with intelligible principles from

which the Executive can implement 8 U.S.C. § 1227(a)(4)(C)(i)-(ii) or § 1182(a)(3)(C)(iii).

189.    Congress has delegated discretionary authority that is standardless and unreviewable.

190.    Congress has failed to provide standards or procedures to allow for judicial review of an agency's discretionary deprivation of a noncitizen's liberty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Petitioner respectfully requests that this Court:

1)    Assume jurisdiction over this matter;

2)    Vacate and set aside Defendants-Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech and advocacy for Palestinian rights;

3)    Vacate and set aside the Rubio Determination as applied to Ms. Chung;

4)    Enjoin Defendants-Respondents from taking any enforcement action against Ms. Chung arising directly or indirectly from an investigation into the applicability of the Foreign Policy Ground;

5)    Enjoin Defendants-Respondents from detaining Ms. Chung pending these proceedings;

6)    Enjoin Defendants-Respondents from transferring Ms. Chung away from the jurisdiction of this District pending these proceedings;

7)    Enjoin Defendants-Respondents from removing Ms. Chung from the United States pending these proceedings;

8)      Declare that Defendants-Respondents' actions to arrest, detain, or transfer Ms.

Chung violate the First Amendment, the Due Process Clause of the Fifth Amendment, the INA,

the APA, the *Accardi* doctrine, and the non-delegation doctrine.

9)      Award reasonable attorneys' fees in this action as provided for by the Equal Access

to Justice Act, 28 U.S.C. § 2412, or other statute; and

10)     Grant such further relief as the Court deems just and proper.


Dated: March 24, 2025                                   Respectfully submitted,
       New York, NY


                                                        EMERY CELLI BRINCKERHOFF ABADY
                                                        WARD & MAAZEL LLP
                                                        _____/s/_____
                                                        Jonathan S. Abady
                                                        Katherine Rosenfeld
                                                        Sonya Levitova
                                                        One Rockefeller Plaza, 8th Floor
                                                        New York, NY 10020
                                                        (212) 763-5000

                                                        CLEAR PROJECT
                                                        MAIN STREET LEGAL SERVICES, INC.
                                                        _____/s/_____
                                                        Naz Ahmad
                                                        Ramzi Kassem
                                                        Tarek Z. Ismail*
                                                        Mudassar Hayat Toppa
                                                        CUNY School of Law
                                                        2 Court Square West, 5th Floor
                                                        Long Island City, NY 11101
                                                        (718) 340-4558

                                                        *Admitted to practice in the Eastern
                                                        District of New York; application to waive
                                                        into the Southern District of New York
                                                        pending.

                                                        HUMAN RIGHTS FIRST
                                                        _____/s/_____
                                                        Joshua Colangelo-Bryan

121 West 36th Street, PMB 520
New York, NY 10018
(212) 845-5243

**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA**
_____/s/_____
Jordan Wells
131 Steuart Street # 400
San Francisco, CA 94105
(415) 543-9444

**LAW OFFICE OF MATTHEW BRAY**
_____/s/_____
Nathan Yaffe
119 West 23rd Street, Suite 900
New York, NY 10011
(646) 253-0580

**JONATHAN HAFETZ, ESQ.**
_____/s/_____
Jonathan Hafetz
1109 Raymond Blvd.
Newark, NJ 07102
(917) 355-6896

*Attorneys for Plaintiff-Petitioner*

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

 I submit this verification on behalf of Plaintiff-Petitioner Yunseo Chung because I am one of her attorneys at the CLEAR Project and have communicated with the other attorneys on her case. On information and belief, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: March 24, 2025

            */s Naz Ahmad*
            Naz Ahmad
            CLEAR Project, Main Street Legal
            Services, Inc.
            CUNY School of Law
            2 Court Square West, 5th Floor
            Long Island City, NY 11101