**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

YUNSEO CHUNG,

*Plaintiff-Petitioner*,

v.

DONALD TRUMP, et al.

*Defendants-Respondents*

Case No. 25-cv-2412 (NRB)

**BRIEF OF MORE THAN 110 IMMIGRATION LAWYERS, LAW PROFESSORS, AND
SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF AMICI CURIAE ........................................................................1

INTRODUCTION ................................................................................................2

ARGUMENT .......................................................................................................2

I.      *Amici* Are Unaware of the Government Having Ever Relied on 8 U.S.C. § 1227(a)(4)(C) to Deport a Permanent Resident for Political Speech ....................2

      A.    Section 1227(a)(4)(C) Is Unique Among Deportability Grounds Because It Purportedly Authorizes Deportation Based on the Unfettered Discretion of a Single Political Official.......................................4

      B.    Section 1227(a)(4)(C) Has Almost Never Been Invoked by DHS .............5

II.     Section 1227(a)(4)(C) Is Unconstitutional...............................................................7

     A.  Section 1227(a)(4)(C) Violates Due Process ......................................................7

        1.  Section 1227(a)(4)(C) Is Void for Vagueness ................................7

        2.  Section 1227(a)(4)(C) Deprives Noncitizens of a Meaningful Opportunity To Be Heard and Effectively Permits Prejudgment of a Noncitizen's Case.......................................................................11

     B.  Section 1227(a)(4)(C) Violates the First Amendment .....................................13

CONCLUSION....................................................................................................16

APPENDIX I  Declaration of Graeme Blair, Ph.D., and David Hausman, J.D., Ph.D.

APPENDIX II  List of *Amici Curiae*

1

# TABLE OF AUTHORITIES

## **Federal Cases**

*Alarcon-Serrano v. I.N.S.*, 220 F.3d 1116 (9th Cir. 2000).............................................13

*Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008)...............................................10

*Bridges v. California*, 314 U.S. 252 (1941)..................................................................14

*Bridges v. Wixon*, 326 U.S. 135 (1945) ......................................................................14

*Burger v. Gonzales,* 498 F.3d 131 (2d Cir. 2007).........................................................11

*Chapman v. United States*, 500 U.S. 453 (1991) ..........................................................10

*Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir.1999)........................................................10

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ............................................................8

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) .......................................................7

*Dennis v. United States*, 341 U.S. 494 (1951) .............................................................14

*Felzcerek v. I.N.S.*, 75 F.3d 112 (2d Cir. 1996) .............................................................7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................10

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1951)..........................................................14

*Jordan v. De George*, 341 U.S. 223 (1951) ...................................................................8

*Kaur v. Holder*, 561 F.3d 957 (9th Cir. 2009) .............................................................13

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)...........................................................14, 15

*Kolender v. Lawson*, 461 U.S. 352 (1983)......................................................................8

*Ljutica v. Holder*, 588 F.3d 119 (2d Cir. 2009) ...........................................................10

*Massieu v. Reno*, 915 F. Supp. 681 (D.N.J. 1996), *rev'd on other grounds,*
91 F.3d 416 (3d Cir. 1996)................................................................................ passim

*Massieu v. Reno*, 91 F.3d 416 (3d Cir. 1996) ...........................................................2, 5

*Michel v. I.N.S.*, 206 F.3d 253 (2d Cir.2000)...........................................................11

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ...........15

*Reno v. Flores*, 507 U.S. 292, 305 (1993) ...............................................................7

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ...........................................................8, 10

*Smith v. Goguen,* 415 U.S. 566 (1974) ...................................................................8

*Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007)...............................................8

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc) .................................10

*United States v. Watkins*, 940 F.3d 152 (2d Cir. 2019) .............................................8

*Vasquez v. Garland*, 80 F.4th 422, 435 (2d Cir. 2023)............................................8, 9

*Guo Qi Wang v. Holder,* 583 F.3d 86, 90 (2d Cir. 2009) ...........................................13

*Zerezghi v. United State Citizenship & Immigr. Servs.*, 955 F.3d 802
 (9th Cir. 2020)...............................................................................................13

## Administrative Decisions

*Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995) ...................................................7

*Matter of Ruiz-Massieu*, 22 I&N Dec. 833 (BIA 1999) ...................................... passim

