**Morningside Heights Legal Services, Inc.**

435 West 116th Street, New York, NY 10027
T 212 854 4291  F 212 854 3554

April 8, 2025

***By ECF***

The Honorable Naomi Reice Buchwald
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:    *Chung v. Trump*, No. 25-cv-2412

Dear Judge Buchwald:

We respectfully move through this letter for leave to submit the attached *amici curiae* brief on behalf of more than 110 immigration lawyers, law professors, and scholars, in support of the petitioner's motion for a temporary restraining order and/or preliminary injunction.[1] The Plaintiff / Petitioner consents to this request.  The Defendants / Respondents take no position on this request.

Given that there is no applicable rule of civil procedure governing amicus curiae briefs, "[d]istrict courts have broad discretion to permit or deny an appearance as amicus curiae in a case." *In GLG Life Tech Corp. Securities Litigation*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012) (internal quotation marks omitted). "The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties." *Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, No. 11 CIV. 6746 RJH, 2011 WL 5865296, at *1 (S.D.N.Y. Nov. 22, 2011).

Here, the proposed amicus brief highlights the unprecedented nature of the government's reliance on 8 U.S.C. 1227(a)(4)(C)(i) to deport a lawful permanent resident for political speech prior to March 2025, drawing on *amici*'s vast collective experience. *Amici curiae* are leading lawyers, law professors, and scholars who practice, write, research, and teach immigration law.

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amicus curiae or its counsel contributed money that was intended to fund preparing or submitting this brief.

*Amici* collectively have many centuries of experience representing individuals at all stages of their immigration proceedings and in federal court. Based on publicly available data from the Executive Office of Immigration Review (EOIR) and published Board of Immigration Appeals (BIA) decisions, out of 11.7 million cases, DHS has invoked INA § 241(a)(4)(C)(i) or INA § 237(a)(4)(C)(i) as a removal charge in *only fifteen cases* prior to March 2025. In just seven of these fifteen cases, the foreign policy deportability ground was the only charge alleged throughout the proceeding. Only four individuals ever were ultimately ordered removed or deported after being charged with removability under this ground. That means, essentially one person ordered removed *per decade* under this provision. What's more, nearly all of these cases arose in the distant past, shortly after the provision was enacted. Focusing on the last 25 years, the EOIR data reflects that INA § 237(a)(4)(C) has been invoked only *four times* prior to March 2025, and *only twice* has it been the only charge alleged throughout the proceeding. In light of this data, it may well be that Ms. Chung's case is virtually unprecedented in the history of this provision and in the history of the United States.

Additionally, the brief elaborates on the arguments that Section 1227(a)(4)(C) is unconstitutional. Specifically, the brief argues that this deportability ground is facially invalid under the void-for-vagueness doctrine, deprives noncitizens of a meaningful opportunity to be heard in violation of due process, and violates the First Amendment. *Amici* include scholars who have written extensively about the void-for-vagueness doctrine and other due process issues in the immigration context, as well as immigrants' First Amendment rights. *Amici* have also personally observed the chilling effects on their campuses following Ms. Chung's arrest.

*Amici* have a strong interest in the outcome of this case and their brief provides non-duplicative insights into the foreign policy deportability ground and its use to arrest and detain a permanent resident for political speech. Accordingly, on behalf of *amici*, undersigned counsel respectfully request that this Court grant leave to file the attached proposed amicus curiae brief in this matter.

Respectfully submitted,

Leave to file the attached
amicus curiae brief is granted.
**So ordered.**

*[signature]*
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE
Dated: April 9, 2025
        New York, New York

/s/ Elora Mukherjee
Elora Mukherjee
Jerome L. Greene Clinical Professor of Law
Columbia Law School
Morningside Heights Legal Services, Inc.
435 W. 116th Street, Room 831
New York, NY 10027
(212) 854-4291
emukherjee@law.columbia.edu
(in her individual capacity)

Fatma Marouf
Professor of Law
Texas A&M School of Law
307 W. 7th St. Suite LL50
Fort Worth, TX 76102
(817) 212-4123
fatma.marouf@law.tamu.edu
(in her individual capacity)


Amber Qureshi
Law Office of Amber Qureshi, LLC
6925 Oakland Mills Rd, PMB #207,
Columbia, MD 21045
(443) 583-4353
amber@qureshilegal.com


Ahilan T. Arulanantham (SBN 237841)
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu
(in his individual capacity)

Adam Cox
Robert A. Kindler Professor of Law
NYU School of Law
40 Washington Sq. South
New York, New York 10012
212-992-8875
adambcox@nyu.edu
(in his individual capacity)

*Counsel for Amici Curiae*[2]

---

[2] The proposed amicus brief does not purport to present the institutional views of the schools with which the preparers of this amicus brief are affiliated.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

YUNSEO CHUNG,

*Plaintiff-Petitioner*,

v.

DONALD TRUMP, et al.

*Defendants-Respondents*

Case No. 25-cv-2412 (NRB)

**BRIEF OF MORE THAN 110 IMMIGRATION LAWYERS, LAW PROFESSORS, AND SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTEREST OF AMICI CURIAE .................................................................................... 1

INTRODUCTION .......................................................................................................... 2

ARGUMENT .................................................................................................................. 2

    I.    *Amici* Are Unaware of the Government Having Ever Relied on 8 U.S.C. §
        1227(a)(4)(C) to Deport a Permanent Resident for Political Speech ..................... 2

        A.    Section 1227(a)(4)(C) Is Unique Among Deportability Grounds
               Because It Purportedly Authorizes Deportation Based on the
               Unfettered Discretion of a Single Political Official..................................... 4

        B.    Section 1227(a)(4)(C) Has Almost Never Been Invoked by DHS ............. 5

    II.    Section 1227(a)(4)(C) Is Unconstitutional............................................................. 7

        A.  Section 1227(a)(4)(C) Violates Due Process ...................................................... 7

             1.  Section 1227(a)(4)(C) Is Void for Vagueness ................................ 7

             2.  Section 1227(a)(4)(C) Deprives Noncitizens of a Meaningful
                 Opportunity To Be Heard and Effectively Permits Prejudgment of
                 a Noncitizen's Case.................................................................... 11

        B.  Section 1227(a)(4)(C) Violates the First Amendment ..................................... 13

CONCLUSION............................................................................................................... 16

APPENDIX I  Declaration of Graeme Blair, Ph.D., and David Hausman, J.D., Ph.D.