*In re U-H-*, 23 I&N Dec. 355 (BIA 2003) ..............................................................13

## Statutes (Title 8 of U.S. Code)

8 U.S.C. § 1182(a)(3)(C)(iii), INA § 212(a)(3)(C)(iii)......................................2, 11, 15

8 U.S.C. § 1227(a)(2), INA § 212(a)(2) ...................................................................4

8 U.S.C. § 1227(a)(3), INA § 212(a)(3) ...................................................................4

8 U.S.C. § 1227(a)(4), INA § 212(a)(4) .................................................................4

8 U.S.C. § 1227(a)(4)(A), INA § 237(a)(4)(A) .....................................................4

8 U.S.C. § 1227(a)(4)(B), INA §237 (a)(4)(B) ......................................................4

8 U.S.C. § 1227(a)(4)(C), INA §237 (a)(4)(C) ......................................................4

8 U.S.C. § 1227(a)(4)(C)(i), INA § 237(a)(4)(C)(i) ...................................... passim

8 U.S.C. § 1227(a)(4)(C)(ii), INA § 237(a)(4)(C)(ii) .................................... passim

8 U.S.C. § 1227(a)(4)(D), INA § 237(a)(4)(D) .....................................................4

8 U.S.C. § 1227(a)(4)(E), INA § 237(a)(4)(E) ......................................................4

8 U.S.C. § 1227(a)(4)(F), INA § 237(a)(4)(F) ......................................................4

8 U.S.C. § 1227(a)(6), INA § 237(a)(6) .................................................................4

8 U.S.C. § 1229a(b)(4), INA § 240(b)(4) .............................................................12

8 U.S.C. § 1229a(c)(3)(A), INA § 240(c)(3)(A) ...................................................12

Former 8 U.S.C. 1251(a)(4)(C), INA § 241(a)(4)(C) ..........................................5, 7

Former 8 U.S.C. 1251(a)(4)(C)(i), INA § 241(a)(4)(C)(i) ......................................5

**<u>Constitutional Provisions</u>**

U.S. Const. amend. I .................................................................................... passim

U.S. Const. amend. V ................................................................................... passim

**<u>Articles and Other Authorities</u>**

Ahilan Arulanantham & Adam Cox, *Explainer on First Amendment and Due Process Issues in Deportation of Pro-Palestinian Student Activist(s)*, Just Sec. (Mar. 12, 2025), https://www.justsecurity.org/109012/legal-issues-deportation-palestinian-student-activists/ ......15

Adam Cox, *The Invention of Immigration Exceptionalism*, 134 YALE L.J. 329 (2024)...............15

Jennifer Lee Koh, *Crimmigration and the Void for Vagueness Doctrine*,
2016 WIS. L. REV. 1127 (2016) ...............................................................................9, 10

Marco Rubio (@marcorubio), X (Mar. 9, 2025, 3:10 PM),
https://x.com/marcorubio/status/1898858967532441945..............................................16

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 1:05 PM),
https://truthsocial.com/@realDonaldTrump/posts/114139222625284782......................................3

Henry Weinstein, *Final Two L.A. 8 Defendants Cleared*, LA Times (Nov. 1, 2007) ....................3

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are more than 110 leading lawyers, law professors, and scholars who practice, write about, research, and teach immigration law.[2] *Amici* collectively have many centuries of experience representing individuals at all stages of their immigration proceedings and in federal court.  Regardless of their differing views on recent campus protests and the war in the Middle East, *amici* are united (1) in finding that the government's reliance on 8 U.S.C. § 1227(a)(4)(C)(i) to deport a lawful permanent resident for political speech appears to be unprecedented prior to March 2025; and (2) in concluding that 8 U.S.C. § 1227(a)(4)(C)(i) is unconstitutional.

*Amici* have a strong interest in the outcome of this case. Allowing the federal government to target immigrants based on 8 U.S.C. § 1227(a)(4)(C)(i) will have devastating effects on immigrants, including lawful permanent residents; will upend the practice of immigration law; and will chill protected First Amendment speech not just on campuses but in communities nationwide.

## INTRODUCTION

Yunseo Chung is a lawful permanent resident who is being threatened with deportation, upon information and belief, under a provision of the Immigration and Nationality Act (INA) that makes deportable any "[noncitizen] whose presence or activities in the United States the

---

[1] No counsel for any party has authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief.