APPENDIX II  List of *Amici Curiae*

1

# TABLE OF AUTHORITIES

## Federal Cases

*Alarcon-Serrano v. I.N.S.*, 220 F.3d 1116 (9th Cir. 2000)..............................................13

*Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008)..............................................10

*Bridges v. California*, 314 U.S. 252 (1941) ..............................................14

*Bridges v. Wixon*, 326 U.S. 135 (1945) ..............................................14

*Burger v. Gonzales,* 498 F.3d 131 (2d Cir. 2007)..............................................11

*Chapman v. United States*, 500 U.S. 453 (1991) ..............................................10

*Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir.1999)..............................................10

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..............................................8

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) ..............................................7

*Dennis v. United States*, 341 U.S. 494 (1951) ..............................................14

*Felzcerek v. I.N.S.*, 75 F.3d 112 (2d Cir. 1996) ..............................................7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..............................................10

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1951)..............................................14

*Jordan v. De George*, 341 U.S. 223 (1951) ..............................................8

*Kaur v. Holder*, 561 F.3d 957 (9th Cir. 2009) ..............................................13

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)..............................................14, 15

*Kolender v. Lawson*, 461 U.S. 352 (1983)..............................................8

*Ljutica v. Holder*, 588 F.3d 119 (2d Cir. 2009) ..............................................10

*Massieu v. Reno*, 915 F. Supp. 681 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996)..............................................passim

*Massieu v. Reno*, 91 F.3d 416 (3d Cir. 1996) ........................................................2, 5

*Michel v. I.N.S.*, 206 F.3d 253 (2d Cir.2000)...........................................................11

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ..........15

*Reno v. Flores*, 507 U.S. 292, 305 (1993) ................................................................7

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ..........................................................8, 10

*Smith v. Goguen,* 415 U.S. 566 (1974) ......................................................................8

*Thibodeau v. Portuondo*, 486 F.3d 61 (2d Cir. 2007)................................................8

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc) .................................10

*United States v. Watkins*, 940 F.3d 152 (2d Cir. 2019) ................................................8

*Vasquez v. Garland*, 80 F.4th 422, 435 (2d Cir. 2023)...........................................8, 9

*Guo Qi Wang v. Holder,* 583 F.3d 86, 90 (2d Cir. 2009) ..........................................13

*Zerezghi v. United State Citizenship & Immigr. Servs.*, 955 F.3d 802
 (9th Cir. 2020).........................................................................................................13

## Administrative Decisions

*Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995) ......................................................7

*Matter of Ruiz-Massieu*, 22 I&N Dec. 833 (BIA 1999) ...................................... passim

*In re U-H-*, 23 I&N Dec. 355 (BIA 2003) ...............................................................13

## Statutes (Title 8 of U.S. Code)

8 U.S.C. § 1182(a)(3)(C)(iii), INA § 212(a)(3)(C)(iii)....................................2, 11, 15

8 U.S.C. § 1227(a)(2), INA § 212(a)(2) ....................................................................4

8 U.S.C. § 1227(a)(3), INA § 212(a)(3) ....................................................................4

3

8 U.S.C. § 1227(a)(4), INA § 212(a)(4) ...................................................................4

8 U.S.C. § 1227(a)(4)(A), INA § 237(a)(4)(A) .........................................................4

8 U.S.C. § 1227(a)(4)(B), INA §237 (a)(4)(B) ..........................................................4

8 U.S.C. § 1227(a)(4)(C), INA §237 (a)(4)(C) ..........................................................4

8 U.S.C. § 1227(a)(4)(C)(i), INA § 237(a)(4)(C)(i) ........................................... passim

8 U.S.C. § 1227(a)(4)(C)(ii), INA § 237(a)(4)(C)(ii) .......................................... passim

8 U.S.C. § 1227(a)(4)(D), INA § 237(a)(4)(D) .........................................................4

8 U.S.C. § 1227(a)(4)(E), INA § 237(a)(4)(E) ..........................................................4

8 U.S.C. § 1227(a)(4)(F), INA § 237(a)(4)(F) ..........................................................4

8 U.S.C. § 1227(a)(6), INA § 237(a)(6) ....................................................................4

8 U.S.C. § 1229a(b)(4), INA § 240(b)(4) ................................................................12

8 U.S.C. § 1229a(c)(3)(A), INA § 240(c)(3)(A)......................................................12

Former 8 U.S.C. 1251(a)(4)(C), INA § 241(a)(4)(C) ...........................................5, 7

Former 8 U.S.C. 1251(a)(4)(C)(i), INA § 241(a)(4)(C)(i) .......................................5

## Constitutional Provisions

U.S. Const. amend. I ............................................................................................ passim

U.S. Const. amend. V........................................................................................... passim

## Articles and Other Authorities

Ahilan Arulanantham & Adam Cox, *Explainer on First Amendment and Due Process Issues in Deportation of Pro-Palestinian Student Activist(s)*, Just Sec. (Mar. 12, 2025), https://www.justsecurity.org/109012/legal-issues-deportation-palestinian-student-activists/ ......15

Adam Cox, *The Invention of Immigration Exceptionalism*, 134 YALE L.J. 329 (2024)...............15

Jennifer Lee Koh, *Crimmigration and the Void for Vagueness Doctrine*,
2016 WIS. L. REV. 1127 (2016) .......................................................................................9, 10

Marco Rubio (@marcorubio), X (Mar. 9, 2025, 3:10 PM),
https://x.com/marcorubio/status/1898858967532441945.............................................16

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 1:05 PM),
https://truthsocial.com/@realDonaldTrump/posts/114139222625284782......................................3

Henry Weinstein, *Final Two L.A. 8 Defendants Cleared*, LA Times (Nov. 1, 2007) ....................3

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are more than 110 leading lawyers, law professors, and scholars who practice, write about, research, and teach immigration law.[2] *Amici* collectively have many centuries of experience representing individuals at all stages of their immigration proceedings and in federal court. Regardless of their differing views on recent campus protests and the war in the Middle East, *amici* are united (1) in finding that the government's reliance on 8 U.S.C. § 1227(a)(4)(C)(i) to deport a lawful permanent resident for political speech appears to be unprecedented prior to March 2025; and (2) in concluding that 8 U.S.C. § 1227(a)(4)(C)(i) is unconstitutional.

*Amici* have a strong interest in the outcome of this case. Allowing the federal government to target immigrants based on 8 U.S.C. § 1227(a)(4)(C)(i) will have devastating effects on immigrants, including lawful permanent residents; will upend the practice of immigration law; and will chill protected First Amendment speech not just on campuses but in communities nationwide.

## INTRODUCTION

Yunseo Chung is a lawful permanent resident who is being threatened with deportation, upon information and belief, under a provision of the Immigration and Nationality Act (INA) that makes deportable any "[noncitizen] whose presence or activities in the United States the

---

[1] No counsel for any party has authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief.

[2] A list of *amici* is set forth in Appendix II. The positions taken in this brief are those of *amici* alone and should not be attributed to any institution with which *amici* are or have been affiliated.

Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." 8 U.S.C. § 1227(a)(4)(C)(i), INA § 237(a)(4)(C)(i). This deportability ground includes an exception, which prohibits deportation because of a noncitizen's lawful "past, current, or expected beliefs, statements, or associations, . . . *unless the Secretary of State personally determines that the [noncitizen's presence] would compromise a compelling United States foreign policy interest*." 8 U.S.C. § 1182(a)(3)(C)(iii), INA § 212(a)(3)(C)(iii) (emphasis added) (incorporated by reference through the exception in 8 U.S.C. § 1227(a)(4)(C)(ii), INA § 237(a)(4)(C)(ii)).

Among all the deportability grounds in the INA, Section 1227(a)(4)(C)(i) provides one of the most sweeping grants of discretionary executive power. This ground has *almost never* been invoked by the Department of Homeland Security (DHS), and *amici* are not aware of any cases prior to March 2025 where it has been used to try to detain and deport a permanent resident, let alone for political speech. The only federal district court to have considered the constitutionality of this ground held that it violates due process because it is unconstitutionally vague and deprives noncitizens of a meaningful opportunity to be heard. *See Massieu v. Reno*, 915 F. Supp. 681 (D.N.J. 1996), *rev'd on other grounds*, 91 F.3d 416 (3d Cir. 1996). In Ms. Chung's case, it also runs afoul of the First Amendment.