[2] A list of *amici* is set forth in Appendix II. The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which *amici* are or have been affiliated.

Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i), INA § 237(a)(4)(C)(i). This deportability ground includes an exception, which prohibits deportation because of a noncitizen's lawful "past, current, or expected beliefs, statements, or associations, . . . *unless the Secretary of State personally determines that the [noncitizen's presence] would compromise a compelling United States foreign policy interest*." 8 U.S.C. § 1182(a)(3)(C)(iii), INA § 212(a)(3)(C)(iii) (emphasis added) (incorporated by reference through the exception in 8 U.S.C. § 1227(a)(4)(C)(ii), INA § 237(a)(4)(C)(ii)).

Among all the deportability grounds in the INA, Section 1227(a)(4)(C)(i) provides one of the most sweeping grants of discretionary executive power. This ground has *almost never* been invoked by the Department of Homeland Security (DHS), and *amici* are not aware of any cases prior to March 2025 where it has been used to try to detain and deport a permanent resident, let alone for political speech. The only federal district court to have considered the constitutionality of this ground held that it violates due process because it is unconstitutionally vague and deprives noncitizens of a meaningful opportunity to be heard. *See Massieu v. Reno*, 915 F. Supp. 681 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996). In Ms. Chung's case, it also runs afoul of the First Amendment.

## ARGUMENT

I. ***Amici* Are Unaware of The Government Having Ever Relied on 8 U.S.C. § 1227(a)(4)(C) to Deport a Permanent Resident for Political Speech Prior to March 2025**

It is not unusual for permanent residents to be placed in removal proceedings. Nor is it novel for the government to target Palestinians or those who express pro-Palestinian views where they have allegedly violated some other provision of the immigration laws.[3] However, the use of the foreign policy ground is extraordinarily rare, and we are unaware of it ever having been used as the sole charge against a lawful permanent resident, let alone in a case where the underlying conduct was itself political speech, prior to March 2025. Upholding the use of Section 1227(a)(4)(C) in this case would give the federal government power to deport permanent residents and other lawfully present noncitizens at the whim of the Secretary of State (or at the whim of the President, through the Secretary of State). As President Trump explained shortly after the arrest of Mahmoud Khalil, a lawful permanent resident in a position similar to Ms. Chung, "[t]his is the first arrest of many to come."[4]

The implications of this case are by no means limited to noncitizens who engage in pro-Palestinian speech. The presence of Ukrainians who are critical of Russia, supporters of more security cooperation with Europe, and economists skeptical of tariffs on Mexico, Canada, and China, could all suddenly be considered adverse to U.S. foreign policy interests and subject to deportation based on the unilateral determination of the Secretary of State. This list has no end, and no meaningful limiting principles. In *Massieu*, the government's reliance on the foreign policy deportability ground was based on "nothing more than the obstinacy of a foreign

---

[3] Henry Weinstein, *Final Two L.A. 8 Defendants Cleared*, LA Times (Nov. 1, 2007).
[4] Donald J. Trump (@realDonaldTrump), Truth Social, (Mar. 10, 2025, 1:05 PM),  at https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

sovereign that is high on the list of nations that the United States must not offend or disappoint."

915 F. Supp. at 701 n.18.

**A. Section 1227(a)(4)(C) Is Unique Among Deportability Grounds Because It Purportedly Authorizes Deportation Based on the Unfettered Discretion of a Single Political Official**

Almost all of the deportability grounds in the Immigration and Nationality Act (INA)

require a lawfully present noncitizen to engage in some *conduct* to be deported, such as

committing a crime (1227(a)(2)), engaging in fraud (1227(a)(3)), or unlawfully voting

(1227(a)(6)). Among the "[s]ecurity and related grounds" in 1227(a)(4), the foreign policy

ground is the only one that can be invoked based solely on the subjective beliefs of an executive

official, rather than any action by the noncitizen. Indeed, the other subsections of 1227(a)(4)

require significant legal breaches, such as engaging in terrorism, seeking to overthrow the U.S.

government through unlawful means, and participating in torture. *See* 8 U.S.C. §§ 1227(a)(4)(A),

(B), (D), (E), (F).