## ARGUMENT

I.  *Amici* Are Unaware of The Government Having Ever Relied on 8 U.S.C. § 1227(a)(4)(C) to Deport a Permanent Resident for Political Speech Prior to March 2025

2

It is not unusual for permanent residents to be placed in removal proceedings. Nor is it novel for the government to target Palestinians or those who express pro-Palestinian views where they have allegedly violated some other provision of the immigration laws.[3] However, the use of the foreign policy ground is extraordinarily rare, and we are unaware of it ever having been used as the sole charge against a lawful permanent resident, let alone in a case where the underlying conduct was itself political speech, prior to March 2025. Upholding the use of Section 1227(a)(4)(C) in this case would give the federal government power to deport permanent residents and other lawfully present noncitizens at the whim of the Secretary of State (or at the whim of the President, through the Secretary of State). As President Trump explained shortly after the arrest of Mahmoud Khalil, a lawful permanent resident in a position similar to Ms. Chung, "[t]his is the first arrest of many to come."[4]

The implications of this case are by no means limited to noncitizens who engage in pro-Palestinian speech. The presence of Ukrainians who are critical of Russia, supporters of more security cooperation with Europe, and economists skeptical of tariffs on Mexico, Canada, and China, could all suddenly be considered adverse to U.S. foreign policy interests and subject to deportation based on the unilateral determination of the Secretary of State. This list has no end, and no meaningful limiting principles. In *Massieu*, the government's reliance on the foreign policy deportability ground was based on "nothing more than the obstinacy of a foreign

---

[3] Henry Weinstein, *Final Two L.A. 8 Defendants Cleared*, LA Times (Nov. 1, 2007).
[4] Donald J. Trump (@realDonaldTrump), Truth Social, (Mar. 10, 2025, 1:05 PM), at https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

sovereign that is high on the list of nations that the United States must not offend or disappoint."

915 F. Supp. at 701 n.18.

### A. Section 1227(a)(4)(C) Is Unique Among Deportability Grounds Because It Purportedly Authorizes Deportation Based on the Unfettered Discretion of a Single Political Official

Almost all of the deportability grounds in the Immigration and Nationality Act (INA)

require a lawfully present noncitizen to engage in some *conduct* to be deported, such as

committing a crime (1227(a)(2)), engaging in fraud (1227(a)(3)), or unlawfully voting

(1227(a)(6)). Among the "[s]ecurity and related grounds" in 1227(a)(4), the foreign policy

ground is the only one that can be invoked based solely on the subjective beliefs of an executive

official, rather than any action by the noncitizen. Indeed, the other subsections of 1227(a)(4)

require significant legal breaches, such as engaging in terrorism, seeking to overthrow the U.S.

government through unlawful means, and participating in torture. *See* 8 U.S.C. §§ 1227(a)(4)(A),

(B), (D), (E), (F).

By contrast, the foreign policy ground merely requires the presence of a noncitizen and

the decision of the Secretary of State; it does not target any conduct whatsoever, let alone some

specified kind of conduct. 8 U.S.C. § 1227(a)(4)(C)(i) (referring to "presence *or* activities"). Nor

does the foreign policy ground require a showing of any *actual* adverse foreign policy

consequences; it simply requires the Secretary to have "reasonable ground to believe"—a

determination the immigration judge purportedly cannot question[5]—that the noncitizen's

---

[5] *See* Part II.A.2 below.

4

presence or activities "*would have potentially* serious" adverse foreign policy consequences. *Id.* (emphasis added). By purportedly giving unfettered discretion to an executive official to decide that someone lawfully present in the United States is deportable, Section 1227(a)(4)(C) is a stark outlier among all the deportability grounds.

During the 35 years that the foreign policy deportability ground has been in existence, only one federal district court has had an opportunity to address it, and that court determined it was unconstitutional in 1996. *Massieu*, 915 F. Supp. at 686. The district court in *Massieu* described this ground as a "breathtaking departure" from "deportation based on adjudications of defined impermissible conduct." *Id.* The Third Circuit reversed the decision based on its finding that the plaintiff had not exhausted administrative remedies, but never reached the constitutional questions. *Massieu v. Reno,* 91 F.3d 416 (3d Cir. 1996).

**B. Section 1227(a)(4)(C) Has Almost Never Been Invoked by DHS**

The foreign policy deportability ground was introduced in 1990 and originally codified at INA § 241(a)(4)(C).[6] The use of this provision to seek an individual's deportation is almost unprecedented in this ground's 35-year history. Based on publicly available data from the Executive Office of Immigration Review (EOIR) and published Board of Immigration Appeals (BIA) decisions, out of 11.7 million cases, DHS has invoked INA § 241(a)(4)(C)(i) or INA § 237(a)(4)(C)(i) as a removal charge in *only fifteen cases* before March 2025, when Mahmoud

---

[6] In 1996, with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, the provision was transferred to INA § 237(a)(4)(C).

Khalil was arrested and charged under this ground.[7] Only five of those cases involved detention throughout the proceeding.[8] Decl. of Graeme Blair ("Blair Decl.") ¶¶6, 14. In just seven of these fifteen cases, the foreign policy deportability ground was the only charge alleged throughout the proceeding. *Id*. ¶14. Out of those seven cases, *one* individual was detained throughout the proceeding. *Id*. Only four individuals ever were ultimately ordered removed or deported after being charged with removability under this ground. *Id*. That amounts to one person being ordered removed *per decade* under this provision.

What's more, nearly all of these cases arose in the distant past, shortly after the provision was enacted. Focusing on the last 25 years, the EOIR data reflects that INA § 237(a)(4)(C)(i) has been invoked only *four times* before March 2025, and *only twice* has it been the only charge alleged throughout the proceeding. *Id*. ¶12. We have not been able to determine whether either of the two charged individuals over the past 25 years were lawful permanent residents—and narrowing further, whether they were lawful permanent residents being charged with the foreign policy deportability ground for only their speech. But neither of those two cases were detained throughout their immigration proceedings. *Id*. ¶14. It may well be that Ms. Chung's case and Mr. Khalil's case are unprecedented in the history of this provision and in the history of the United States. At a minimum, the government's assertion of authority here is extraordinary—indeed, vanishingly rare.

---

[7] Charlie Savage, *Congress Wrote a Deportation Law to be Used 'Sparingly.' Trump Has Other Ideas*, NY Times, Apr. 1, 2025.

[8] In the EOIR data, cases may not necessarily mean different individuals. Blair Decl. ¶6. Therefore, it is possible that this charge has been invoked against even fewer than fifteen individuals.

The BIA decision in Massieu's case confirms that the foreign policy deportability ground "has been used very rarely." *Matter of Ruiz-Massieu*, 22 I&N Dec. 833, 838 (BIA 1999) (citing *Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995), as "the only published Board case").[9] The government's apparent decision to invoke this charge against Ms. Chung and Mr. Khalil is alarming given this history. Although at least some uses of the foreign policy ground appear to have resulted in deportations, the majority have not, highlighting the problems with the overall discretion granted by the statute. This case—which challenges the administration's policy of viewpoint-based immigration enforcement, not the INA itself—clearly falls outside any reasonable application of the provision in light of the serious constitutional concerns explained below.