By contrast, the foreign policy ground merely requires the presence of a noncitizen and

the decision of the Secretary of State; it does not target any conduct whatsoever, let alone some

specified kind of conduct. 8 U.S.C. § 1227(a)(4)(C)(i) (referring to "presence *or* activities"). Nor

does the foreign policy ground require a showing of any *actual* adverse foreign policy

consequences; it simply requires the Secretary to have "reasonable ground to believe"—a

determination the immigration judge purportedly cannot question[5]—that the noncitizen's

---

[5] *See* Part II.A.2 below.

4

presence or activities "*would have potentially* serious" adverse foreign policy consequences. *Id.*
(emphasis added). By purportedly giving unfettered discretion to an executive official to decide
that someone lawfully present in the United States is deportable, Section 1227(a)(4)(C) is a stark
outlier among all the deportability grounds.

During the 35 years that the foreign policy deportability ground has been in existence,
only one federal district court has had an opportunity to address it, and that court determined it
was unconstitutional in 1996. *Massieu*, 915 F. Supp. at 686. The district court in *Massieu*
described this ground as a "breathtaking departure" from "deportation based on adjudications of
defined impermissible conduct." *Id.* The Third Circuit reversed the decision based on its finding
that the plaintiff had not exhausted administrative remedies, but never reached the constitutional
questions. *Massieu v. Reno,* 91 F.3d 416 (3d Cir. 1996).

### B.  Section 1227(a)(4)(C) Has Almost Never Been Invoked by DHS

The foreign policy deportability ground was introduced in 1990 and originally codified at
INA § 241(a)(4)(C).[6] The use of this provision to seek an individual's deportation is almost
unprecedented in this ground's 35-year history. Based on publicly available data from the
Executive Office of Immigration Review (EOIR) and published Board of Immigration Appeals
(BIA) decisions, out of 11.7 million cases, DHS has invoked INA § 241(a)(4)(C)(i) or INA §
237(a)(4)(C)(i) as a removal charge in *only fifteen cases* before March 2025, when Mahmoud

---

[6] In 1996, with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act,
Pub. L. No. 104–208, the provision was transferred to INA § 237(a)(4)(C).

Khalil was arrested and charged under this ground.[7] Only five of those cases involved detention throughout the proceeding.[8] Decl. of Graeme Blair ("Blair Decl.") ¶¶6, 14. In just seven of these fifteen cases, the foreign policy deportability ground was the only charge alleged throughout the proceeding. *Id*. ¶14. Out of those seven cases, *one* individual was detained throughout the proceeding. *Id*. Only four individuals ever were ultimately ordered removed or deported after being charged with removability under this ground. *Id*. That amounts to one person being ordered removed *per decade* under this provision.

What's more, nearly all of these cases arose in the distant past, shortly after the provision was enacted. Focusing on the last 25 years, the EOIR data reflects that INA § 237(a)(4)(C)(i) has been invoked only *four times* before March 2025, and *only twice* has it been the only charge alleged throughout the proceeding. *Id*. ¶12. We have not been able to determine whether either of the two charged individuals over the past 25 years were lawful permanent residents—and narrowing further, whether they were lawful permanent residents being charged with the foreign policy deportability ground for only their speech. But neither of those two cases were detained throughout their immigration proceedings. *Id*. ¶14. It may well be that Ms. Chung's case and Mr. Khalil's case are unprecedented in the history of this provision and in the history of the United States. At a minimum, the government's assertion of authority here is extraordinary—indeed, vanishingly rare.

---

[7] Charlie Savage, *Congress Wrote a Deportation Law to be Used 'Sparingly.' Trump Has Other Ideas*, NY Times, Apr. 1, 2025.

[8] In the EOIR data, cases may not necessarily mean different individuals. Blair Decl. ¶6. Therefore, it is possible that this charge has been invoked against even fewer than fifteen individuals.

The BIA decision in Massieu's case confirms that the foreign policy deportability ground "has been used very rarely." *Matter of Ruiz-Massieu*, 22 I&N Dec. 833, 838 (BIA 1999) (citing *Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995), as "the only published Board case").[9] The government's apparent decision to invoke this charge against Ms. Chung and Mr. Khalil is alarming given this history. Although at least some uses of the foreign policy ground appear to have resulted in deportations, the majority have not, highlighting the problems with the overall discretion granted by the statute. This case—which challenges the administration's policy of viewpoint-based immigration enforcement, not the INA itself—clearly falls outside any reasonable application of the provision in light of the serious constitutional concerns explained below.