## II. Section 1227(a)(4)(C) is Unconstitutional

### A. Section 1227(a)(4)(C) Violates Due Process

It is well-settled that noncitizens have a right to due process. *Reno v. Flores,* 507 U.S. 292, 305–07 (1993); *Felzcerek v. I.N.S.*, 75 F.3d 112, 115 (2d Cir. 1996). Section 1227(a)(4)(C)(i) violates due process because it is void for vagueness and deprives noncitizens of a meaningful opportunity to be heard, effectively resulting in pre-judgment of their deportability.

### 1. Section 1227(a)(4)(C) Is Void for Vagueness

The Supreme Court has long held that a person cannot constitutionally be punished under a vague criminal statute, as this would undermine "ordinary rules of fair play" and violate "the

---

[9] *Amici* have exhaustively searched unpublished BIA cases involving INA § 241(a)(4)(C) or INA § 237 (a)(4)(C) and have found none.

first essential of due process." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The

void-for-vagueness doctrine has also long been applied to deportation statutes. *See Jordan v. De

George*, 341 U.S. 223, 231 (1951) (recognizing that deportation is a "drastic measure"). In 2018,

the Supreme Court relied on the void-for-vagueness doctrine to strike down the residual clause of

the "crime of violence" aggravated felony deportability ground. *Sessions v. Dimaya*, 584 U.S.

148, 174-75 (2018).

As the Supreme Court recognized in *Dimaya*, a law is unconstitutionally vague if it fails

either one of two clearly articulated tests. *Id.* at 155 (plurality); *see also United States v. Watkins*,

940 F.3d 152, 161 (2d Cir. 2019) (same). The key questions are whether a statute "fails to

provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless

that it authorizes or encourages seriously discriminatory enforcement." *Vasquez v. Garland*, 80

F.4th 422, 435 (2d Cir. 2023). The purpose of the first inquiry regarding fair notice "is to enable

the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527

U.S. 41, 58 (1999). The second inquiry, which has been described as "the more important" of the

two, *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), requires a court to inquire whether the

statutory language is "of such a standardless sweep" that it allows enforcers "to pursue their

personal predilections." *Smith v. Goguen,* 415 U.S. 566, 575 (1974). A statute must establish

"sufficiently clear standards to minimize the risk of arbitrary enforcement." *Thibodeau v.

Portuondo*, 486 F.3d 61, 67 (2d Cir. 2007).

Section 1227(a)(4)(C) violates both parts of the test. First, as the district court held in

*Massieu*, this deportability ground "provides absolutely no notice to [noncitizens] as to what is

required of them under the statute." 915 F.Supp. at 699. Since "no one outside the Department of State and, perhaps, the President ever knows what our nation's frequently covert foreign policy is at any given time, . . . there is no conceivable way that [a noncitizen] could know, *ex-ante*, how to conform his or her activities to the requirements of the law." *Id.* at 700. Furthermore, "it is even less likely that [a noncitizen] could know that his or her mere presence here would or could cause adverse foreign policy consequences when our foreign policy is unpublished, ever-changing, and often highly confidential." *Id.* Certainly, no one would expect that a student's peaceful participation in a protest would have serious foreign policy consequences for the United States, much less "compromise a compelling foreign policy interest." 8 U.S.C. § 1182(a)(C)(iii) (incorporated by reference in 8 U.S.C. § 1127(a)(4)(C)(ii)). Indeed, pro-Palestinian protests had been occurring for over a year on university campuses and elsewhere nationwide prior to Trump's inauguration without any government officials claiming that these protests had a negative impact on foreign policy interests. As Professor Jennifer Lee Koh has argued, "[n]otice before the imposition of immigration penalties is particularly important because immigration adjudications do not operate on a level playing field between the parties." Jennifer Lee Koh, *Crimmigration and the Void for Vagueness Doctrine*, 2016 WIS. L. REV. 1127, 1157 (2016) (internal quotation marks omitted).

Second, Section 1227(a)(4)(C) is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Vasquez*, 80 F.4th at 435. It fails to provide even "minimal guidelines to govern law enforcement," and allows the Secretary State, or the President, acting through the Secretary of State, "to pursue their personal predilections." *Smith*,

415 U.S. at 574–75. Because Section 1227(a)(4)(C) has no "explicit standards" and instead ostensibly gives the Secretary of State total discretion to determine that a noncitizen's presence has potentially serious adverse foreign policy consequences, it permits deportation "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972); *see also Chatin v. Coombe,* 186 F.3d 82, 89 (2d Cir. 1999) (same).

Finally, as the Supreme Court has recognized, "where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms," leading people to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S.at 109 (internal quotation marks and footnotes omitted). Consequently, statutes that trigger First Amendment concerns have historically received more scrutiny from courts when challenged as void for vagueness. Koh, *supra* at 1138. Indeed, in cases pre-dating *Dimaya*, the Second Circuit suggested that "[c]laims of facial invalidity" under the void-for-vagueness doctrine "are generally limited to statutes that threaten First Amendment interests." *Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008) (citing *Chapman v. United States*, 500 U.S. 453, 467 (1991)); *see also Ljutica v. Holder*, 588 F.3d 119, 125 (2d Cir. 2009) ("Outside the First Amendment context, we assess statutes for vagueness only as applied.") (citing *United States v. Rybicki,* 354 F.3d 124, 129–30 (2d Cir. 2003) (en banc)).

The Supreme Court made clear in *Dimaya*, however, that a statute need not touch on First Amendment concerns to be void for vagueness on its face: there, the Supreme Court determined

10

that the residual clause of the crime of violence deportability ground was facially invalid despite the absence of First Amendment interests, because the provision "produces more unpredictability and arbitrariness than the Due Process Clause [of the Fifth Amendment] tolerates," 584 U.S. at 175. That holding serves to reinforce the conclusion that 1227(a)(4)(C), which clearly threatens First Amendment interests, can be facially invalid under the void-for-vagueness doctrine. Section 1227(a)(4)(C)(ii) expressly authorizes the Secretary of State to rely exclusively on a person's lawful "beliefs, statements, or associations" in determining that a person should be deportable under the provision, as long as the Secretary of State makes a personal determination that the foreign policy interests are "compelling." 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating by reference 8 U.S.C. § 1182(a)(3)(C)(iii), INA § 212(a)(3)(C)(iii)).[10] This intrusion into First Amendment interests provides additional support for finding Section 1227(a)(4)(C) unconstitutionally vague.

**2.    Section 1227(a)(4)(C) Deprives Noncitizens of a Meaningful Opportunity to Be Heard and Effectively Permits Prejudgment of a Noncitizen's Case**

The fundamental right to due process requires a "full and fair opportunity to present [one's] claims." *Burger v. Gonzales,* 498 F.3d 131, 134 (2d Cir. 2007); *Michel v. I.N.S.,* 206 F.3d 253, 259 (2d Cir. 2000). In a typical deportation proceeding, DHS bears the burden of establishing deportability by "clear and convincing evidence," and an immigration judge's decision must be based on "reasonable, substantive, and probative evidence." 8 U.S.C. §

---

[10] The use of the word "compelling" in this exception distinguishes it from the language in Section 1227(a)(4)(C)(i) requiring only "potentially serious adverse foreign policy consequences."

1229a(c)(3)(A). That decision is normally made after a full administrative hearing, where the noncitizen has "a reasonable opportunity to examine the evidence" submitted by DHS, to present evidence, and to cross-examine the government's witnesses. 8 U.S.C. § 1229a(b)(4)(B). In the government's view, under Section 1227(a)(4)(C), however, it is the Secretary of State who unilaterally determines that a noncitizen is deportable. Even though a noncitizen charged under this ground has a technical right to a hearing before an immigration judge, the BIA has determined that there is  no way for the noncitizen to actually question or challenge the Secretary of State's determination: no evidence must be presented to support the Secretary of State's assertions, and no opportunity is provided for the noncitizen to cross-examine the Secretary of State or any other government official about the alleged foreign policy concerns. *Matter of Ruiz-Massieu,* 22 I&N Dec. at 844-45.