## II.  Section 1227(a)(4)(C) is Unconstitutional

### A.  Section 1227(a)(4)(C) Violates Due Process

It is well-settled that noncitizens have a right to due process. *Reno v. Flores,* 507 U.S. 292, 305–07 (1993); *Felzcerek v. I.N.S.*, 75 F.3d 112, 115 (2d Cir. 1996). Section 1227(a)(4)(C)(i) violates due process because it is void for vagueness and deprives noncitizens of a meaningful opportunity to be heard, effectively resulting in pre-judgment of their deportability.

### 1.  Section 1227(a)(4)(C) Is Void for Vagueness

The Supreme Court has long held that a person cannot constitutionally be punished under a vague criminal statute, as this would undermine "ordinary rules of fair play" and violate "the

---

[9] *Amici* have exhaustively searched unpublished BIA cases involving INA § 241(a)(4)(C) or INA § 237 (a)(4)(C) and have found none.

7

first essential of due process." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The void-for-vagueness doctrine has also long been applied to deportation statutes. *See Jordan v. De George*, 341 U.S. 223, 231 (1951) (recognizing that deportation is a "drastic measure"). In 2018, the Supreme Court relied on the void-for-vagueness doctrine to strike down the residual clause of the "crime of violence" aggravated felony deportability ground. *Sessions v. Dimaya*, 584 U.S. 148, 174-75 (2018).

As the Supreme Court recognized in *Dimaya*, a law is unconstitutionally vague if it fails either one of two clearly articulated tests. *Id.* at 155 (plurality); *see also United States v. Watkins*, 940 F.3d 152, 161 (2d Cir. 2019) (same). The key questions are whether a statute "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Vasquez v. Garland*, 80 F.4th 422, 435 (2d Cir. 2023). The purpose of the first inquiry regarding fair notice "is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). The second inquiry, which has been described as "the more important" of the two, *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), requires a court to inquire whether the statutory language is "of such a standardless sweep" that it allows enforcers "to pursue their personal predilections." *Smith v. Goguen,* 415 U.S. 566, 575 (1974). A statute must establish "sufficiently clear standards to minimize the risk of arbitrary enforcement." *Thibodeau v. Portuondo*, 486 F.3d 61, 67 (2d Cir. 2007).

Section 1227(a)(4)(C) violates both parts of the test. First, as the district court held in *Massieu*, this deportability ground "provides absolutely no notice to [noncitizens] as to what is

8

required of them under the statute." 915 F.Supp. at 699. Since "no one outside the Department of State and, perhaps, the President ever knows what our nation's frequently covert foreign policy is at any given time, . . . there is no conceivable way that [a noncitizen] could know, *ex-ante*, how to conform his or her activities to the requirements of the law." *Id.* at 700. Furthermore, "it is even less likely that [a noncitizen] could know that his or her mere presence here would or could cause adverse foreign policy consequences when our foreign policy is unpublished, ever-changing, and often highly confidential." *Id.* Certainly, no one would expect that a student's peaceful participation in a protest would have serious foreign policy consequences for the United States, much less "compromise a compelling foreign policy interest." 8 U.S.C. § 1182(a)(C)(iii) (incorporated by reference in 8 U.S.C. § 1127(a)(4)(C)(ii)). Indeed, pro-Palestinian protests had been occurring for over a year on university campuses and elsewhere nationwide prior to Trump's inauguration without any government officials claiming that these protests had a negative impact on foreign policy interests. As Professor Jennifer Lee Koh has argued, "[n]otice before the imposition of immigration penalties is particularly important because immigration adjudications do not operate on a level playing field between the parties." Jennifer Lee Koh, *Crimmigration and the Void for Vagueness Doctrine*, 2016 WIS. L. REV. 1127, 1157 (2016) (internal quotation marks omitted).