In *Matter of Ruiz-Massieu*, the majority of the Board, sitting en banc, held that the Secretary of State's letter "should be treated as *conclusive evidence* of the respondent's deportability," finding that the immigration judge had "erred in holding that the [government] is obliged to present clear, unequivocal, and convincing evidence in support of the Secretary of State's belief." *Id.* at 842 (emphasis added). The Board reasoned that the government met its burden of proof "by the Secretary's *facially reasonable and bona fide determination* that the respondent's presence here would cause potentially serious adverse foreign policy consequences for the United States." *Id.* (emphasis added). The Board stressed that the statute granted the Secretary of State "exclusive authority" to determine the existence of a "reasonable ground" for believing in potentially serious adverse foreign policy consequences, *id.* at 842, and confirmed

12

"the fundamentally ministerial aspect of the Immigration Judge's role" in such proceedings. *Id.* at 844. Any other approach, according to the Board, would require the immigration judge and the Board to "intrude into the realm of foreign policy." *Id.* at 844.

The extreme deference given to the Secretary of State's determination under the Board's decision in *Ruiz-Massieu* is similar to relying on "secret evidence," which courts have found "cabined by constitutional due process limitations." *Kaur v. Holder*, 561 F.3d 957, 960 (9th Cir. 2009) (BIA violated due process by using secret evidence against a petitioner); *see also Zerezghi v. United State Citizenship & Immigr. Servs.*, 955 F.3d 802, 813 (9th Cir. 2020) (vague reference to unspecific records deprived U.S. citizen and his noncitizen wife of a meaningful opportunity to respond in violation of due process); *cf. Matter of Ruiz-Massieu*, 22 I&N. Dec. at 845 (reasoning that allowing the immigration judge to review the reasonableness of the Secretary's determination could require the government "to proffer secret or confidential information and expert witnesses, or involve a deposition of the Secretary of the State"). The Board's interpretation of Section 1227(a)(4)(C) both deprives the noncitizen of the right to a meaningful opportunity to be heard and results in pre-judgment of deportability based solely on the Secretary of State's assertions, in violation of the Fifth Amendment.[11]

## B. Section 1227(a)(4)(C) Violates the First Amendment

---

[11] By contrast, the Board has held that the "reasonable ground to believe" standard in both the terrorist activity inadmissibility ground and the bar to withholding of removal based on being a danger to the security of the United States are akin to probable cause determinations. *In re U-H-*, 23 I&N Dec. 355, 356 (BIA 2003); *see also Guo Qi Wang v. Holder*, 583 F.3d 86, 90 (2d Cir. 2009) (equating "serious reasons to believe" standard to probable cause); *Alarcon–Serrano v. I.N.S.,* 220 F.3d 1116, 1119 (9th Cir. 2000) ("reason to believe" standard for controlled substance traffickers ground must be based on "reasonable, substantial, and probative evidence").

13

Media reports indicate  that Ms. Chung was placed in deportation proceedings because she engaged in constitutionally protected political protests. The Supreme Court long ago stated, without qualification, that "[f]reedom of speech and of press is accorded [noncitizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). *Bridges* concerned an Australian union organizer who lived much of his life in Southern California. Various U.S. government officials repeatedly targeted him for his pro-labor speech activities, but the Supreme Court protected him twice—first from jail and contempt of court in *Bridges v. California*, 314 U.S. 252 (1941), and later from deportation in *Bridges v. Wixon*.

In the decades since *Bridges v. Wixon* was decided, the Supreme Court, on several occasions, ruled against noncitizens who argued that immigration decisions violated their free speech rights. Critically, however, in none of these cases has the Court retreated from its holding that noncitizens living in the United States are protected by the First Amendment. When the Supreme Court upheld the deportation of former Communist Party members during the Red Scare, it did so by concluding that the deportations were permitted by the First Amendment, which at the time was less protective of the speech rights of citizens and noncitizens alike. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 592 & nn.18-19 (1951) (applying the framework in *Dennis v. United States*, 341 U.S. 494 (1951), a non-immigration case). And when the Court rejected the speech claims of citizens who argued that the exclusion of the Communist professor they had invited was pretextual, the Court did not decide the core free speech question, holding only that it would not look behind the facially valid reason given for the visa denial in order to sort out whether the professor had really been excluded because of his speech. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *cf. United States v. Armstrong*, 517 U.S. 456 (1996) (refusing, in a non-immigration case alleging pretextual prosecution, to permit discovery in order

14

to look behind the facially valid reason given for the charging decision). The Court's approach in these cases is consistent with the application of ordinary principles of free speech and constitutional law, not some special watered-down set of protections for noncitizens. *See* Adam Cox, *The Invention of Immigration Exceptionalism*, 134 YALE L.J. 329 (2024); Ahilan Arulanantham & Adam Cox, *Explainer on First Amendment and Due Process Issues in Deportation of Pro-Palestinian Student Activist(s)*, Just Security (Mar. 12, 2025). Here, since the only basis for deporting Ms. Chung is her political speech, the present case does not involve the complicated issue of pretext that was present in *Mandel,* or the selective prosecution question that plagued the Palestinians who had fallen out of status in *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488-92 (1999) (refusing to find selective prosecution of unlawfully present students, but still keeping the door open for "outrageous" selective prosecution claims in such cases). Ms. Chung, of course, is a lawfully present permanent resident.

As noted above, Section 1227(a)(4)(C) contains, on its face, an exception openly authorizing deportation because of a person's speech—so long as the Secretary of State makes a "personal determination" that the ideological deportation is warranted (according to the "compelling United States foreign policy interest" standard). *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating by reference 8 U.S.C. § 1182 (a)(3)(C)(iii)). This provision clearly conflicts with the Supreme Court precedents holding that the First Amendment protects the free speech rights of noncitizens residing in the United States. Section 1227(a)(4)(C) is therefore unconstitutional.

If this statutory provision is permitted to stand, even temporarily, it will continue to have a chilling effect on speech at universities and in communities across the country. *Amici* have personally observed this chilling effect on their campuses following Mr. Khalil's arrest and the

attempted arrest of Ms. Chung when ICE searched her dorm room as well as the room of another

Columbia student. Students, scholars, professors, and others fear speaking freely because

President Trump announced that many more arrests will come, and Secretary of State Marco

Rubio confirmed "we're going to keep doing it,"[12] "revoking the visas and/or green cards . . . so

they can be deported."[13]

## CONCLUSION

For the foregoing reasons, Ms. Chung's  motion for a temporary restraining order and/or

preliminary injunction should be granted.

DATED: April 8, 2025                    /s/ Elora Mukherjee
                                        Elora Mukherjee
                                        Jerome L. Greene Clinical Professor of Law
                                        Columbia Law School
                                        Morningside Heights Legal Services, Inc.
                                        435 W. 116th Street, Room 831
                                        New York, NY 10027
                                        Tel: (212) 854-4291
                                        emukherjee@law.columbia.edu
                                        (in her individual capacity)


                                        Fatma Marouf
                                        Professor of Law
                                        Texas A&M School of Law
                                        307 W. 7th St. Suite LL50
                                        Fort Worth, TX 76102
                                        Tel: (817) 212-4123
                                        fatma.marouf@law.tamu.edu
                                        (in her individual capacity)


                                        Amber Qureshi

---

[12] Kaia Hubbard, *Secretary of State Marco Rubio Says "We're Going to Keep Going It" After Arrest of Columbia Activist*, CBS News Face the Nation (Mar. 16, 2025).