Second, Section 1227(a)(4)(C) is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Vasquez*, 80 F.4th at 435. It fails to provide even "minimal guidelines to govern law enforcement," and allows the Secretary State, or the President, acting through the Secretary of State, "to pursue their personal predilections." *Smith*,

415 U.S. at 574–75. Because Section 1227(a)(4)(C) has no "explicit standards" and instead ostensibly gives the Secretary of State total discretion to determine that a noncitizen's presence has potentially serious adverse foreign policy consequences, it permits deportation "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972); *see also Chatin v. Coombe,* 186 F.3d 82, 89 (2d Cir. 1999) (same).

Finally, as the Supreme Court has recognized, "where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms," leading people to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S.at 109 (internal quotation marks and footnotes omitted). Consequently, statutes that trigger First Amendment concerns have historically received more scrutiny from courts when challenged as void for vagueness. Koh, *supra* at 1138. Indeed, in cases pre-dating *Dimaya*, the Second Circuit suggested that "[c]laims of facial invalidity" under the void-for-vagueness doctrine "are generally limited to statutes that threaten First Amendment interests." *Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008) (citing *Chapman v. United States*, 500 U.S. 453, 467 (1991)); *see also Ljutica v. Holder*, 588 F.3d 119, 125 (2d Cir. 2009) ("Outside the First Amendment context, we assess statutes for vagueness only as applied.") (citing *United States v. Rybicki,* 354 F.3d 124, 129–30 (2d Cir. 2003) (en banc)).

The Supreme Court made clear in *Dimaya*, however, that a statute need not touch on First Amendment concerns to be void for vagueness on its face: there, the Supreme Court determined

that the residual clause of the crime of violence deportability ground was facially invalid despite the absence of First Amendment interests, because the provision "produces more unpredictability and arbitrariness than the Due Process Clause [of the Fifth Amendment] tolerates," 584 U.S. at 175. That holding serves to reinforce the conclusion that 1227(a)(4)(C), which clearly threatens First Amendment interests, can be facially invalid under the void-for-vagueness doctrine. Section 1227(a)(4)(C)(ii) expressly authorizes the Secretary of State to rely exclusively on a person's lawful "beliefs, statements, or associations" in determining that a person should be deportable under the provision, as long as the Secretary of State makes a personal determination that the foreign policy interests are "compelling." 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating by reference 8 U.S.C. § 1182(a)(3)(C)(iii), INA § 212(a)(3)(C)(iii)).[10] This intrusion into First Amendment interests provides additional support for finding Section 1227(a)(4)(C) unconstitutionally vague.

    **2.    Section 1227(a)(4)(C) Deprives Noncitizens of a Meaningful Opportunity to Be Heard and Effectively Permits Prejudgment of a Noncitizen's Case**

The fundamental right to due process requires a "full and fair opportunity to present [one's] claims." *Burger v. Gonzales,* 498 F.3d 131, 134 (2d Cir. 2007); *Michel v. I.N.S.,* 206 F.3d 253, 259 (2d Cir. 2000). In a typical deportation proceeding, DHS bears the burden of establishing deportability by "clear and convincing evidence," and an immigration judge's decision must be based on "reasonable, substantive, and probative evidence." 8 U.S.C. §

---

[10] The use of the word "compelling" in this exception distinguishes it from the language in Section 1227(a)(4)(C)(i) requiring only "potentially serious adverse foreign policy consequences."

1229a(c)(3)(A). That decision is normally made after a full administrative hearing, where the noncitizen has "a reasonable opportunity to examine the evidence" submitted by DHS, to present evidence, and to cross-examine the government's witnesses. 8 U.S.C. § 1229a(b)(4)(B). In the government's view, under Section 1227(a)(4)(C), however, it is the Secretary of State who unilaterally determines that a noncitizen is deportable. Even though a noncitizen charged under this ground has a technical right to a hearing before an immigration judge, the BIA has determined that there is  no way for the noncitizen to actually question or challenge the Secretary of State's determination: no evidence must be presented to support the Secretary of State's assertions, and no opportunity is provided for the noncitizen to cross-examine the Secretary of State or any other government official about the alleged foreign policy concerns. *Matter of Ruiz-Massieu,* 22 I&N Dec. at 844-45.