[13] Marco Rubio (@marcorubio), X (Mar. 9, 2025, 3:10 PM), https://x.com/marcorubio/status/1898858967532441945.

Law Office of Amber Qureshi, LLC
6925 Oakland Mills Rd, PMB #207,
Columbia, MD 21045
Tel: (443) 583-4353
amber@qureshilegal.com

Ahilan T. Arulanantham
Professor from Practice
UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Tel: (310) 825-1029
arulanantham@law.ucla.edu
(in his individual capacity)


Adam Cox
Robert A. Kindler Professor of Law
NYU School of Law
40 Washington Sq. South
New York, New York 10012
Tel: (212) 992-8875
adambcox@nyu.edu
(in his individual capacity)

*Counsel for Amici Curiae*[14]

---

[14] This amicus brief does not purport to present the institutional views of the schools with which the preparers of this amicus brief are affiliated.

## Certificate of Service

I certify that on April 8, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the Southern District of New York. To the best of my knowledge, all participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Elora Mukherjee
Elora Mukherjee
Jerome L. Greene Clinical Professor of Law
Columbia Law School
Morningside Heights Legal Services, Inc.
435 W. 116th Street, Room 831
New York, NY 10027
Tel: (212) 854-4291
emukherjee@law.columbia.edu
(in her individual capacity)

*Counsel for Amici Curiae*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

YUNSEO CHUNG,

> *Plaintiff-Petitioner,*

v.

Case No. 25-cv-4212

Donald TRUMP, *et al.*,

> *Defendants-Respondents.*

## DECLARATION OF GRAEME BLAIR, Ph.D. AND DAVID HAUSMAN, J.D., Ph.D.

We, Graeme Blair and David Hausman, declare under penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1. Graeme Blair is an associate professor of political science at UCLA. He studies policing and how to make social science research more credible, ethical, and useful. He teaches courses on research design and data analysis for undergraduates and Ph.D. students. His book, *Research Design in the Social Sciences*, was published by Princeton University Press in 2023, and his book *Crime, Insecurity, and Community Policing* was published by Cambridge University Press in 2024. He received a Ph.D. in politics from Princeton University and a B.A. in political science from Reed College. He is the recipient of the Leamer-Rosenthal Prize in Open Social Science.

2. David Hausman is an assistant professor of law at UC Berkeley. He has conducted data analysis as a consulting expert in numerous immigration cases. He has also published scholarly research using immigration enforcement datasets, evaluating, for example, the effect of sanctuary policies (*Proceedings of the National Academy of Sciences*), the effect of an algorithmic no-release policy (*Journal of Law and Economics*, forthcoming), the effect of the first Trump administration's efforts to control the immigration courts (*Journal of Law, Economics and Organization*), and the effect of appeals on immigration court outcomes (*University of Pennsylvania Law Review*). He received his J.D. and Ph.D. in political science from Stanford University and clerked for Judge Stephen Williams on the D.C. Circuit Court of Appeals.

3.  Hausman is the Faculty Director of the Deportation Data Project, where Blair is the Deputy Director for Data. That Project collects, analyzes, and posts public, anonymized U.S. government immigration enforcement datasets. In addition to posting publicly available data on its website, the Project uses the Freedom of Information Act to obtain datasets from federal government agencies and publishes analysis of the datasets it receives.

4.  We submit this declaration in support of the Brief of Over 110 Immigration Lawyers, Law Professors, and Scholars as Amici Curiae in the above-captioned case.

5.  For our calculations in this declaration, we used the CASE dataset posted by the Executive Office of Immigration Review ("EOIR") in its FOIA Library.[1] We are familiar with the spreadsheets and the data contained therein.

6.  The spreadsheets track immigration proceedings and record the detention status of individuals whose cases are pending or complete in the immigration courts and the Board of Immigration Appeals ("BIA"). They include, among other things, the immigration charges against each person, their entry date, the date on the Notice to Appear ("NTA"), the date and time of every hearing scheduled in the case, the outcome of the case, and, when applicable, an appeal. The spreadsheets do not include personally identifiable information, such as names or A-numbers.

7.  The most recent EOIR CASE dataset, which was posted in early March 2025, contains 11,720,036 unique cases. Each "case" in the EOIR CASE dataset does not necessarily correspond to a different, unique individual. For example, if a removal proceeding against a specific individual ends, and later, DHS issues a new charging document against them, two "cases" corresponding with that same individual would appear in the EOIR CASE dataset.

8.  Counsel for Amici Curiae asked us to summarize the data in the CASE dataset for cases where the Department of Homeland Security ("DHS") has alleged that a noncitizen violated the Immigration and Nationality Act ("INA") § 237(a)(4)(C)(i) or, prior to 1996, INA § 241(a)(4)(C)(i).

9.  We identified a list of relevant case numbers from two sources.

10. First, we accessed the charges table in the CASE dataset, and we searched by charge.[2] We found 14 cases where DHS charged a noncitizen with removability under INA § 237(a)(4)(C)(i) or § 241(a)(4)(C)(i). In 7 cases, INA § 237(a)(4)(C)(i) or § 241(a)(4)(C)(i) was the only charge invoked.

---

[1] Available at https://www.justice.gov/eoir/foia-library-0. Because of the sheer volume of the spreadsheets, which would be millions of pages in length if printed or saved in paginated format, it is impractical to submit copies to the Court. As a result, pursuant to Federal Rule of Evidence 1006, this declaration contains a summary of the contents of the spreadsheets.

[2] We accounted for differences in punctuation and capitalization.

11. Second, counsel for Amici Curiae shared a written BIA decision, *Matter of Khalifa*, 21 I&N Dec. 107 (BIA 1995), with us. According to the BIA decision, the noncitizen in that case was charged with removability under INA § 241(a)(4)(C)(i) on December 16, 1994. That case did not appear in our search of the CASE dataset, likely because that charge was added when the NTA was amended. We found the case in a separate search based on the information found in the BIA decision.[3]

12. With these 15 cases, we constructed a table of information presented below. We started with the most recent proceeding for each case from the proceedings table in the CASE dataset and retained the date DHS issued the charging document to the noncitizen ("OSC date"; the Notice to Appear was previously called an Order to Show Cause), custody status (whether they were detained), and a code representing the Immigration Judge's ("IJ") decision in the proceeding. We then merged in the charges for each proceeding from the charges table, which resulted in one to three charges that were entered in at least one proceeding for these cases. We then merged by case number to include details from the cases table, including the date of entry into the United States. We then merged by case number to the appeals table to add the BIA decision date. We then constructed a date representing the final decision date in the case ("Decision date") by either taking the completion date from the last proceeding or, if it was later, the BIA decision date from the Table of Appeals.

13. There are 4 cases in the EOIR CASE dataset where DHS charged a noncitizen with removability under INA § 237(a)(4)(C)(i) or § 241(a)(4)(C)(i) and the date on the NTA was **on or after January 1, 2000**. Out of those 4 cases, 2 cases were ones in which INA § 237(a)(4)(C)(i) or § 241(a)(4)(C)(i) was the only charge invoked.