In *Matter of Ruiz-Massieu*, the majority of the Board, sitting en banc, held that the Secretary of State's letter "should be treated as *conclusive evidence* of the respondent's deportability," finding that the immigration judge had "erred in holding that the [government] is obliged to present clear, unequivocal, and convincing evidence in support of the Secretary of State's belief." *Id.* at 842 (emphasis added). The Board reasoned that the government met its burden of proof "by the Secretary's *facially reasonable and bona fide determination* that the respondent's presence here would cause potentially serious adverse foreign policy consequences for the United States." *Id.* (emphasis added). The Board stressed that the statute granted the Secretary of State "exclusive authority" to determine the existence of a "reasonable ground" for believing in potentially serious adverse foreign policy consequences, *id.* at 842, and confirmed

"the fundamentally ministerial aspect of the Immigration Judge's role" in such proceedings. *Id.* at 844. Any other approach, according to the Board, would require the immigration judge and the Board to "intrude into the realm of foreign policy." *Id.* at 844.

The extreme deference given to the Secretary of State's determination under the Board's decision in *Ruiz-Massieu* is similar to relying on "secret evidence," which courts have found "cabined by constitutional due process limitations." *Kaur v. Holder*, 561 F.3d 957, 960 (9th Cir. 2009) (BIA violated due process by using secret evidence against a petitioner); *see also Zerezghi v. United State Citizenship & Immigr. Servs.*, 955 F.3d 802, 813 (9th Cir. 2020) (vague reference to unspecific records deprived U.S. citizen and his noncitizen wife of a meaningful opportunity to respond in violation of due process); *cf. Matter of Ruiz-Massieu*, 22 I&N. Dec. at 845 (reasoning that allowing the immigration judge to review the reasonableness of the Secretary's determination could require the government "to proffer secret or confidential information and expert witnesses, or involve a deposition of the Secretary of the State"). The Board's interpretation of Section 1227(a)(4)(C) both deprives the noncitizen of the right to a meaningful opportunity to be heard and results in pre-judgment of deportability based solely on the Secretary of State's assertions, in violation of the Fifth Amendment.[11]

### B.  Section 1227(a)(4)(C) Violates the First Amendment

---

[11] By contrast, the Board has held that the "reasonable ground to believe" standard in both the terrorist activity inadmissibility ground and the bar to withholding of removal based on being a danger to the security of the United States are akin to probable cause determinations. *In re U-H-*, 23 I&N Dec. 355, 356 (BIA 2003); *see also Guo Qi Wang v. Holder,* 583 F.3d 86, 90 (2d Cir. 2009) (equating "serious reasons to believe" standard to probable cause); *Alarcon–Serrano v. I.N.S.,* 220 F.3d 1116, 1119 (9th Cir. 2000) ("reason to believe" standard for controlled substance traffickers ground must be based on "reasonable, substantial, and probative evidence").

13

Media reports indicate  that Ms. Chung was placed in deportation proceedings because she engaged in constitutionally protected political protests. The Supreme Court long ago stated, without qualification, that "[f]reedom of speech and of press is accorded [noncitizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). *Bridges* concerned an Australian union organizer who lived much of his life in Southern California. Various U.S. government officials repeatedly targeted him for his pro-labor speech activities, but the Supreme Court protected him twice—first from jail and contempt of court in *Bridges v. California*, 314 U.S. 252 (1941), and later from deportation in *Bridges v. Wixon*.

In the decades since *Bridges v. Wixon* was decided, the Supreme Court, on several occasions, ruled against noncitizens who argued that immigration decisions violated their free speech rights. Critically, however, in none of these cases has the Court retreated from its holding that noncitizens living in the United States are protected by the First Amendment. When the Supreme Court upheld the deportation of former Communist Party members during the Red Scare, it did so by concluding that the deportations were permitted by the First Amendment, which at the time was less protective of the speech rights of citizens and noncitizens alike. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 592 & nn.18-19 (1951) (applying the framework in *Dennis v. United States*, 341 U.S. 494 (1951), a non-immigration case). And when the Court rejected the speech claims of citizens who argued that the exclusion of the Communist professor they had invited was pretextual, the Court did not decide the core free speech question, holding only that it would not look behind the facially valid reason given for the visa denial in order to sort out whether the professor had really been excluded because of his speech. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *cf. United States v. Armstrong*, 517 U.S. 456 (1996) (refusing, in a non-immigration case alleging pretextual prosecution, to permit discovery in order