14. Table 1, below, shows these data for all 15 cases, including the case ID, entry date (date of entry into the United States), OSC date (date DHS issued the charging document to the noncitizen), custody status (whether the immigrant was detained throughout the case, detained and then released during the case, or never detained during the case), the decision date (final decision date either from the proceedings table or appeals table as

---

[3] We conducted a search in the proceedings table based on dates that appeared in the BIA opinion and found an apparently matching record. We believe this record corresponds to the case in the BIA decision for several reasons. First, in the cases table, the date of entry of the noncitizen is recorded as December 1, 1994. In the BIA decision, it states, referring to the noncitizen: "He entered the United States as a nonimmigrant visitor on December 1, 1994…." Second, the nationality recorded in the CASE dataset is Saudi Arabia. The BIA decision states, consonantly: "The record reflects that the respondent is 38-year-old native and citizen of Saudi Arabia." Third, in the proceedings table, the "OSC Date" or date DHS issued the charging document to the noncitizen is December 16, 1994. This is the same day noted in the BIA decision, which reads: "On December 16, 1994, an Order to Show Cause was issued in his case." Fourth, in the same table, the base city code is "SFR," representing San Francisco. The BIA decision indicates the case was based there also; it is labeled at the top: "File AXX XX7 661-San Francisco."

The CASE dataset does not reflect the relevant charge and thus did not come up in our initial search, most likely because the table simply was not updated when the first charges were withdrawn and the new, relevant charge was issued. In the charges table, the noncitizen in that case, ID 2559790, was recorded as being charged under INA § 241(a)(1)(A) and § 241(a)(4)(B). This is likely because when the NTA was first filed, DHS did not charge the noncitizen with deportability under 241(a)(4)(C)(i), as confirmed in the BIA decision. The original charges were, according to that decision, the same as those in the CASE dataset, for deportability under § 241(a)(1)(A) and (B) as well as 241(a)(4)(B). The BIA decision states that those charges were withdrawn on January 5, 1995. According to the decision, DHS then charged the noncitizen instead with deportability under § 241(a)(4)(C) the same day.

described above), the decision (the final decision of the IJ after any appeals, if applicable), and the charges from the charges table.

| Case ID | Entry date | OSC date | Custody status | Decision date | Decision | Charges First | Second | Third |
|---|---|---|---|---|---|---|---|---|
| 2454560 | 1977-10-17 | 1991-03-15 | Never detained | 1992-01-15 | Relief/rescinded | 241a04ci | | |
| 2529143 | 1992-02-17 | 1999-08-04 | Detained | 2000-07-13 | Removed | 237a04ai | 237a04ci | |
| 3000162 | 1994-02-01 | 1994-10-28 | Released | 2005-09-20 | Relief/rescinded | 241a01b | 241a04ci | |
| 3000168 | 1994-02-01 | 1994-10-28 | Never detained | 2005-09-20 | Relief/rescinded | 241a01b | 241a04ci | |
| 3000175 | 1994-02-01 | 1994-10-28 | Never detained | 1997-04-14 | Administrative closing - other | 241a01b | 241a04ci | |
| 3042103 | 1989-07-01 | 1995-01-04 | Never detained | 1995-08-02 | Relief/rescinded | 241a04ci | | |
| 3130892 | 2001-11-16 | 2003-10-15 | Detained | 2003-10-27 | Voluntary departure | 237a01b | 237a04ci | |
| 3357300 | 1995-02-23 | 1995-07-18 | Never detained | 1995-12-08 | Case terminated by IJ | 241a04ci | | |
| 3457035 | 1994-12-24 | 1995-04-11 | Released | 2003-09-24 | Deported | 241a04ci | | |
| 3466804 | 1994-04-23 | 1996-11-26 | Never detained | 1997-05-08 | Case terminated by IJ | 241a01b | 241a01ci | 241a04ci |
| 3476658 | 1995-03-02 | 1995-12-21 | Detained | 1999-10-14 | Case terminated by IJ | 241a04ci | | |
| 5573574 | 2005-10-02 | 2006-08-03 | Released | 2008-09-03 | Case terminated by IJ | 237a04ci | | |
| 7760620 | [missing] | 2015-09-15 | Detained | 2015-10-28 | Removed | 237a01ci | 237a04ci | 237a01b |
| 9108003 | 2018-06-02 | 2019-08-21 | Never detained | [missing] | [missing] | 237a04ci | | |
| 2559790 | 1994-12-01 | 1994-12-16 | Detained | 1995-04-26 | Deported | 241a01b | 241a04b | |

April 8, 2025

GRAEME BLAIR
Los Angeles, California

DAVID HAUSMAN
Berkeley, California

4

# APPENDIX II
# LIST OF AMICI*

*\*All amici have signed on in an individual capacity, with institutional affiliation for identification purposes only.*

Cori Alonso-Yoder
Associate Professor of
Fundamentals of Lawyering
The George Washington University
Law School

Nadia Anguiano
Associate Clinical Professor of Law
University of Minnesota Law School

Sabrineh Ardalan
Clinical Professor of Law
Harvard Law School

Paulina Arnold
Assistant Professor
Michigan Law School

Sameer Ashar
Clinical Professor of Law
UC Irvine School of Law

Sabrina Balgamwalla
Assistant Professor
Wayne State Law School

Caitlin Barry
Professor of Law
Villanova University
Charles Widger School of Law

Lenni Benson
Distinguished Professor of Immigration and
Human Rights Law
New York Law School

Jacqueline Bhabha
Professor of the Practice
Harvard University

Diana Blank
Visiting Assistant Clinical Professor &
William R. Davis Clinical Teaching Fellow
University of Connecticut School of Law

Matthew Boaz
Assistant Professor
University of Kentucky
J. David Rosenberg College of Law

Richard Boswell
Professor of Law
Univ. of Calif. College of Law, San
Francisco

Annie Bright
Visiting Assistant Professor of Law
St. Mary's University School of Law

Emily Brown
Assistant Clinical Professor of Law
The Ohio State University
Moritz College of Law

Stacy Brustin
Professor of Law Emerita
The Catholic University of America

Katherine Buckel
Lecturer in Law
Columbia Law School

J. Anna Cabot
Clinical Associate Professor and
Assistant Dean of Clinical Education
University of Houston Law Center

Kristina M. Campbell
Professor of Law and Rita G. &
Norman L. Roberts Faculty Scholar Director
Beatriz and Ed Schweitzer Border Justice
  Initiative
Gonzaga University School of Law

Elizabeth Campbell
Clinical Professor of Law
University of Michigan

Jocelyn Cazares Willingham
Assistant Professor of Law
Co-Director, Immigration and
  Human Rights Clinic
University of the District of Columbia
David A. Clarke School of Law

Jennifer Chacón
Bruce Tyson Mitchell Professor of Law
Stanford Law School

Angélica Cházaro
Charles Stone Professor of Law
University of Washington School of Law

R. Linus Chan
Professor of Clinical Law
University of Minnesota Law School

Gabriel Chin
Edward L. Barrett Jr. Chair
Martin Luther King Jr. Professor
U.C. Davis School of Law

Dree K. Collopy
Adjunct Professor
American University
Washington College of Law

Jenny-Brooke Condon
Professor of Law
Seton Hall Law School

Lance Conklin
Adjunct Professor
Trinity Law School

Erin B. Corcoran
Executive Director, Kroc Institute for
  International Peace Studies
University of Notre Dame