14

to look behind the facially valid reason given for the charging decision). The Court's approach in these cases is consistent with the application of ordinary principles of free speech and constitutional law, not some special watered-down set of protections for noncitizens. *See* Adam Cox, *The Invention of Immigration Exceptionalism*, 134 YALE L.J. 329 (2024); Ahilan Arulanantham & Adam Cox, *Explainer on First Amendment and Due Process Issues in Deportation of Pro-Palestinian Student Activist(s)*, Just Security (Mar. 12, 2025). Here, since the only basis for deporting Ms. Chung is her political speech, the present case does not involve the complicated issue of pretext that was present in *Mandel,* or the selective prosecution question that plagued the Palestinians who had fallen out of status in *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488-92 (1999) (refusing to find selective prosecution of unlawfully present students, but still keeping the door open for "outrageous" selective prosecution claims in such cases). Ms. Chung, of course, is a lawfully present permanent resident.

As noted above, Section 1227(a)(4)(C) contains, on its face, an exception openly authorizing deportation because of a person's speech—so long as the Secretary of State makes a "personal determination" that the ideological deportation is warranted (according to the "compelling United States foreign policy interest" standard). *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating by reference 8 U.S.C. § 1182 (a)(3)(C)(iii)). This provision clearly conflicts with the Supreme Court precedents holding that the First Amendment protects the free speech rights of noncitizens residing in the United States. Section 1227(a)(4)(C) is therefore unconstitutional.

If this statutory provision is permitted to stand, even temporarily, it will continue to have a chilling effect on speech at universities and in communities across the country. *Amici* have personally observed this chilling effect on their campuses following Mr. Khalil's arrest and the

15

attempted arrest of Ms. Chung when ICE searched her dorm room as well as the room of another Columbia student. Students, scholars, professors, and others fear speaking freely because President Trump announced that many more arrests will come, and Secretary of State Marco Rubio confirmed "we're going to keep doing it,"[12] "revoking the visas and/or green cards . . . so they can be deported."[13]

## CONCLUSION

For the foregoing reasons, Ms. Chung's  motion for a temporary restraining order and/or preliminary injunction should be granted.

DATED: April 8, 2025                   /s/ Elora Mukherjee
                                       Elora Mukherjee
                                       Jerome L. Greene Clinical Professor of Law
                                       Columbia Law School
                                       Morningside Heights Legal Services, Inc.
                                       435 W. 116th Street, Room 831
                                       New York, NY 10027
                                       Tel: (212) 854-4291
                                       emukherjee@law.columbia.edu
                                       (in her individual capacity)


                                       Fatma Marouf
                                       Professor of Law
                                       Texas A&M School of Law
                                       307 W. 7th St. Suite LL50
                                       Fort Worth, TX 76102
                                       Tel: (817) 212-4123
                                       fatma.marouf@law.tamu.edu
                                       (in her individual capacity)


                                       Amber Qureshi

---

[12] Kaia Hubbard, *Secretary of State Marco Rubio Says "We're Going to Keep Going It" After Arrest of Columbia Activist*, CBS News Face the Nation (Mar. 16, 2025).

[13] Marco Rubio (@marcorubio), X (Mar. 9, 2025, 3:10 PM), https://x.com/marcorubio/status/1898858967532441945.

Law Office of Amber Qureshi, LLC
6925 Oakland Mills Rd, PMB #207,
Columbia, MD 21045
Tel: (443) 583-4353
amber@qureshilegal.com

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Tel: (310) 825-1029
arulanantham@law.ucla.edu
(in his individual capacity)


Adam Cox
Robert A. Kindler Professor of Law
NYU School of Law
40 Washington Sq. South
New York, New York 10012
Tel: (212) 992-8875
adambcox@nyu.edu
(in his individual capacity)

*Counsel for Amici Curiae*[14]

---

[14] This amicus brief does not purport to present the institutional views of the schools with which the preparers of this amicus brief are affiliated.

17

**Certificate of Service**

I certify that on April 8, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the Southern District of New York. To the best of my knowledge, all participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

<u>/s/ Elora Mukherjee</u>
Elora Mukherjee
Jerome L. Greene Clinical Professor of Law
Columbia Law School
Morningside Heights Legal Services, Inc.
435 W. 116th Street, Room 831
New York, NY 10027
Tel: (212) 854-4291
emukherjee@law.columbia.edu
(in her individual capacity)

*Counsel for Amici Curiae*