Rose Cuison-Villazor
Professor of Law and
Chancellor's Social Justice Scholar
Rutgers Law School

Haiyun Damon-Feng
Assistant Professor of Law
Benjamin N. Cardozo School of Law

Daniel Morales
Associate Professor
Dwight Olds Chair in Law
University of Houston Law Center

Deborah M. Weissman
Reef C. Ivey II Distinguished Professor
  of Law
University of North Carolina School of Law

Lauren DesRosiers
Visiting Assistant Professor
Director, Immigration Law Clinic
Albany Law School

Michael Doyle
University Professor
Columbia Law School

Stella Burch Elias
Professor of Law
University of Iowa College of Law

Amy Foerster
Professor of Sociology
Pace University

Richard Frankel
Professor of Law
Drexel University
Thomas R. Kline School of Law

Niels Frenzen
Sidney M. and Audrey M. Irmas Endowed
  Clinical Professor of Law
Co-Director, Immigration Clinic
University of Southern California
Gould School of Law

Maryellen Fullerton
Suzanne J. and Norman Miles Professor
 of Law
Brooklyn Law School

John Harland Giammatteo
Associate Professor
State University of New York at Buffalo
School of Law

Denise Gilman
Clinical Professor
Co-Director, Immigration Clinic
University of Texas School of Law

Jennifer Gordon
Professor of Law
Fordham University School of Law

Joanne Gottesman
Clinical Professor of Law
Rutgers Law School

Pratheepan Gulasekaram
Provost Professor of Law
University of Colorado

Jacob Hamburger
Visiting Assistant Professor of Law
Cornell Law School

Lindsay M.  Harris
Professor of Law
University of San Francisco School of Law

Geoffrey Heeren
Professor of Law
University of Idaho College of Law

Mackenzie Heinrichs
Fellow and Visiting Assistant Professor of
  Clinical Law
University of Minnesota School of Law

Mary Holper
Clinical Professor of Law
Boston College Law School

Talia Inlender
Deputy Director
Center for Immigration Law and Policy
UCLA School of Law

Eisha Jain
Professor of Law
University of North Carolina School of Law

Kit Johnson
Professor of Law
The University of Oklahoma College of Law

Jon Bauer
Clinical Professor of Law
Richard D. Tulisano '69 Scholar in
  Human Rights
University of Connecticut School of Law

Elizabeth Jordan
Visiting Assistant Professor
Director, Immigration Law and
  Policy Clinic
University of Denver Sturm College of law

Michael Kagan
Joyce Mack Professor of Law
University of Nevada, Las Vegas

Nancy Kelly
Senior Clinical Instructor
Harvard Law School

Elizabeth  Keyes
Professor of Law
University of Baltimore

Kathleen Kim
Professor of Law
LMU Loyola Law School

Jennifer  Koh
Associate Professor of Law
Pepperdine Caruso School of Law

Daniel M. Kowalski
Editor-in-Chief
Bender's Immigration Bulletin (LexisNexis)

Jennifer J. Lee
Associate Professor of Law
Temple Law School

Theo Liebmann
Clinical Professor of Law
Hofstra University
Maurice A. Deane School of Law

Aly Madan
Adjunct Professor of Law
New England Law | Boston

Randi Mandelbaum
Associate Dean for Clinical Education
 (Newark campus)
Professor of Law
Rutgers Law School

Lynn Marcus
Clinical Law Professor
University of Arizona James E. Rogers
College of Law

Peter Markowitz
Professor of Law
Benjamin N. Cardozo School of Law

Fatma Marouf
Professor of Law
Texas A&M School of Law

Estelle McKee
Clinical Professor
Cornell Law School

Katie Herbert Meyer
Professor of Practice
Washington University in St. Louis
School of Law

Jennifer Moore
Professor of Law
University of New Mexico School of Law

Daniel Morales
Associate Professor of Law
Dwight Olds Chair in Law
University of Houston Law Center

Angela Morrison
Professor of Law
Texas A&M School of Law

Hiroshi Motomura
Susan Westerberg Prager Distinguished
 Professor of Law
UCLA School of Law

Elora Mukherjee
Jerome L. Greene Clinical Professor of Law
Columbia Law School

Karen Musalo
Professor of Law
UC Law San Francisco

Lori Nessel
Professor of Law
Director, Immigrants' Rights/International
Human Rights Clinic
Seton Hall Law School

Mae Ngai
Professor of History
Columbia University

John Palmer
Associate Professor
Universitat Pompeu Fabra

Sarah Paoletti
Practice Professor of Law
University of Pennsylvania Carey
Law School

Reena Parikh
Assistant Clinical Professor
Boston College Law School

Jackie Pearce
Clinical Instructor
CUNY School of Law

Huyen Pham
Professor of Law
Texas A&M University School of Law

Jaya Ramji-Nogales
Professor of Law
Temple University

Sarah Rogerson
Professor of Law
Clinic Director
Albany Law School

Carrie Rosenbaum
Senior Fellow
Santa Clara University School of Law

Rachel Rosenbloom
Professor of Law
Northeastern University School of Law

Rubén G. Rumbaut
Distinguished Professor of Sociology
University of California, Irvine

Lexie Salamone
Immigration Law Clinic Attorney Fellow
Washington University School of Law

Faiza Sayed
Associate Professor of Law
Brooklyn Law School

Anne Schaufele
Assistant Professor
University of the District of Columbia
David A. Clarke School of Law

Erica Schommer
Clinical Professor of Law
St. Mary's University School of Law

Philip Schrag
Delaney Family Professor of Public Interest
  Law
Georgetown University

Ragini  Shah
Clinical Professor of Law
Suffolk University Law School

Sarah Sherman-Stokes
Clinical Associate Professor
Boston University School of Law

Anita Sinha
Professor of Law
American University Washington
College of Law

Doug Smith
Lecturer
Brandeis University

Elissa Steglich
Clinical Professor
University of Texas School of Law

Juliet Stumpf
Edmund O. Belsheim Professor of Law
Lewis & Clark Law School

Maureen Sweeney
Law School Professor
University of Maryland Carey
School of Law

David Thronson
Professor of Law
Michigan State University College of Law

Mia Unger
Lecturer in Law
Columbia Law School

Sheila Velez Martinez
Jack and Lovell Olender Professor of
  Asylum, Refugee and Immigration Law
University of Pittsburgh School of Law

Leti Volpp
Robert D. and Leslie Kay Raven Professor
  of Law
UC Berkeley School of Law

Jonathan Weinberg
Distinguished Professor of Law
Wayne State University

Anna Welch
Professor of Law
University of Maine School of Law

Virgil Wiebe
Professor of Law
University of St. Thomas

John Willshire
Senior Clinical Instructor
Harvard Law School

Amelia Wilson
Assistant Clinical Professor
Director of the Immigration Justice Clinic
Elisabeth Haub School of Law
Pace University

Michael Wishnie
William O. Douglas Clinical Professor of
  Law
Yale Law School

Lauris Wren
Clinical Professor of Law
Maurice A. Deane School of Law
Hofstra University

Stephen Yale-Loehr
Retired Professor of Immigration Practice
Cornell Law School

Mary Yanik
Clinical Associate Professor of Law
Tulane Law School

Bri Zhuang
Immigration Law Teaching Fellow
University of Maine School of Law