EXHIBIT B

2025 WL 1232369
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Mahmoud KHALIL, Petitioner,

v.

William P. JOYCE et al., Respondents.

No. 25-cv-01963 (MEF)(MAH)
|
Signed April 29, 2025

**Synopsis**

**Background:** Noncitizen, a lawful permanent resident (LPR) and graduate student, filed habeas petition against Secretary of State and other federal officials, claiming arrest, immigration detention, and initiation of removal proceedings violated First Amendment, Due Process Clause, and Administrative Procedure Act (APA). The United States District Court for the Southern District of New York, Jesse M. Furman, J., 2025 WL 849803, granted noncitizen's motion for transfer to District of New Jersey, where he had been detained when his counsel filed petition. Government moved to dismiss for lack of jurisdiction. The District Court for the District of New Jersey, Michael E. Farbiarz, J., 2025 WL 972959, found habeas jurisdiction was proper in New Jersey, but noted other jurisdictional issues might exist, 2025 WL 1019658. Detainee moved for preliminary injunction setting aside Secretary's determination regarding adverse foreign policy consequences of noncitizen's presence and activities in United States, ordering cessation of government's alleged policy of detaining and seeking to remove noncitizens expressing support for Palestinian rights, and ordering detainee's release from detention.

**Holdings:** The District Court, Farbiarz, J., held that:

[1] statute limiting judicial review of questions arising from removal actions and proceedings did not apply given that no final order of removal had been entered;

[2] agency would not provide meaningful review of First Amendment retaliation challenge to Secretary's determination;

[3] agency expertise would have almost no role in resolving First Amendment retaliation challenge to Secretary's determination;

[4] requiring noncitizen to raise retaliation claim in removal proceedings would not satisfy First Amendment's requirement of prompt judicial review of claims involving immediate impacts on political speech;

[5] statute precluding judicial review of decisions or actions "by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders" did not apply to Secretary's determination;

[6] statute limiting judicial review of questions arising from removal actions and proceedings did not bar habeas review of First Amendment retaliation challenge to alleged policy; and

[7] statute barring judicial review of detention pending removal decision did not preclude consideration of noncitizen's request for preliminary injunction requiring release from detention.

Ordered accordingly.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (53)

**[1]    Injunction** 🔑

One requirement for obtaining a preliminary injunction is that the movant must show it is likely he will be the ultimate winner when the case is over and done and reaches its normal finish line.

**[2]    Federal Courts** 🔑

Jurisdiction is always the first and fundamental question, because a court that does not have jurisdiction does not have power over a case.

**[3]    Federal Courts** 🔑

A court that lacks jurisdiction cannot decide the merits of a case, and so it should not speak to them.

**[4]**    Statutes 🔑

Where the words of a statute are clear and distinct, they must be enforced as written.

**[5]**    Aliens, Immigration, and Citizenship 🔑

The "judicial review" alluded to in the INA provision stating that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section" is conducted only by federal courts of appeals after the immigration courts are done with their work, that is, after the Board of Immigration Appeals (BIA) has affirmed the immigration judge's (IJ) order or after the time for appealing to the BIA has run out, with federal district courts having no role. Immigration and Nationality Act §§ 101, 242,

🚩 8 U.S.C.A. §§ 1101(a)(47)(B), 🚩 1252(a)(5),
🚩 (b)(2), 🚩 (b)(9).

**[6]**    Statutes 🔑

Where statutory terms are undefined, the court looks to the ordinary and contemporary meanings of the words Congress used; this includes referring to time-of-enactment dictionaries, both general and legal.

**[7]**    Aliens, Immigration, and Citizenship 🔑

Secretary of State's determination that presence and activities of noncitizen, a lawful permanent resident, in United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest," as basis for pending removal proceeding, was "action"

within meaning of INA provision stating "[j]udicial review of all questions of law and fact…arising from any action…or proceeding… to remove [a noncitizen]…shall be available only" on review of final order of removal; Secretary's determination was decision made as to noncitizen and culminated in physical thing, namely memorandum reflecting determination. Immigration and Nationality Act §§ 237, 242,

🚩 8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩 1252(b)
(9).

**[8]**    Statutes 🔑

Putting "any" before a statutory word confirms the word must be understood in an inclusive way, to reach the outer edge of its possible orbit.

**[9]**    Aliens, Immigration, and Citizenship 🔑

The term "action," in the INA provision stating that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section," has its ordinary meaning of "something done."

Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)(9).

**[10]**    Aliens, Immigration, and Citizenship 🔑

The phrase "any action," in the INA provision stating that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section," covers all actions, without qualification. Immigration and Nationality Act §

242, 🚩 8 U.S.C.A. § 1252(b)(9).

**[11]    Statutes** 🔑

Statutes should not be read to create redundancies and surplus.

**[12]    Aliens, Immigration, and Citizenship** 🔑

Secretary of State's determination that he had reasonable grounds to believe presence and activities of noncitizen, a lawful permanent resident, in United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" was "action taken to remove an alien," within meaning of INA provision stating that "[j]udicial review of all questions of law and fact…arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section"; sole legal function of such a determination was to seek removal, as confirmed by Secretary's memorandum, which stated it concerned removability. Immigration and Nationality Act §§ 237, 242, 🚩8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩1252(b)(9).

**[13]    Aliens, Immigration, and Citizenship** 🔑

To "remove an alien from the United States," within the meaning of the INA provision stating that "[j]udicial review of all questions of law and fact…arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section," means to act with the intent or purpose to remove someone. Immigration and Nationality Act § 242, 🚩8 U.S.C.A. § 1252(b)(9).

**[14]    Aliens, Immigration, and Citizenship** 🔑

Whether Secretary of State's determination that presence and activities of noncitizen, a lawful permanent resident, in United States

"would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" violated Free Speech Clause was question "arising from" action taken to remove noncitizen, as necessary for INA provision stating "[j]udicial review of all questions of law and fact…arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section" to preclude habeas court from reviewing First Amendment claim; Secretary's determination was basis for noncitizen's detention and pending removal proceeding. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 237, 242, 🚩8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩1252(b)(9).

**[15]    Federal Courts** 🔑

Dicta from the United States Supreme Court carry special weight.

**[16]    Federal Courts** 🔑

Logically necessary and explicitly invoked steps along the way to a court's holding can be binding precedent.

**[17]    Aliens, Immigration, and Citizenship** 🔑

INA provision stating "[j]udicial review of all questions of law and fact…arising from any action…or proceeding…to remove [a noncitizen]…shall be available only" on review of final removal order did not apply to detained noncitizen's claim, in habeas petition, that Secretary of State's determination that noncitizen's presence and activities in United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest," which was basis of pending removal proceedings, was retaliatory in violation of Free Speech Clause; no final order of removal had yet been entered in underlying removal proceedings. U.S. Const. Amend. 1; Immigration

and Nationality Act §§ 237, 242, 🚩 8 U.S.C.A.
§§ 1227(a)(4)(C)(i), 🚩 1252(b)(9).

**[18]    Aliens, Immigration, and Citizenship** 🔑

The INA provision stating "[j]udicial review of
all questions of law and fact…arising from any
action taken or proceeding brought to remove
an alien from the United States under this
subchapter shall be available only in judicial
review of a final order under this section" does
not reach cases in which a final order of removal
has not been entered; rather, it only speaks to
cases in which judicial review goes forward after
the immigration courts have entered a final order
of removal. Immigration and Nationality Act §
242, 🚩 8 U.S.C.A. § 1252(b)(9).

**[19]    Aliens, Immigration, and Citizenship** 🔑

The INA provision stating "[j]udicial review of
all questions of law and fact…arising from any
action taken or proceeding brought to remove
an alien from the United States under this
subchapter shall be available only in judicial
review of a final order under this section"
requires that, when there is an order of removal,
review of any issues related to that order must
be consolidated into a single petition for review
and cannot be brought piecemeal; one may not,
for instance, follow a petition for review of a
final order of removal with a habeas petition or a
petition for a writ of mandamus. Immigration and
Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)
(9).

**[20]    Federal Courts** 🔑

When the Supreme Court, fragmented, decides a
case and no single rationale explaining the result
enjoys the assent of five Justices, the holding of
the Court may be viewed as that position taken by
those Members who concurred in the judgments
on the narrowest grounds.

**[21]    Federal Courts** 🔑

Questions which merely lurk in the record,
neither brought to the attention of the court nor
ruled upon, are not to be considered as having
been so decided as to constitute precedents.

**[22]    Federal Courts** 🔑

When an explicit ruling in a judicial decision
necessarily rests on an implicit logical
proposition, both the explicit ruling and the
implicit proposition can count as rulings.

**[23]    Aliens, Immigration, and Citizenship** 🔑

The INA provision stating "[j]udicial review of
all questions of law and fact…arising from any
action taken or proceeding brought to remove
an alien from the United States under this
subchapter shall be available only in judicial
review of a final order under this section" does
not strip district courts of jurisdiction over such
questions if later review in the federal court
of appeals, after the immigration courts are
done, would not be meaningful. Immigration and
Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)
(9).

**[24]    Administrative Law and Procedure** 🔑

As a matter of administrative law, if Congress
has explicitly pulled jurisdiction away from the
federal district courts, the case goes to the agency
for first-cut adjudication there.

**[25]    Administrative Law and Procedure** 🔑

If Congress has not explicitly pulled jurisdiction
away from the federal district courts, the analysis
of whether a case may be brought in federal
district court or must first be pursued in
administrative proceedings asks whether it is
fairly discernible, mainly as a matter of statutory
interpretation, that Congress intended for claims
to go to administrative courts as opposed to
federal district courts; if the answer is yes, then

the focus narrows to the particular type of claim that is in play, and whether Congress wanted that type of claim to make its first stop in a federal court or before an administrative adjudicator.

**[26]**    **Administrative Law and Procedure**    👈

To determine whether Congress wanted a particular type of claim to make its first stop in a federal court or before an administrative adjudicator, as the second step of the analysis of whether a plaintiff must pursue the claim before an agency rather than in district court, courts are to look to whether agency-first adjudication would (1) supply meaningful review, which is by far the most important factor; (2) draw on agency expertise; and (3) run through issues that are core rather than collateral.

**[27]**    **Aliens, Immigration, and Citizenship**    👈

In removal proceedings, immigration courts would not be able to grant relief that noncitizen, a lawful permanent resident, sought on claim that Secretary of State's determination that noncitizen's presence and activities in United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" was retaliatory in violation of First Amendment, weighing in favor of finding that habeas court had jurisdiction over such claim, despite INA's limitation on review of questions arising from removal actions or proceedings, because agency review would not be meaningful; immigration court could not enjoin or suppress declaration on First Amendment grounds from being used as evidence in removal proceedings. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 237, 242, 🚩8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩1252(b)(9).

**[28]**    **Aliens, Immigration, and Citizenship**    👈

Motions to suppress evidence on First Amendment grounds have no place in proceedings before an immigration judge (IJ) or the Board of Immigration Appeals (BIA). U.S. Const. Amend. 1.

**[29]**    **Aliens, Immigration, and Citizenship**    👈

In removal proceedings, immigration courts would likely be unable to conduct adequate fact-finding on noncitizen's claim that his arrest and detention were retaliatory in violation of First Amendment, supporting finding that habeas court had jurisdiction over claim, despite INA's limitation on review of questions arising from removal actions or proceedings, because administrative review would not be meaningful; immigration courts were not suited to developing record on sweeping issue of whether proffered probable cause for arrest, including determination by Secretary of State that noncitizen's presence would have adverse foreign-policy consequences, reflected selective enforcement or retaliatory pattern or practice, which raised constitutional issues outside agency's usual purview. U.S. Const. Amends. 1, 4; Immigration and Nationality Act §§ 237, 242, 🚩8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩1252(b) (9).

**[30]**    **Aliens, Immigration, and Citizenship**    👈

Noncitizen's claim that Secretary of State's determination that presence and activities of noncitizen, a lawful permanent resident, in United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest" was retaliatory in violation of First Amendment was not collateral to INA provision limiting judicial review of final orders of removal, weighing in favor of finding that provision required noncitizen to present such claim in removal proceedings before immigration judge (IJ) and Board of Immigration Appeals (BIA) rather than in habeas proceedings before district court; Secretary's determination was basis for removal proceedings pending against noncitizen. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 237, 242,

8 U.S.C.A. §§ 1227(a)(4)(C)(i), 1252(b)(9).

**[31]    Aliens, Immigration, and Citizenship** 🔑

Agency expertise would have almost no role in immigration courts' assessment of noncitizen's claim that Secretary of State's determination of reasonable grounds to believe noncitizen's presence and activities in United States "would have potentially serious adverse foreign policy consequences," which was basis of pending removal proceeding, was retaliatory in violation of First Amendment, weighing in favor of finding that habeas court had jurisdiction over such claim despite INA's limitation on review of questions arising from removal actions or proceedings; immigration judges (IJs) rarely dealt with First Amendment issues, could not interpret immigration laws in way that would receive strong deference from federal court, and could not review Secretary's determination for reasonableness. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 237, 242, 8 U.S.C.A. §§ 1227(a)(4)(C)(i), 1252(b)(9).

**[32]    Administrative Law and Procedure** 👓

Generally, an agency's expertise can weigh in favor of requiring litigants to pursue adjudication of a claim in administrative courts rather than district courts, even when the legal theory that undergirds the claim is not one as to which an agency adjudicator has any expertise.

**[33]    Constitutional Law** 👓

Speech deals with matters of public concern, and is entitled to special protection under the First Amendment, when it can be fairly considered as relating to any matter of political concern to the community. U.S. Const. Amend. 1.

**[34]    Constitutional Law** 👓

Noncitizen's public statements that Israel had committed "genocide," that university where noncitizen was student was "financing and in other ways facilitating it," and that United States was on wrong side of conflict constituted speech on subject of public concern, and thus, statements were entitled to special protection under First Amendment, for purposes of determining whether INA's limitation on judicial review of questions arising from final orders of removal precluded habeas court from exercising jurisdiction over noncitizen's claim that his immigration detention was retaliatory in violation of First Amendment; topic was of political concern to community and was of legitimate news interest. U.S. Const. Amend. 1; Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(b)(9).

**[35]    Constitutional Law** 👓

Speech can be a matter of public concern, such that it is entitled to special protection under the First Amendment, when it is a subject of legitimate news interest, including as to all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period. U.S. Const. Amend. 1.

**[36]    Constitutional Law** 👓

Noncitizen's immigration detention, which resulted from Secretary of State's determination that noncitizen's presence and activities in United States would have potentially serious adverse foreign-policy consequences, had present impacts on noncitizen's political speech regarding Israel's military campaign in Gaza, supporting finding that First Amendment entitled noncitizen to swift judicial review of his claim that Secretary's determination was retaliatory in violation of First Amendment; detention prevented noncitizen from speaking publicly and deterred him and others from speaking. U.S. Const. Amend. 1; Immigration and Nationality Act § 237, 8 U.S.C.A. § 1227(a)(4)(C)(i).

**[37]  Constitutional Law**  🔑

The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury supporting prompt relief. U.S. Const. Amend. 1.

**[38]  Constitutional Law**  🔑

The timeliness of political speech is particularly important under the First Amendment. U.S. Const. Amend. 1.

**[39]  Constitutional Law**  🔑

When a challenged law or government action has a here-and-now impact on political speech, there must be no unnecessary delay in adjudicating a First Amendment claim; courts must deal thoughtfully and thoroughly with the speech issue, but deal with it on a faster-than-usual timeline. U.S. Const. Amend. 1.

**[40]  Constitutional Law**  🔑

A "prior restraint" is government censorship that cuts off speech before it makes it to the public; it is a restraint of speech that is prior to publication.

**[41]  Constitutional Law**  🔑

Prior restraints, which are immediate and irreversible, are presumptively unconstitutional under the First Amendment. U.S. Const. Amend. 1.

**[42]  Constitutional Law**  🔑

The First Amendment allows for some prior restraints, but only when judicial review is almost immediately available, so as to quickly dissipate any chill on the freedom of speech. U.S. Const. Amend. 1.

**[43]  Statutes**  🔑

Declaring a statute unconstitutional is always a fateful act, the very last resort.

**[44]  Statutes**  🔑

Statutes are generally to be read as they were written, not with judge-made exceptions bored into them.

**[45]  Aliens, Immigration, and Citizenship**  🔑

Requiring noncitizen to first raise his First Amendment retaliation challenge to Secretary of State's determination, as basis for his detention, that his presence and activities in United States would have "adverse foreign policy consequences" in administrative removal proceedings, with judicial review postponed until entry of final order of removal, would not satisfy First Amendment's requirement that immediate impacts on political speech be reviewed without unnecessary delay, supporting habeas review during pendency of removal proceedings; delay in judicial review would serve little purpose, as immigration courts could not enjoin Secretary's determination and had no expertise on issue, and delayed and after-the-fact damages remedy for ongoing suppression of speech would be inadequate. U.S. Const. Amend. 1; Immigration and Nationality Act § 237, 🚩8 U.S.C.A. § 1227(a)(4)(C)(i).

**[46]  Constitutional Law**  🔑

Delaying judicial review of First Amendment challenges involving here-and-now impacts on political speech is permissible, and even necessary, to ensure thoughtful consideration of hard issues, but not delay that may be long, that will serve little real practical purpose, and that will come and go with little to show for the wait. U.S. Const. Amend. 1.

**[47]  Constitutional Law**  🔑

The doctrine of constitutional doubt counsels that ambiguous statutory language be construed to avoid serious constitutional doubts.

**[48]**   Aliens, Immigration, and Citizenship 🔑

In the INA provision stating that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter," the reference to "Attorney General" should be read as "Secretary of Homeland Security," given the creation of the Department of Homeland Security (DHS) after the enactment of this provision. 6 U.S.C.A. § 557; Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(g).

**[49]**   Aliens, Immigration, and Citizenship 🔑

INA provision stating that "no court shall have jurisdiction to hear any cause or claim…arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" did not strip habeas court of jurisdiction over noncitizen's claim that Secretary of State's determination that his presence and activities in United States "would have potentially serious adverse foreign policy consequences," which was basis for his detention and pending removal proceedings, was retaliatory in violation of First Amendment; determination was not decision or action to execute removal order or adjudicate case, was not by Secretary of Homeland Security, and was separate from Secretary of Homeland Security's exercise of prosecutorial discretion. U.S. Const. Amend. 1; Immigration and Nationality Act §§ 237, 242, 🚩 8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩1252(g).

**[50]**   Aliens, Immigration, and Citizenship 🔑

In exercising her power to decide whether a "deportable" noncitizen will be removed

from the United States, the Secretary of Homeland Security generally has wide discretion. Immigration and Nationality Act § 237, 🚩 8 U.S.C.A. § 1227(a).

**[51]**   Aliens, Immigration, and Citizenship 🔑

INA provision stating that "[j]udicial review of all questions of law and fact…arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order" of removal did not deprive habeas court of jurisdiction over detained noncitizen's claim that government's alleged policy of imposing adverse immigration consequences to retaliate against noncitizens who protested Israel's military campaign in Gaza violated First Amendment; it was difficult to say government's alleged policy, which noncitizen characterized as ill-defined, was "action" within meaning of INA provision, and immigration courts in removal proceedings would not be well-equipped to conduct discovery on any such policy. U.S. Const. Amend. 1; Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252(b)(9).

**[52]**   Aliens, Immigration, and Citizenship 🔑

INA provision stating that "no court shall have jurisdiction to hear any cause or claim… arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" did not deprive habeas court of jurisdiction over detained noncitizen's claim that government's alleged policy of imposing adverse immigration consequences to retaliate against noncitizens who protested Israel's military campaign in Gaza violated First Amendment; alleged policy was far removed from discretionary decision to initiate removal proceedings against noncitizen, which arose from Secretary of State's determination that noncitizen's presence would have adverse foreign-policy consequences, which resulted from alleged policy. U.S. Const. Amend. 1;

Immigration and Nationality Act §§ 237, 242,
🚩 8 U.S.C.A. §§ 1227(a)(4)(C)(i), 🚩 1252(g).

[53]    Aliens, Immigration, and Citizenship 👉

INA provision barring judicial review as
to detention pending decision on whether a
noncitizen is to be removed from United States
did not preclude habeas court from considering
noncitizen's request for preliminary injunction
requiring his release from immigration detention
pending resolution of merits of his claims that
his detention and removal proceedings, arising
from determination by Secretary of State that his
presence in United States would have potentially
serious adverse foreign-policy consequences,
was retaliatory in violation of First Amendment
and resulted from impermissibly vague policy
in violation of due process; if habeas court
were to hold that government was attempting to
remove noncitizen on unconstitutional basis, no
removal decision would be pending any longer.
U.S. Const. Amends. 1, 5; Immigration and
Nationality Act §§ 236, 237, 🚩 8 U.S.C.A. §§
1226(e), 🚩 1227(a)(4)(C)(i).

**West Codenotes**

**Prior Version's Validity Called into Doubt**

🚩 8 U.S.C.A. § 1251(a)(4)(C)(i)

**Attorneys and Law Firms**

Kyle Barron, The Legal Aid Society, New York, NY, Baher Azmy, Center for Constitutional Rights, New York, NY, Molly Knopp Biklen, Omar C. Jadwat, New York Civil Liberties Union, New York, NY, Joshua Lewis Dratel, Amy E. Greer, Dratel & Lewis, New York, NY, Farrin R. Anello, Jeanne LoCicero, Molly KC Linhorst, American Civil Liberties Union of New Jersey Foundation, Newark, NJ, Naz Ahmad, Main Street Legal Services, Inc., Cuny School of Law, Long Island City, NY, for Petitioner.

August Flentje, Dhruman Yogesh Sampat, DOJ-United States Attorney's Office, Washington, DC, for Respondents.

Greg Harold Greubel, Foundation for Individual Rights and Expression, Philadelphia, PA, for Amicus Foundation for Individual Rights and Expression.

Elora Mukherjee, Morningside Heights Legal Services, Inc. Columbia Law School, New York, NY, Ian Hinonangan, Hinonangan Law Office, Jersey City, NJ, for Amicus Immigration Lawyers, Law Professors, and Scholars.

Leena Khandwala, Detention and Deportation Defense Initiative, Newark, NJ, for Amicus International Law Professors, Experts, Practitioners, and Scholars.

John Michael Miano, Summit, NJ, for Amicus Immigration Reform Law Institute.

David A. Brown, II, Naman Howell Smith & Lee PLLC, San Antonio, TX, for Amicus National Jewish Advocacy Center.

**OPINION**

Michael E. Farbiarz, United States District Judge

**Table of Contents**

**\*1  I. Background**
**A. The Facts**

**B. Procedural History**

**C. The Motion**

**D. The Response**


**II. The Question**

**III. The Court's Approach**

**IV. Section 1252(b)(9) Does Not Apply Here**
**A. Section 1252(b)(9)**

  **1. The Statute**

  **2. The Question**

  **3. The Answer**

    **a) "Action"**

    **b) "To Remove"**

c) **"Under This Subchapter"**

d) **"Arising From"**

B. **The Text**

C. **Chehazeh**


V. **If Section 1252(b)(9) Applies Here**
A. **EOHC**

B. **Administrative Law**

  1. **Structure**

  2. **Thunder Basin**

C. **EOHC In Context**

D. **Massieu**

E. **Conclusion**


VI. **Meaningful Review**
A. **Legal Remedies**

B. **Factual Development**

C. **Expertise**

D. **Conclusion**

  1. **Public Concern**

  2. **First Amendment Speed**

    a) **Administrative Proceedings**

    b) **State Prosecutions**

    c) **The Supreme Court**

    d) **Prior Restraints**

    e) **Implications**

  3. **AADC**

  4. **Axon**

VII. **Section 1252(g)**

VIII. **The Policy**

IX. **Conclusion**

* * *

A lawful permanent resident is held in immigration custody, and federal officials have begun proceedings before an immigration judge to remove him from the United States.

The lawful permanent resident has moved for a preliminary injunction, claiming that one of the charges against him is unconstitutional and that this Court should therefore order him released.

In response, federal officials argue that the motion should be denied, in part because this Court cannot hear the case. Certain statutes, they say, strip the Court of jurisdiction.

The jurisdictional argument is not persuasive. This Opinion explains why.


I. **Background**

  A. **The Facts**

A lawful permanent resident [1] was arrested by federal officials. See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6; Second Supplemental Declaration of Acting Field Office Director William P. Joyce ("Joyce Declaration") (ECF 72) ¶¶ 6-7.

While in custody, he was handed various forms. See Declaration of Mahmoud Khalil ("Khalil Declaration") (ECF 73-1) ¶¶ 4-6; Joyce Declaration ¶ 7.

These said two main things.

First, that federal officials were seeking to remove him from the United States based on 8 U.S.C. § 1227(a)(4)(C)(i), of which more in a moment. See Joyce Declaration ¶ 7.

And second, that as part of that process he had to appear before an immigration judge. [2] See Khalil Declaration ¶ 5.

The proceedings before the immigration judge are now underway.

\* \* \*

At an immigration court hearing earlier this month, the immigration judge assessed federal officials' argument that the lawful permanent resident should be removed from the United States under 🚩 8 U.S.C. § 1227(a)(4)(C)(i).

**\*2** Under that statute, "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."

The immigration judge referred to a memorandum from the Secretary of State to the Secretary of the Department of Homeland Security. See Audio Recording of Hearing (April 11, 2025) ("April 11 Audio Recording") at 1:34:40 to 1:34:48.

In the memo, the Secretary of State wrote that he had "determined" that the Petitioner was "deportable" under 🚩 Section 1227(a)(4)(C)(i). See Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Determination") (ECF 198-1) at 1.

Based on the memo, the immigration judge ruled that the requirements of 🚩 Section 1227(a)(4)(C)(i) had been met and that the lawful permanent resident could therefore be removed from the United States. See April 11 Audio Recording at 1:37:46 to 1:38:25.

\* \* \*

There are further immigration court proceedings to come.

For example, an appeal of the immigration judge's decision might be taken to the Board of Immigration Appeals. [3]

And more proceedings have been scheduled before the immigration judge. [4]

### B. Procedural History

The lawful permanent resident filed a habeas corpus petition in a federal district court.

From here, he is called "the Petitioner." The various people he named in his habeas petition are referred to, collectively, as "the Respondents." [5]

\* \* \*

**\*3** The Petitioner filed his case in New York, but it was transferred to New Jersey. See Khalil v. Joyce, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025).

In New Jersey, the Respondents moved to dismiss the case, arguing it should go forward in Louisiana, where the Petitioner is in custody. The motion was denied. The Court held that habeas jurisdiction is proper in New Jersey. See Khalil v. Joyce, ——— F.Supp.3d ———, 2025 WL 972959 (D.N.J. Apr. 1, 2025). [6]

But as the Court noted: there are "other jurisdictional hurdles." Khalil v. Joyce, 2025 WL 1019658, at \*1 n.2 (D.N.J. Apr. 4, 2025).

This Opinion considers them.

### C. The Motion

The Petitioner has moved for a preliminary injunction. See ECF 66.

Through this motion, he asks the Court to order three things. See Petitioner's Amended Memorandum of Law in Support of Motion for Preliminary Injunctive Relief ("Motion for Preliminary Injunction") (ECF 124) at 9-10.

\* \* \*

First, and as noted above, the Secretary of State has determined that the Petitioner's presence and activities in the United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." Determination at 1. And based on the Secretary's determination, the immigration judge has ruled that the Petitioner can be removed from the United States. See April 11 Audio Recording at 1:37:46 to 1:38:25.

The Petitioner asks the Court to order that the Secretary's determination be set aside, vacated. See Motion for Preliminary Injunction at 9.

The determination, the Petitioner argues, was made in retaliation for statements the Petitioner made on political issues, and this retaliation violates the First Amendment. See id. at 10-18. [7]

* * *

**\*4** <u>Second</u>, the Petitioner alleges that the Respondents are pursuing a policy to "to arrest, detain, and seek to remove noncitizens who engage in expressive activities ... supporting Palestinian rights," <u>id.</u> at 4, --- and that it is because of this policy that federal official are seeking to remove him from the United States. <u>See id.</u>

The Petitioner asks the Court to order that the policy be stopped. <u>See id.</u> at 9-10.

The policy violates the First Amendment, the Petitioner says, because it is premised on "viewpoint discrimination," <u>id.</u> at 19 --- it operates against people who take one view in certain public debates, but not those who take other views.

And the policy also violates the Fifth Amendment, the Petitioner says, because it is too vague --- and due process requires precision, so that people can know in advance what the government might seek to do. <u>See id.</u> at 16.

* * *

<u>Third</u> and finally, the Petitioner says he is being detained by immigration authorities in retaliation for the public statements he has made, <u>see id.</u> at 33, and also to "chill" him from making other statements. <u>See id.</u> This, the argument goes, violates the Petitioner's First Amendment rights --- and the Court should therefore order the Petitioner released from custody. <u>See id.</u> at 9.

### D. The Response

The Petitioner, as noted, has sought a preliminary injunction as to each of the three things set out above.

In doing so, the Petitioner is asking for a remedy at an early stage of this case, before it runs its typical and full course. [8]

To win a preliminary injunction, a litigant must show a number of things.

**[1]** One of them: that he is "likely" to be the ultimate winner --- when the case is over and done, and reaches its normal finish line. <u>See, e.g.,</u> Starbucks Corp. v. McKinney, 602 U.S. 339, 345, 144 S.Ct. 1570, 219 L.Ed.2d 99 (2024).

The Respondents argue that the Petitioner has not met this standard. <u>See</u> Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction ("Opposition Brief") (ECF 156) at 8-32.

As to why, some of the Respondents' arguments focus on the merits of the case. <u>See id.</u> at 23-32.

Others zero in on the Court's power over the case --- in particular, on a set of statutes that the Respondents say take away this Court's jurisdiction. <u>See id.</u> at 8-21.

### II. The Question

**[2]** "Jurisdiction is, as always, the 'first and fundamental question.' " Baymont Franchise Sys., Inc. v. Narnarayandev, LLC, 348 F.R.D. 220, 227 (D.N.J. 2024) (quoting Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453, 20 S.Ct. 690, 44 L.Ed. 842 (1900)).

**[3]** This is because a court that does not have jurisdiction does not have power over a case. It cannot decide the merits, see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), and so it should not speak to them.

Against this backdrop, the Court will consider in this Opinion solely whether it has jurisdiction. Merits issues (and other issues, like venue) will be taken up later.

* * *

Begin the jurisdictional analysis by getting a fuller sense of the main issue that is on the table.

The Court starts off with jurisdiction here.

The habeas corpus statute gives federal district courts jurisdiction over habeas cases, <u>see</u> 28 U.S.C. § 2241(a), and this is a habeas case. <u>See</u> Second Amended Petition ("Petition") (ECF 162) ¶ 20.

Moreover, the Court has previously ruled that it has habeas jurisdiction over this case in particular. <u>See</u> Khalil, ——— F.Supp.3d ———, 2025 WL 972959.

**\*5** The question, then, is this: does anything take away the Court's jurisdiction?

The Respondents say yes, and they point to two "jurisdiction-stripping" statutes. See Opposition Brief at 9–20, 23.

The statutes are in ⚑ Title 8 of the United States Code, at Section 1252(g) and ⚑ Section 1252(b)(9). Their current versions became law in 2005. [9]

If these statutes do not strip away this Court's habeas jurisdiction, then things stay as they were and this Court resolves the case.

If these statutes do strip away this Court's habeas jurisdiction, then the way forward is different. The front-line review will be done by the immigration courts.

Either way, though, the next rung up on the ladder is the same. Whoever does the first-cut look, this Court or the immigration courts, what follows is review in a federal court of appeals (and after that, review would be possible in the Supreme Court). [10]

## III. The Court's Approach

The Court first takes up the Respondents' argument that ⚑ Section 1252(b)(9) strips jurisdiction.

⚑ Section 1252(b)(9), it is said, prevents this Court from considering the Petitioner's claim that the Secretary of State's determination under ⚑ Section 1227(a)(4)(C)(i) was unconstitutional.

Out of the gate, this ⚑ Section 1252(b)(9) argument looks strong. See Part IV.A.

But ultimately, it is not persuasive.

This is because ⚑ Section 1252(b)(9) applies only after a final order of removal has been entered by the immigration courts. The words of the statute say so. See Part IV.B. And so has the Third Circuit. [11] See Part IV.C.

But no final order of removal has been entered in this case. Therefore, ⚑ Section 1252(b)(9) does not apply.

* * *

There is, though, a wrinkle.

In another case, [12] the Third Circuit has suggested that ⚑ Section 1252(b)(9) can apply, as here, before a final order of removal has been entered by the immigration courts.

But even on the assumption that the second case is controlling, ⚑ Section 1252(b)(9) does not remove jurisdiction from this Court as to the Secretary of State's determination.

*6 Under the second case, ⚑ Section 1252(b)(9) strips jurisdiction from a federal district court over a claim only when that claim could still get "meaningful" federal court review later --- after the immigration courts have wrapped up their work, and the claim then goes to a federal court for the first time, a federal court of appeals. See Part V.

But in this case, that sort of delayed federal court review would not be "meaningful" federal court review.

This is for two reasons.

First, because there would be little to show for any such delay. Usually, the immigration courts can tee things up for the federal court of appeals, by providing a remedy for any illegal conduct, by finding the facts, and by applying their distinctive expertise. But the immigration courts cannot do any of that as to the Secretary of State's determination. See Part VI.A to Part VI.C.

And second, the law requires sped-up judicial review of First Amendment claims of the kind the Petitioner raises here. That is not consistent with delaying federal court review until after the immigration courts have finished their work and the case then moves to a federal court of appeals. See Part VI.D.

* * *

Next, the Court considers the Respondents' argument that ⚑ Section 1252(g) cuts off review here of the Secretary of State's determination.

But the ⚑ Section 1252(g) argument does not work. It runs aground on the plain words of the statute and the Supreme Court's main decision in this area. [13] See Part VII.

* * *

Finally, the Court considers the alleged policy that the Petitioner has challenged --- and assesses whether Section 1252(b)(9) or Section 1252(g) take away jurisdiction from this Court to consider it.

As to the policy, the jurisdiction-stripping argument is not persuasive for most of the same reasons it was not persuasive as to the Secretary's determination, plus a few more. See Part VIII. [14]

**IV. Section 1252(b)(9) Does Not Apply Here**
Get underway now with the jurisdictional analysis.

The Respondents' first argument is that Section 1252(b)(9) removes this Court's jurisdiction to consider the Petitioner's request for an injunction vacating the Secretary's determination. See Opposition Brief at 9–14.

At first, this argument looks strong. See Part IV.A.

But in the end, it does not work. Section 1252(b)(9) does not apply in cases like this one, in which a final order of removal has not been entered by the immigration courts. See Part IV.B. And the Third Circuit has confirmed as much. See Part IV.C.

Bottom line: Section 1252(b)(9) is irrelevant here. It applies to post-order-of-removal cases, and this is a pre-order-of-removal case.

**A. Section 1252(b)(9)**
To start off, bracket for a few moments the question of whether Section 1252(b)(9) does or does not apply to pre-order-of-removal cases like this one. Assume, instead --- and throughout this Part IV.A --- that Section 1252(b)(9) applies to such cases.

Under the statute, there is a four-part test for deciding whether Section 1252(b)(9) removes jurisdiction over a given claim. See Part IV.A.2.

Applying that test, the Court concludes that Section 1252(b)(9), assuming that it applies, would strip away this Court's jurisdiction over the Petitioner's claim that the Secretary of State's determination is unconstitutional. See Part IV.A.3.

**\*7** That sets the stage for the question taken up in Part IV.B and in Part IV.C: does Section 1252(b)(9) apply in pre-order-of-removal cases like this one?

**1. The Statute**

Begin, as always, with the words Congress used in the law it passed. See Lawson v. FMR LLC, 571 U.S. 429, 440, 134 S.Ct. 1158, 188 L.Ed.2d 158 (2014); United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

**[4]** Here, those words are "clear and distinct," Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 339, 4 L.Ed. 97 (1816), so they must be enforced as written. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (collecting cases).

And their effect here is unmissable. If Section 1252(b)(9) applies, there is no jurisdiction in this Court over the Petitioner's challenge to the Secretary of State's determination.

* * *

In relevant part, Section 1252(b)(9) says:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be

available only in judicial review of a
final order under this section.

🚩 8 U.S.C. § 1252(b)(9).

\* \* \*

This part of 🚩 Section 1252(b)(9) does not itself say when
and where the "judicial review" it mentions is to take place.

[5]  But other parts of 🚩 Section 1252 do. They make clear
that the "judicial review" alluded to in 🚩 Section 1252(b)(9)
is conducted only by federal courts of appeals, with federal
district courts having no role. And the court of appeals' review
kicks in after the immigration courts are done with their work
--- after the Board of Immigration Appeals has affirmed the
immigration judge's order or after the time for appealing to
the Board has run out. [15]

### 2. The Question

As set out just above, if "judicial review" is covered by
🚩 Section 1252(b)(9), then that review must happen only
later (after the immigration courts have finished their work)
and only elsewhere (in the federal court of appeals, not here).

\*8  The question, then, is this: is the judicial review
the Petitioner seeks here, of the Secretary of State's
determination, covered by 🚩 Section 1252(b)(9)?

If it is not covered, then 🚩 Section 1252(b)(9) is no hurdle to
this Court keeping jurisdiction.

If it is covered, 🚩 Section 1252(b)(9) strips jurisdiction ---
and review by this Court would be out of bounds.

\* \* \*

To answer the question, look to the front end of 🚩 Section
1252(b)(9), the part before the word "shall."

Again, 🚩 Section 1252(b)(9):

Judicial review of all questions of
law and fact, including interpretation
and application of constitutional and
statutory provisions, arising from any
action taken or proceeding brought
to remove an alien from the United
States under this subchapter shall be
available only in judicial review of a
final order under this section.

🚩 8 U.S.C. § 1252(b)(9) (emphasis added).

What judicial review is covered by the first half of the
sentence?

"Judicial review of all questions of law and fact, including
interpretation and application of constitutional and statutory
provisions, arising from any action taken or proceeding
brought to remove an alien from the United States under this
subchapter[.]" Id.

In other words, 🚩 Section 1252(b)(9) kicks in when four
conditions are met:

1. There is "any action ... or proceeding,"

2. "to remove an alien from the United States,"

3. "under this subchapter," and

4. judicial review is sought as to "a[ ] question[ ] of law and
   fact" that "aris[es] from" such "action" or "proceeding."

Below, the Court ticks through these --- and concludes that
each of the four boxes is checked.

What this means: 🚩 Section 1252(b)(9) covers judicial
review of the Secretary of State's determination --- and so,
if 🚩 Section 1252(b)(9) applies in the first place, [16] that
Section prevents this Court from assessing the Secretary's
determination.

### 3. The Answer

Section 1252(b)(9), as noted, spins off a four-part test for deciding whether judicial review of a claim is covered by the statute. See Part IV.A.2.

**[6]**  As shown below, each part of the test is satisfied. [17]

### a) "Action"

Is the Secretary's determination an "action" or "proceeding" within the meaning of Section 1252(b)(9)?

**[7]**  The Court's conclusion: it is an "action."

At around the time of Section 1252(b)(9)'s initial enactment in 1996, authoritative sources understood "action" broadly. [18]

**\*9**  The Oxford English Dictionary defined "action" as "a thing done, a deed." Action, n., sense 3.a, Oxford English Dictionary (2d ed. 1989). And a leading legal dictionary went roughly the same way. See Action, Black's Law Dictionary (6th ed. 1990) ("something done.").

In making his determination, formalized through a memorandum, the Secretary of State took an action. Writing or approving a memo is not something that just happens; it takes doing --- the "do[ing]" of "something."

The inquiry could end there.

And it would, except that something else reinforces the conclusion that the Secretary's determination is an "action." Namely, Congress put the word "any" before the word "action"; the statute says "any action." 8 U.S.C. § 1252(b)(9) (emphasis added).

**[8]**  And putting "any" before a word confirms it must be understood in an inclusive way, to reach the outer edge of its possible orbit.

A year after Section 1252(b)(9) first became law, for example, the Supreme Court said: "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' " United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d

132 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).

This wide-angle view of "any" matches up with a long line of Supreme Court cases.

In Collector of Internal Revenue v. Hubbard, 79 U.S. 12 Wall. 1, 15, 20 L.Ed. 272 (1870), for example, the Supreme Court interpreted a statute that said certain tax suits shall not "be maintained in any court." 79 U.S. at 3. It was "quite clear" that "any court" meant any court, federal or state. Id. at 15.

More recently, the Court reaffirmed that "any" "ordinarily 'refers to a member of a particular group or class without distinction or limitation' and in this way 'implies every member of the class or group.' " SAS Inst., Inc. v. Iancu, 584 U.S. 357, 362, 138 S.Ct. 1348, 200 L.Ed.2d 695 (2018) (cleaned up) (quoting Any, Oxford English Dictionary (3d ed. 2016)); see also United States v. Alvarez–Sanchez, 511 U.S. 350, 358, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994).

\* \* \*

Bottom line:

**[9]**  The Secretary of State's determination was a decision made as to the Petitioner, and it culminated in a physical thing in the world -- the memorandum that reflects the determination. The determination was "something done," and that is what "action" means.

**[10]**  And whatever possible doubt there might be is dissipated by Congress' use of "any action." Per that phrase, Section 1252(b)(9) covers all actions --- without qualification, nothing carved out.

This conclusion, that the Secretary's determination is an "action," is linguistically obvious.

So much so that the Petitioner seems to see things in the same way. In making his determination, the Petitioner writes in his legal brief, the Secretary "had taken [an] action." Motion for Preliminary Injunction at 17 (emphasis added); see also id. at 1, 7, 13 (describing the challenged conduct as an "action").

\* \* \*

The first of the four 🚩 Section 1252(b)(9) boxes is checked. The Secretary's determination counts as an "action."

\* \* \*

Before moving on, note a possible counterargument.

Namely, it might be argued that 🚩 Section 1252(b)(9) refers only to an "action" of the legal sort --- as in, say, a civil action, or some other kind of lawsuit. After all, one of the basic definitions of "action" is "[a] legal process or suit." Action, n., sense 8, Oxford English Dictionary (2d ed. 1989).

**\*10** If this were the right understanding of 🚩 Section 1252(b)(9), the Secretary's determination could not be chalked up as an "action." The determination is "a thing done." Action, n., sense 3, Oxford English Dictionary (2d ed. 1989). But it is not a lawsuit.

This sort of reading, though, does not make sense.

For starters, 🚩 Section 1252(b)(9) does not speak of "bringing" an action, but of "tak[ing]" one.

In everyday English, people "take action" all the time. But people do not "take a civil action" --- they bring one.

That is how the words have been used for centuries. See, e.g., id. (quoting 1 Tomlins, Law Dictionary (1809)) ("A man attainted of treason ... cannot bring an action.").

And to see the proof: across 200 years, the U.S. Reports contain 136 mentions of a "civil action brought" --- but none of a civil action "taken." Cf. Delligatti v. United States, ––– U.S. ––––, 145 S. Ct. 797, 813, ––– L.Ed.2d –––– (2025) (Gorsuch, J., dissenting) ("[A]nalyzing 'how particular combinations of words are used in a vast database of English prose' can shed light on how ordinary people understand statutory terms.") (quoting 🚩 Facebook, Inc. v. Duguid, 592 U.S. 395, 412, 141 S.Ct. 1163, 209 L.Ed.2d 272 (2021) (Alito, J., dissenting)).

Moreover, to read "action" in its legal sense would make redundant another term in 🚩 Section 1252(b)(9) --- "proceeding."

"Proceeding" covers a part of the legal process. See Proceeding, Black's Law Dictionary (6th ed. 1990) ("[T]he form and manner of conducting juridical business before a court or judicial officer."); Proceeding, vbl. n., sense 3, Oxford English Dictionary (2d ed. 1989) ("The instituting or carrying on of an action at law[.]"); see also Waetzig v. Halliburton Energy Servs., Inc., ––– U.S. ––––, 145 S. Ct. 690, 698–99, ––– L.Ed.2d –––– (2025) (surveying definitions of "proceeding").

As the Supreme Court confirmed this Term: " 'proceeding' encompasses all steps in an action." Waetzig, 145 S. Ct. at 699.

If "proceeding" sweeps in the full arc of "an action," as the Supreme Court's recent opinion suggests, then "action" --- if it is understood in its legal sense --- would be fully encompassed within "proceeding."

**[11]** The two words would cover the same thing. They would become redundant. One or the other would be reduced to surplus, an unnecessary bit of add-on. And reading statutes to create redundancies and surplus --- that is not how things are supposed to go. See Bufkin v. Collins, ––– U.S. ––––, 145 S. Ct. 728, 741, ––– L.Ed.2d –––– (2025); Waetzig, 145 S. Ct. at 699; 🚩 Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803).

And note a final point.

On the few occasions it has discussed 🚩 Section 1252(b)(9), the Supreme Court has used "action" in its general sense --- not in any legal sense. See, e.g., 🚩 Jennings v. Rodriguez, 583 U.S. 281, 293, 138 S.Ct. 830, 200 L.Ed.2d 122 (2018) (suggesting that placing someone in detention is an "action"); 🚩 Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ("AADC") (similar).

In a nutshell: the possible counterargument sketched out here does not work. As used in 🚩 Section 1252(b)(9), "action" means what it usually does. It does not mean a lawsuit. [19]

**b) "To Remove"**

**\*11**   The first of the four Section 1252(b)(9) boxes is checked. *See* Part IV.A.3(a). The Secretary of State's determination was an "action taken."

 **[12]**   The next question: was the "action taken to remove an alien from the United States"? 8 U.S.C. § 1252(b)(9) (emphasis added).

It was.

The key word in the quoted phrase is "to."

As used with the verb "remove," "to" signals "purpose or intention." *To*, sense B.I, Oxford English Dictionary (2d ed. 1989).

And the cases confirm what the dictionaries say. *See, e.g.*, Loughrin v. United States, 573 U.S. 351, 354-55, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014) (concluding that "to obtain" in 18 U.S.C. § 1344 signals "inten[t]"); Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662, 668, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) (concluding that "to get" in the relevant statute "denotes purpose").

\* \* \*

Given the above, the question is this: was the Secretary of State's determination (an "action") done ("taken") with the purpose or intention ("to") of removing an alien from the United States"?

Yes, clearly.

When a Secretary of State says he has "reasonable ground[s] to believe" that a person's "presence or activities in the United States ... would have potentially serious adverse foreign policy consequences for the United States"[20] --- that statement has only one known function in our law.

And that function is to seek the person's removal from the United States. *See* 8 U.S.C. § 1227(a)(4)(C)(i) ("[a]n alien who meets the criteria quoted just above "is deportable.").

The memo that formalizes the Secretary's determination confirms this.

Its "subject" line says that it concerns "[r]emovability [d]eterminations" under the immigration laws. *See* Determination at 1.

The first paragraph of the memo explains that the Secretary has deemed the Petitioner to be a "deportable alien[ ]" under the removal statute. *See id.* The second paragraph lays out the Secretary's understanding of the relevant statute. *See id.* And the last paragraph asserts that the Petitioner's "presence" in the United State would harm American foreign policy. *See id.* at 1–2.

 **[13]**   In short: under Section 1252(b)(9), "to remove an alien from the United States" means to act with the intent or purpose to remove someone. And that was the purpose of the Secretary's determination.

### c) "Under This Subchapter"

Next: Section 1252(b)(9) applies when the claim in question "aris[es] from any action taken ... under this subchapter."

The subchapter in question is Subchapter II of Chapter 12 of Title 8 --- the part of the Immigration and Nationality Act that spans Section 1151 to Section 1382.

And the Secretary made his determination under 8 U.S.C. § 1227(a)(4)(C), which is part of Subchapter II.

So the Petitioner's claim, which challenges the Secretary's determination, "aris[es] from an[ ] action taken ... under this subchapter."

### d) "Arising From"

To this point, the Court has concluded that the Secretary's determination was (a) an action taken (b) to remove an alien from the United States (c) under the relevant subchapter.

That leaves a fourth and final question.

Judicial review is sought here to enjoin the Petitioner's detention as a violation of the First Amendment. *See* Petition ¶¶ 89-90.

**\*12**  **[14]**  Does assessment of that "question[ ] ... aris[e] from an[ ] action taken [the Secretary's determination] to remove an alien [the Petitioner] from the United States"?

Yes.

The Supreme Court has recently debated what "arising from" means in 🚩 Section 1252(b)(9). See 🚩 Jennings, 583 U.S. 281, 138 S.Ct. 830, 200 L.Ed.2d 122. How tight must the nexus be between A and B to say that B arises from A?

Whatever the answer to that question might be in the abstract, there can be no doubt that review of the legality of the Petitioner's detention "aris[es] from" the Secretary's determination.

The two are tightly yoked together. The Secretary of State's determination is not tangential to the detention of the Petitioner or his removal under 🚩 Section 1227(a)(4)(C)(i). Quite the opposite. The determination is what allows removal to go forward in the first place --- indeed, it has _only_ that purpose under the law, and it is the _only_ piece of evidence put forward before the immigration courts in support of a 🚩 Section 1227(a)(4)(C)(i) removal.

\* \* \*

To sum up:

Built into 🚩 Section 1252(b)(9) is a four-part test for deciding whether judicial review is or is not covered.

**[15]**  **[16]**  Here, that test is satisfied, for the reasons set out above.[21]  What this means: _assuming_ that 🚩 Section 1252(b)(9) applies here in the first place, this Court has no jurisdiction to consider the Petitioner's claim as to the Secretary's determination.

**\*13**  Is this assumption right? Take that up now.

### B. The Text

The words of 🚩 Section 1252(b)(9) seem to cover the Petitioner's challenge to the Secretary's determination. See Part IV.A.

**[17]**  **[18]**  But the analysis that supports this conclusion, see _id._, is zoomed in to a fault. Pan out to see the rest of the statute, and what becomes clear is this: 🚩 Section 1252(b)(9) does not apply here as a categorical matter. It does not reach cases like this one, in which a final order of removal has not been entered.

\* \* \*

🚩 Section 1252(b)(9) is part of 🚩 Section 1252(b), and 🚩 Section 1252(b) starts with a lead-in.

> With respect to review of an order of removal ..., the following requirements apply:

From there, 🚩 Section 1252(b) runs through a set of numbered "requirements," 1252(b)(1), (b)(2), and so on --- out to (b)(9).

With that structure in mind, look to some relevant parts of 🚩 Section 1252(b):

**(b) Requirements for review of orders of removal**

With respect to review of an order of removal ..., the following requirements apply:

**(1) Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2) Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings ....

**(3) Service**

**(A) In general**

... The petition shall be served on the Attorney General and on the officer or employee of the [federal immigration agency] in charge of the ... district in which the final order of removal ... was entered....

**(4) Scope and standard for review**

Except as provided in paragraph (5)(B)--

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based, ....

[...]

**(9) Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus ..., or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

Looking to the full statute is required, and always has been. [22]

**\*14**  Doing so here makes clear that 📁 Section 1252(b)(9) has no bearing on this case.

📁 Section 1252(b)(9) speaks to cases in which judicial review goes forward after the immigration courts enter a final order of removal.

But 📁 Section 1252(b)(9) does not purport to say anything about what happens when --- as here --- judicial review takes place before an order of removal is entered.

\* \* \*

The point is clear from the get-go.

The title of 📁 Section 1252(b) says that the Section, which includes 📁 Section 1252(b)(9), is about "Requirements for review of orders of removal."

These words assume that an order of removal has already been entered. After all, "review" means to "look at a thing again." Review, v., sense 1, Merriam-Webster, https://www.merriam-webster.com/dictionary/review (accessed Apr. 17, 2025);

accord, e.g., Review, v., sense 2, Oxford English Dictionary (2d ed. 1989) ("view, inspect, or examine a second time or again").

And there can be no looking "again" at a thing (here, an order of removal) that does not already exist. If a movie is not out until next year, a newspaper might run a preview. But the review comes after the fact --- after the filming and editing are wrapped up and someone can sit and watch the final product.

Bottom line: 📁 Section 1252(b)'s heading ("Requirements for review of orders of removal") shows that 📁 Section 1252(b)(9) kicks in after a final order has been entered, not before. [23]

\* \* \*

Other parts of 📁 Section 1252(b) point in the same direction.

Start from the top, with the 📁 Section 1252(b) lead-in.

It says that "[w]ith respect to review of an order of removal ..., the following requirements apply." 📁 8 U.S.C. § 1252(b) (emphasis added). And as noted, one of those "requirements" listed under that Section is 1252(b)(9).

The clear implication: 📁 Section 1252(b)(9) is about "review of an order of a removal," not about a situation in which review might take place before such an order exists.

Move now to the first substantive part of 📁 Section 1252(b), 📁 Section 1252(b)(1).

📁 Section 1252(b)(1) lays down a deadline for when a person must act if he or she wants to seek out the judicial review that is the subject of 📁 Section 1252(b): "The petition for review [in the court of appeals] must be filed not later than 30 days after the date of the final order of removal."

**\*15**  This timeline assumes that a final order of removal has been entered. It happened. It was done on a certain "date," and the 30-day countdown goes from there.

And note: 🚩 Section 1252(b) provides no deadline for a court challenge that might be brought before the entry of a final order of removal. Why not? Because 🚩 Section 1252(b) does not cover those sorts of challenges.

Walk through the statute and see more of the same.

Under 🚩 Section 1252(b), the court challenge is to go forward in "the judicial circuit in which the immigration judge completed the proceedings." Id. § 1252(b). That makes sense if 🚩 Section 1252(b) covers situations in which an order of removal has been entered. But not if it also speaks to the period before an order has been entered. At that point, the "proceedings" before the immigration judge are not "completed." They are underway.

And along the same lines:

Why would Congress require service where "the final order of removal ... was entered," id. § 1252(b)(3), if it meant for 🚩 Section 1252(b) to cover situations in which there was not yet a final order of review that had been "entered"?

Why would Congress limit review "only" to "the administrative record on which the order of removal is based," 🚩 8 U.S.C. § 1252(b)(4)(A), if the review takes place before an order of removal, "based" on the record, has been entered?

In sum, a broader look shows that 🚩 Section 1252(b)(9) comes online after an order of removal has been entered by the immigration courts.

Therefore, 🚩 Section 1252(b)(9) does not purport to say anything about what might happen in cases like this one, cases that are brought before a final order of removal is entered.

The upshot: 🚩 Section 1252(b)(9) has no role to play here, and so it cannot strip this Court of jurisdiction.

* * *

A final note.

On the understanding sketched out just above, 🚩 Section 1252(b)(9) has an important role to play.

It tells federal district courts that, after an order of removal is finalized, they are not part of the mix. The immigration courts will do the front-line work. And the work of Article III judicial review belongs to the court of appeals, and fully. An issue here or there --- those cannot be plucked out by a district court for its own review.

By conveying this message, 🚩 Section 1252(b)(9) "streamlines" review, as courts have observed that it aims to. See 🚩 Nken v. Holder, 556 U.S. 418, 424, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009); 🚩 F.J.A.P. v. Garland, 94 F.4th 620, 628 (7th Cir. 2024); 🚩 Patel v. U.S. Att'y Gen., 971 F.3d 1258, 1269 (11th Cir. 2020), aff'd sub nom. 🚩 Patel v. Garland, 596 U.S. 328, 142 S.Ct. 1614, 212 L.Ed.2d 685 (2022); 🚩 Cooper Butt ex rel. Q.T.R. v. Barr, 954 F.3d 901, 906 (6th Cir. 2020).

And it also cuts off "piecemeal" litigation, another of its core purposes. See 🚩 Gicharu v. Carr, 983 F.3d 13, 18 (1st Cir. 2020); 🚩 Jama v. Dep't of Homeland Sec., 760 F.3d 490, 496 (6th Cir. 2014); 🚩 Chehazeh v. Att'y Gen. of U.S., 666 F.3d 118, 131 (3d Cir. 2012); 🚩 Aguilar v. U.S. Immigr. & Customs Enf't, 510 F.3d 1, 9 (1st Cir. 2007).

But 🚩 Section 1252(b)(9) does those things only where it applies --- and that is after orders of removal have been entered, not, as here, before.[24]

* * *

**\*16** Here, the Petitioner does not seek judicial review of an order of removal. None has been finalized. And therefore, 🚩 Section 1252(b)(9) does not prevent this Court from considering the Petitioner's claim that the Secretary's determination must be set aside as unconstitutional.

"Jurisdictional rules ... should be 'clear and easy to apply.' " 🚩 Axon Enter., Inc. v. FTC, 598 U.S. 175, 212, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023) (Gorsuch, J., concurring) (quoting 🚩 Hamer v. Neighborhood Housing Servs. of Chi., 583 U.S. 17, 25, 138 S.Ct. 13, 199 L.Ed.2d 249 (2017)). This one is.

### C. Chehazeh

Do cases support the reading of 🚩 Section 1252(b)(9) laid out just above?

At the Supreme Court, there is no binding authority. A majority of Justices has not directly passed on the question one way or another. [25]

But the Supreme Court addressed 🚩 Section 1252(b)(9) in passing in an earlier case.

And based on that Supreme Court case, and based on an earlier decision of its own, the Third Circuit has held that 🚩 Section 1252(b)(9) applies only <u>after</u> a final order of removal has been entered --- and such an order, as noted, has not been entered here as to the Petitioner.

**[19]** The Third Circuit's analysis and holding as to 🚩 Section 1252(b)(9) is quoted here in full:

[T]he Supreme Court has noted that 🚩 § 1252(b)(9) is subject to the limitations of 🚩 § 1252(b), and, therefore, "applies only 'with respect to review of an order of removal under subsection (a)(1).' " 🚩 INS v. St. Cyr, 533 U.S. 289, 313, 121 S.Ct. 2271, 150 L.Ed.2d 347, (2001) (quoting 🚩 8 U.S.C. § 1252(b)). 🚩 Section 1252(b)(9), "by its own terms," does not bar review of an order "not subject to judicial review under 🚩 § 1252(a)(1)," 🚩 St. Cyr, 533 U.S. at 313, 121 S.Ct. 2271, and 🚩 § 1252(a)(1) describes only "review of a final order of removal." See 🚩 8 U.S.C. § 1252(a)(1) ("Judicial review of a final order of removal ... is governed only by chapter 158 of title 28, except as provided in sub[s]ection (b) of this section ...."). 🚩 Section 1252(b)(9), therefore, requires only that, when there is an order of removal under subsection (a)(1), review of any issues related to that order must be consolidated into a single petition for review and cannot be brought piecemeal. One may not, for instance, follow a petition for review with a habeas petition or a petition for a writ of mandamus.

**\*17** Although 🚩 St. Cyr issued prior to the REAL ID Act, the REAL ID Act did not modify 🚩 § 1252(b) or

the instruction that 🚩 § 1252(b)(9) "applies only 'with respect to review of an order of removal under subsection (a)(1).' " 🚩 St. Cyr, 533 U.S. at 313, 121 S.Ct. 2271 (quoting 🚩 8 U.S.C. § 1252(b)). Since that time, both the Ninth and Eleventh Circuits have held that, when a person is not seeking review of "an order of removal under subsection (a)(1)," the limitations of 🚩 § 1252(b)(9) do not apply. See 🚩 Singh v. Gonzales, 499 F.3d 969, 978 (9th Cir. 2007) ("By virtue of its explicit language ... 1252(b)(9) applies only to those claims seeking judicial review of orders of removal."); 🚩 Madu v. Att'y Gen., 470 F.3d 1362, 1367 (11th Cir. 2006) (explaining that " 🚩 section 1252(b)(9) applies only with respect to review of an order of removal" and that the REAL ID Act "did not expand the scope of 🚩 § 1252(b)(9) by making it applicable to cases other than those involving 'review of an order of removal' " (internal quotation marks omitted)); cf. House Conference Report on the REAL ID Act, H.R. Rep. No. 109–72, at 175, 2005 U.S.C.C.A.N. 240, 300 ("Section 106 would not preclude habeas review over challenges to detention that are independent of challenges to removal orders. Instead, the bill would eliminate habeas review only over challenges to removal orders.").

While we have not written precedentially on the scope of 🚩 § 1252(b)(9) after the REAL ID Act, we have addressed the effect of nearly identical language in 🚩 § 1252(a)(5). In 🚩 Kumarasamy v. Attorney General, we considered whether a habeas petition that was before us on appeal when the REAL ID Act came into effect should be converted into a petition for review pursuant to 🚩 8 U.S.C. § 1252(a)(5). 🚩 453 F.3d 169, 172 (3d Cir. 2006). That subsection states that a "petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review of an order of removal." 🚩 8 U.S.C. § 1252(a)(5). The petitioner in <u>Kumarasamy</u> had not been seeking review of an order of removal but was seeking habeas relief, claiming that his deportation was illegal "because there was <u>no</u> order of removal." 🚩 453 F.3d at 172 (emphasis in original). We held that 🚩 § 1252(a)(5) did not apply, because that provision pertained only to "judicial review of an order

of removal." Id. (emphasis in original). Our holding in Kumarasamy supports the conclusion that, because § 1252(b) refers only to "review of an order of removal under subsection (a)(1)," it, and its subsections, are inapplicable when there is no such order.

Not all courts agree with the conclusion reached by the Ninth and Eleventh Circuits and suggested by us in Kumarasamy. The First Circuit held in Aguilar v. United States Immigration & Customs Enforcement that "the reach of section 1252(b)(9) is not limited to challenges to singular orders of removal." 510 F.3d 1, 9 (1st Cir. 2007). The reasoning of Aguilar, however, appears to conflict with the Supreme Court's explicit instruction in St. Cyr, 533 U.S. at 313, 121 S.Ct. 2271 ("Section 1252(b)(9) applies only 'with respect to review of an order of removal under subsection (a)(1).' "), and with the language of § 1252(b) ("With respect to review of an order of removal under subsection (a)(1) of this section, the following requirements apply ...."). We therefore join with the Ninth and Eleventh Circuits and hold that § 1252(b)(9) applies only "with respect to review of an order of removal under subsection (a)(1)." 8 U.S.C. § 1252(b). Because Chehazeh is not seeking review of any order of removal --- as there has been no such order with respect to him --- § 1252(b)(9) does not preclude judicial review.

Chehazeh, 666 F.3d at 131–33 (cleaned up).

This is all but dispositive.

There is no order of removal in this case. And so Section 1252(b)(9) does not apply under Chehazeh. "Because [the Petitioner] is not seeking review of any order of removal --- as there has been no such order with respect to him --- § 1252(b)(9) does not preclude judicial review." Id.

\* \* \*

Might Chehazeh be distinguished from this case on factual grounds?

**\*18** Chehazeh, after all, was an "unusual" case, id. at 121, focused on the Board of Immigration Appeals' decision to sua sponte reopen a decision. See id.

Perhaps, it might be argued, Chehazeh does not apply to the more typical case, where a person in a removal proceeding seeks federal district court review before the immigration court proceedings have run their course.

But that sort of distinction seems to have been considered and rejected by the Third Circuit in EOHC v. Secretary United States Department of Homeland Security, 950 F.3d 177 (3d Cir. 2020).

There, people in removal proceedings went to the district court. See id. at 180. Up against Chehazeh, the federal-government appellees argued that that case should be limited to its facts. See Brief for Appellees at 37, EOHC, 950 F.3d 177 (No. 19-2927). But the Third Circuit did not seem to accept this position. This was the EOHC court's only mention of Chehazeh:

[Section 1252(b)(9)] does not reach "claims that are independent of, or wholly collateral to, the removal process," like "claims that cannot effectively be handled through the available administrative process." Aguilar, 510 F.3d at 11; accord J.E.F.M. v. Lynch, 837 F.3d 1026, 1032 (9th Cir. 2016) (collecting cases); Reply Br. 16 (interpreting Chehazeh v. Att'y Gen. of the U.S., 666 F.3d 118 (3d Cir. 2012)); Oral Arg. Tr. 20–21.

EOHC, 950 F.3d at 186.

Now look to the page of the Reply Brief that was cited as "interpreting" Chehazeh. It reads, in part: "the government's argument that this Court should 'limit Chehazeh to its facts' ... is misplaced. Instead, ... the applicability of section 1252(b)(9) depends on the nature of the claim being considered." Reply Brief for Appellants at 16, EOHC, 950 F.3d 177 (No. 19-2927).

It appears that the EOHC court, by citing this page of the brief, meant to signal that it rejected any cabining of Chehazeh to its facts.

\* \* \*

Might it be argued that Chehazeh has been implicitly overruled by the Supreme Court's decision in Jennings?

This seems unlikely.

The Third Circuit in EOHC referenced Chehazeh, as noted. See EOHC, 950 F.3d at 186. And it also discussed Jennings at length. See id. at 185–86. If Jennings overruled Chehazeh, would EOHC not have said so?

And more directly: there is no reason to think Jennings pushed aside Chehazeh.

To see why, look first to the facts of Jennings.

Noncitizens in immigration custody had been detained for more than six months without bond hearings, and they argued this was illegal under various statutes. See id. at 290, 138 S.Ct. 830. Those statutes applied to certain noncitizens --- those who had not received a final order of removal. See id. at 291, 299, 303, 138 S.Ct. 830. [26]

Jennings, then, was like Chehazeh --- a pre-order-of-final-removal case.

*19  As to jurisdiction, what did the Supreme Court rule in Jennings? Did Section 1252(b)(9) strip jurisdiction or not?

The answer is not straightforward, because the Jennings Court fragmented on the jurisdictional question. See id. at 284, 138 S.Ct. 830. Eight justices took part and there were three opinions; none commanded a majority. See id. at 284, 292, 138 S.Ct. 830.

[20]  How to decide what to take away from this? When "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (cleaned up); see generally Richard M. Re, Beyond the Marks Rule, 132 Harv. L. Rev. 1942 (2019).

But this "Marks rule" is not clarifying here. [27]

Chehazeh held that, as a categorical matter, Section 1252(b)(9) does not apply before entry of an order of removal. See 666 F.3d at 133.

But on that question, there is no Jennings majority to cobble together using Marks.

As noted, eight Justices took part in Jennings. See 583 U.S. at 284, 138 S.Ct. 830.

Two Justices, with Justice Thomas writing, held that Section 1252(b)(9) can apply before a final order of removal exists. See id. at 317–18, 138 S.Ct. 830 (Thomas, J., concurring).

Three Justices, with Justice Breyer writing, suggested that it cannot apply before a final order of removal exists. See id. at 355, 138 S.Ct. 830 (Breyer, J., dissenting).

And three Justices, with Justice Alito writing, took no explicit stance on the question.

Rather, Justice Alito's opinion held that Section 1252(b)(9) did not control the particular case before the Court --- because detention without a bail hearing did not "aris[e] from" actions to remove the noncitizens, as Section 1252(b)(9) requires. See id. at 292–95, 138 S.Ct. 830.

But nothing can be read into Justice Alito's opinion as to whether Section 1252(b)(9) might otherwise apply before an order of removal; therefore, no holding of his can join that of another opinion, via the Marks rule, to make a majority.

This is for two reasons.

[21]  First, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 170, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004); see also, e.g., United States v. More, 7 U.S. (3 Cranch) 159,

172, 2 L.Ed. 397 (1805) (Chief Justice Marshall making this point at oral argument as to jurisdiction).

**\*20** Justice Alito took no "position," Marks, 430 U.S. at 193, 97 S.Ct. 990, on whether Section 1252(b)(9) could or could not categorically have applied if the statute's "arising from" language had fit the case before the Court.

So why impute a position to him?

And all the more so because Justice Alito's opinion noted that the parties had not briefed "the scope of" Section 1252(b) (9), see Jennings, 583 U.S. at 294, 138 S.Ct. 830, and so, as Justice Alito put it, his opinion declined "to provide a comprehensive interpretation" of Section 1252(b)(9), ruling only that the statute did not apply given the facts at hand. See id. at 294, 138 S.Ct. 830.

**[22]** To see the second point, start by noting that when an explicit ruling (call it "CD") necessarily rests on an implicit logical proposition (call it "AB") --- then both CD and AB can count as rulings. See footnote 28 (discussing this).

If Justice Alito's explicit ruling (CD) was that jurisdiction was stripped in Jennings because of Section 1252(b)(9)'s language, then that would logically rest on the implicit idea (AB) that Section 1252(b)(9) applied in the first place.

But that is not where Justice Alito's opinion came down.

It held that, because of Section 1252(b)(9)'s language, jurisdiction was not stripped --- and that ruling does not rest on a logically necessary sense that Section 1252(b)(9) applied. After all, Justice Alito could have reached the same result (no jurisdiction strip) regardless of his answer to the question of whether Section 1252(b)(9) does or does not categorically apply to pre-order-of-removal cases. [28]

\* \* \*

**\*21** In sum: even after deploying the Marks rule, it cannot be said that a Jennings majority spoke to the Chehazeh question --- let alone implicitly overruled the Third Circuit's Chehazeh opinion.

## V. If Section 1252(b)(9) Applies Here

Where things stand:

The Respondents argue that Section 1252(b)(9) pulls away jurisdiction, such that this Court cannot consider the Petitioner's motion to enjoin the Secretary's determination.

That argument looks solid at first. See Part IV.A. But look to all of Section 1252(b), and the argument melts away. Section 1252(b)(9) is in play only when an order of removal has been entered. That is what the statute says. See Part IV.B. And that is what the Third Circuit has held. See Part IV.C.

Therefore, Section 1252(b)(9) does not apply here --- there is no order of removal.

But there is an important difficulty.

To see it, compare (a) Chehazeh and (b) EOHC, two Third Circuit cases that have been mentioned at various points above.

\* \* \*

Chehazeh holds that Section 1252(b)(9) applies only when an order of removal has been entered. The long excerpt above, see Part IV.C, shows that.

Move now to EOHC.

It, too, was an immigration case. And it held that Section 1252(b)(9) precluded the district court from hearing a particular claim --- even though no order of removal had been entered. See EOHC, 950 F.3d at 180.

Chehazeh and EOHC appear to pull in opposite directions.

Does Section 1252(b)(9) apply when there is, as here, no order of removal?

Chehazeh seems to say no. EOHC seems to say yes.

If Chehazeh controls, then 🚩 Section 1252(b)(9) is not on the table in this case. It is categorically irrelevant. Jurisdiction is not affected by it. See Part IV.B and IV.C.

But if EOHC controls, 🚩 Section 1252(b)(9) potentially does apply here --- and if it does, there is a solid textual case, see Part IV.A, that it strips this Court of jurisdiction.

* * *

How to proceed?

The Court closely reviews EOHC, and concludes that it stands for this principle: the question of whether 🚩 Section 1252(b)(9) allows a federal district court to hear a claim that has been brought to it depends on whether the claim could get "meaningful review" if federal court review is delayed out into the future --- as will happen if the federal district court is divested of jurisdiction by 🚩 Section 1252(b)(9), and the case is then sent down the immigration courts route. See Part V.A. [29]

In other words:

[23]   Under EOHC, 🚩 Section 1252(b)(9) strips jurisdiction if later review in the federal court of appeals, after the immigration courts are done, would be meaningful. But 🚩 Section 1252(b)(9) does not strip jurisdiction if post-immigration-courts review would not be meaningful.

On this reading, EOHC essentially applies the Supreme Court's general administrative law jurisprudence in the particular context of immigration law --- and that makes sense, given that immigration law, in this area, is a part of the administrative law family. See Part V.B.

And on this reading, EOHC is fully consistent with one of the Third Circuit's key relevant precedents --- the opinion authored by then-Judge Alito in 🚩 Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996). Massieu applied the same body of general administrative law jurisprudence that EOHC does. See Part V.C.

* * *

**\*22**   The question of how the referenced "meaningful review" issue plays out in this case is taken up in Part VI.

For now, though, start with EOHC, and move on to administrative law more generally and then to Massieu.

### A. EOHC

This is what the 🚩 EOHC case was about:

A father and his minor daughter came to the United States from Guatemala. See 🚩 EOHC, 950 F.3d at 181.

Federal officials began removal proceedings. See 🚩 id. The Board of Immigration Appeals eventually entered a stay of removal, see 🚩 id., but the father and his daughter became concerned that they would be moved to Mexico, see 🚩 id., to wait things out there while American immigration courts assessed whether they should be removed back to Guatemala. [30] See 🚩 id.

The father and his daughter filed a habeas petition in Pennsylvania. See 🚩 id. They pressed a set of claims, and as to each one the Third Circuit asked the same question: can this claim go forward in the federal district court? Or do jurisdiction-stripping statutes take away that possibility, requiring the claim to run down the immigration-court track? See 🚩 id. at 184.

To answer these questions, EOHC relied on this principle: that 🚩 Section 1252(b)(9) allows claims to be brought in a federal district court now if there could not be "meaningful" judicial review of those claims later --- after the immigration courts have finished their work and a federal court (the court of appeals) then gets involved. See 🚩 id. at 180 ("When a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, 🚩 § 1252(b)(9) does not bar consideration by a district court."); see also 🚩 id. at 186–87 (invoking meaningful review as to 🚩 Section 1252(b)(9); cf. 🚩 id. at 189-90 (invoking meaningful review as to other jurisdiction-stripping provisions).

In immigration law, involvement by an Article III federal court is typically a late-in-the-process thing. See 🚩 id. at 180. Immigration courts handle the case at Time 1, and a federal court (a court of appeals) gets involved for the first time only at Time 2. See 🚩 id.

But, EOHC holds, if waiting until Time 2 would undermine "meaningful" federal court review --- then that review can be hurried up, and a "detained alien" can first go to a federal court, a federal district court, at Time 1, rather than have the immigration courts take the initial look, with federal court review to take place only afterwards (in a federal court of appeals).

In that circumstance, Article III judicial review --- usually pushed out into the future as a job for a federal court of appeals --- is pulled back into the present, and is undertaken by a federal district court (whose work is later reviewed by a federal court of appeals).

* * *

How does this principle work in practice?

The EOHC father and daughter claimed that they would be temporarily moved to Mexico, to wait there for the immigration courts' decision in their removal proceedings. See 🚩 id. at 181. Such a claim, EOHC held, can be taken up right away by a federal district court, consistent with 🚩 Section 1252(b)(9). See 🚩 id. at 187.

**\*23**  Why?

Because, per EOHC, there can be no "meaningful" consideration later of such a claim by a court of appeals, after the immigration courts have wrapped up their work. By then, the father and daughter could already have been in Mexico for years, and those years would have been lost. See 🚩 id. at 186-87. "Now-or-never" claims, 🚩 id. at 186, as that one was, can go forward now in a federal district court because they fit into a broader umbrella category --- claims that cannot later be "meaningful[ly]" reviewed when they would ordinarily make their way to a federal court of appeals.

And take a second example, to see the flip side of the coin.

The EOHC father and daughter also claimed that being moved to Mexico would fray their relationship with their lawyer, which would violate their statutory right to counsel at an eventual removal hearing. See 🚩 id. at 187–88.

EOHC, citing 🚩 Section 1252(b)(9), held that this claim could not be brought right away in federal district court. [31]

Why not?

Because the claim could get "meaningful" review later --- as the court of appeals looked back on what happened at the removal hearing, with an eye on any damage that may have been done to the attorney-client relationship. See 🚩 id. at 188 ("[T]he court of appeals can redress any deprivation of counsel in the removal proceedings before the alien is removed.").

**B. Administrative Law**

In a nutshell, EOHC held that 🚩 Section 1252(b)(9) does not take jurisdiction away from federal district courts when the alternative --- going the standard route, to the immigration courts and then to a federal court of appeals --- would undermine "meaningful" judicial review.

EOHC indicated that its approach flowed from a broad range of sources --- statutory text, a recent Supreme Court decision, and a set of presumptions. See 🚩 id. at 184–86.

And that approach is also closely consistent with broader principles of administrative law --- the legal family that, in this context, immigration law is part of.

**1. Structure**

To begin seeing this, start with the classic picture of adjudication in the federal system.

On the ground floor is a federal district court. Then the next level up is a federal court of appeals. And finally the Supreme Court sits atop the pyramid.

But the classic picture is not everywhere the current one.

In administrative law, for example, the federal district court is often swapped out, its place taken by an administrative court.

In cases related to the SEC, the FTC, the EPA, the FDA, and the FCC, the rungs on the ladder often look like this: an agency administrative judge (or an administrative law judge, or some other non–Article III official), does the front-line dispute resolution. And after that is done, the case plugs back into the standard system --- with the administrative judge's decision then reviewed by an Article III court, the federal court of appeals. See Federal Appeals Jurisdiction and Practice § 15:1 (2025 ed.); 2 Charles H. Koch & Richard Murphy, Admin. L. & Prac. § 5:10 (3d ed. 2024).

\* \* \*

**\*24**  There was a time when immigration detention was commonly reviewed using the classic tools of American adjudication.

A person in custody typically (though not always) started off in the federal district court, seeking a habeas corpus writ. See Carlson v. Landon, 342 U.S. 524, 531–32, 72 S.Ct. 525, 96 L.Ed. 547 (1952); Fong Haw Tan v. Phelan, 333 U.S. 6, 8, 68 S.Ct. 374, 92 L.Ed. 433 (1948); U.S. ex rel. Tisi v. Tod, 264 U.S. 131, 132–33, 44 S.Ct. 260, 68 L.Ed. 590 (1924) Chin Yow v. United States, 208 U.S. 8, 13, 28 S.Ct. 201, 52 L.Ed. 369 (1908); Yamataya v. Fisher, 189 U.S. 86, 87, 23 S.Ct. 611, 47 L.Ed. 721 (1903).

But the plates began to shift during the mid-20th century.

New jurisdictional statutes became law. [32]

And now, immigration law looks in some basic ways like a branch of administrative law.

Cases generally go in the first instance to immigration judges, see 8 C.F.R. § 1003.10, and immigration judges are roughly akin to other administrative judges. See footnote 2; 2 Fed. Proc., L. Ed. § 2:159. And as with administrative judges, immigration judges' decisions are ultimately funneled out of the agency --- for relatively late-in-the-process review by a federal court, a courts of appeals. See 8 U.S.C. § 1252(a)(5).

Bottom line: immigration disputes are resolved using many of the same basic structures as bread-and-butter administrative disputes, like those involving the SEC, FTC, or FDA.

The next section begins to explain why this similarity matters.

## 2. Thunder Basin

The key question covered by this Opinion is this: under Section 1252(b)(9), must the Petitioner's constitutional challenge to the Secretary of State's determination go forward in the first instance before this Court or before the immigration courts?

At its core, this question is a variant on an everyday set of administrative law questions --- questions that are spun off by administrative-agency adjudication that, as the prior section shows, makes use of the same basic structure (agency adjudication, followed by federal court of appeals review) as modern immigration law.

Look here at how administrative law generally handles issues of this sort, and then return, later, to immigration law and to EOHC.

\* \* \*

As a matter of administrative law:

What to do if a litigant tries to sue in federal district court, but a separate system of administrative-agency courts has been set up? Does she get to stay in the federal district court, or must she move over to the agency's courts, and await federal court review in the court of appeals?

The Supreme Court has answered these questions in a string of cases involving the Mine Safety and Health Administration, the Public Company Accounting Oversight Board, the Merit Systems Protection Board, and the Federal Trade Commission.

**\*25**  The anchor case in the chain is Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994), and so the law in this area often goes by the shorthand of "Thunder Basin."

Thunder Basin law in a nutshell:

**[24]**  If Congress has explicitly pulled jurisdiction away from the federal district courts, the case goes to the agency for first-cut adjudication there. See Axon, 598 U.S. at 185, 143 S.Ct. 890; Adorers of the Blood of Christ v. FERC, 897 F.3d 187, 195 (3d Cir. 2018); accord, e.g., Jarkesy v. SEC, 803 F.3d 9, 15 (D.C. Cir. 2015); Cochran v. SEC, 20 F.4th 194, 205 (5th Cir. 2021); Bank of La. v. FDIC, 919 F.3d 916, 923 (5th Cir. 2019); Jones Brothers, Inc. v. Sec'y of Lab., 898 F.3d 669, 675 (6th Cir. 2018); E. Bridge, LLC v. Chao, 320 F.3d 84, 88 (1st Cir. 2003).

**[25]**  But if Congress has not explicitly pulled jurisdiction away from the federal district courts, ask: is it "fairly discernible" that Congress intended for claims to go to administrative courts as opposed to federal district courts? See Elgin v. Dep't of Treasury, 567 U.S. 1, 10, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012); Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010); see also Axon, 598 U.S. at 185, 143 S.Ct. 890. [33]

If the answer to the step-one "fairly discernible" question is "no," then the case stays in federal district court.

If the answer to the "fairly discernible" question is "yes," then the focus narrows, to the particular "type" of claim that is in play --- and whether (now, step-two) Congress wanted that type of claim to make its first stop in a federal court or before an administrative adjudicator. See Axon, 598 U.S. at 186, 143 S.Ct. 890; Elgin, 567 U.S. at 22, 132 S.Ct. 2126; Free Enter. Fund, 561 U.S. at 489, 130 S.Ct. 3138; Thunder Basin, 510 U.S. at 208, 114 S.Ct. 771; Adorers, 897 F.3d at 195; Kreschollek v. S. Stevedoring Co., 78 F.3d 868, 873 (3d Cir. 1996); accord, e.g., Cochran, 20 F.4th at 206; Tilton v. SEC, 824 F.3d 276, 281 (2d Cir. 2016); Bennett v. SEC, 844 F.3d 174, 181 (4th Cir. 2016); Bebo v. SEC, 799 F.3d 765, 769 (7th Cir. 2015); Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin., 62 F.3d 37, 40 (1st Cir. 1995).

**[26]**  To answer this "type" question, courts are to look to whether agency-first adjudication would: (1) supply "meaningful review"; (2) draw on agency expertise; and (3) run through issues that are core, rather than collateral. See Axon, 598 U.S. at 184–85, 143 S.Ct. 890; Elgin, 567 U.S. at 15, 132 S.Ct. 2126; Free Enter. Fund, 561 U.S. at 489, 130 S.Ct. 3138; Thunder Basin, 510 U.S. at 212–13, 114 S.Ct. 771; accord, e.g., Bank of La., 919 F.3d at 923; Hill v. SEC, 825 F.3d 1236, 1241 (11th Cir. 2016); Tilton, 824 F.3d at 281; Bennett, 844 F.3d at 181; Jarkesy, 803 F.3d at 17; Bebo, 799 F.3d at 769.

**\*26**  Of these three, "meaningful review" is by far the most important. See Bennett, 844 F.3d at 183 n.7; Hill, 825 F.3d at 1245; Tilton, 824 F.3d at 282; Bebo, 799 F.3d at 774.

Can there be "meaningful review" if Article III review is deferred until after the administrative court finishes its work and hands things over to the federal court of appeals?

Or does "meaningful review" require that the claim be heard, now, in the federal district court? [34]

### C. EOHC In Context

Come back now to the EOHC case, and see it in light of the broader administrative law principles laid out just above.

EOHC was an immigration-adjudication case.

And as discussed, the basic structure of immigration adjudication is closely similar to the structure of administrative adjudication more generally. See Part V.B.1.

No surprise, then, that in those closely related contexts, similar questions are answered in roughly the same way.

The questions:

Do the relevant statutes mean that a case stays in federal district court? Or do they mean that a case is channeled in the first instance to agency tribunals, like SEC, FTC, or immigration courts --- and only after they are done with their

work does the case potentially go to federal court, a federal court of appeals?

The answer:

Under Thunder Basin (for administrative law in general) and under EOHC (for immigration law in particular) the answer is largely the same: it depends on whether delayed federal court review is consistent with the imperative of "meaningful review."

The key point: EOHC was, in essence, applying general administrative law rules (the Thunder Basin rules) to closely related immigration law questions.

And EOHC applied Thunder Basin systematically.

EOHC precisely invoked Thunder Basin's step-one test. Compare 🚩 Thunder Basin, 510 U.S. at 207, 114 S.Ct. 771 ("In cases involving delayed judicial review ..., we shall find that Congress has allocated initial review to an administrative body where such intent is fairly discernible.") (emphasis added) (cleaned up), with 🚩 EOHC, 950 F.3d at 188 ("We look to whether the congressional intent to preclude judicial review is fairly discernible in the statutory scheme.") (emphasis added) (cleaned up).

EOHC undertook the basic step-one analysis prescribed in 🚩 Thunder Basin. Compare 🚩 Thunder Basin, 510 U.S. at 207, 114 S.Ct. 771 (to get at the question of Congressional intent, looking to a "statute's language, structure, and purpose"), with 🚩 EOHC, 950 F.3d at 188 ("In discerning that intent, we look at the statute's 'text, structure, and purpose.' ") (quoting 🚩 Elgin, 567 U.S. at 10, 132 S.Ct. 2126).

And, as has been noted, EOHC focused on the main Thunder Basin step-two concern --- the "meaningful" judicial review. Compare 🚩 Thunder Basin, 510 U.S. at 207, 114 S.Ct. 771 ("Whether a statute is intended to preclude initial judicial review is determined from ... whether the claims can be afforded meaningful review."), with 🚩 EOHC, 950 F.3d at 180, 186, 189–90. [35]

\* \* \*

**\*27** In applying the Thunder Basin rules, [36] why did EOHC land on the "meaningful review" rule?

Per the Thunder Basin line of cases, that is the standard to use when Congress has not said in an "explicit" way that certain types of cases must go to an administrative court. See Part V.B.1.

Presumably, the EOHC court did not view Congress as having provided sufficiently "explicit" direction as to whether certain cases must first go to immigration courts. [37]

\* \* \*

In a nutshell: to determine whether to apply 🚩 Section 1252(b)(9) to a given claim, EOHC applied Thunder Basin, and in particular its "meaningful review" test.

### D. Massieu

EOHC sits atop Thunder Basin --- and foregrounding this only emphasizes the close continuity between EOHC and one of the Third Circuit's key precedents in this area, Massieu.

To see the point, look now to Massieu.

During the mid-1990s, the federal government sought to remove a Mexican national, Mario Ruiz Massieu, from the United States. See 🚩 Massieu v. Reno, 91 F.3d 416, 417-19 (3d Cir. 1996).

This was to be done based on a determination made by Secretary of State Warren Christopher, using the same law invoked in this case to seek the removal of the Petitioner. See 🚩 id. at 418.

Massieu sued, and Judge Barry, then of this Court, ruled that she had jurisdiction over the case. See 🚩 Massieu v. Reno, 915 F. Supp. 681, 697 (D.N.J. 1996), rev'd, 🚩 91 F.3d 416 (3d Cir. 1996). [38]

**\*28** The Third Circuit, per then-Judge Alito, reversed. See 🚩 Massieu, 91 F.3d at 425. It held that the case needed to first go to the immigration courts. See 🚩 id.

The Third Circuit in 🚩Massieu came to that conclusion by analyzing the case using the two-step Thunder Basin doctrine described above in Part IV.B.

First, Judge Alito looked to text, purpose, and other sources to decide if Congress had expressed a "fairly discernible" intent to send the case to an immigration judge in the first instance, and not to a federal district judge. See 🚩id. at 420.

And the Massieu court then went to the second step, moving through each of the required Thunder Basin factors --- the critical "meaningful review" factor, plus the "collateral" and "expertise" factors. See 🚩id. at 422.

* * *

Massieu is relevant here in three main ways.

* * *

First, Massieu is very similar to this case.

The Respondents go so far as to say it is "on all fours." See Opposition Brief at 12. And there is a lot to that. Massieu involved the same statute as this case (what is now 🚩8 U.S.C. § 1227(a)(4)(C)(i)) and the same question as this case (in what court should the claim start?).

Whether Massieu controls the outcome here is taken up in the next Part.

* * *

Second, Massieu, as noted, is closely consistent with EOHC.

EOHC and Massieu land in the same place --- on a concern for "meaningful review" as a key touchstone for deciding whether a case must go to the immigration courts before a federal district court.

EOHC and Massieu thus point in the same direction.

Each suggests that, on the assumption that 🚩Section 1252(b)(9) applies here, [39] this Court must conduct a Thunder Basin-type analysis, and with an emphasis on Thunder Basin's most important factor --- "meaningful" judicial review. [40]

* * *

Third and finally, Massieu undermines any argument that the immigration laws in some "explicit" way require that this case be sent now to the immigration courts.

After all, if the immigration laws were explicit on that point, then Judge Alito's opinion would not have done what it did. It would not have conducted a Thunder Basin analysis --- because that is called for only when the relevant laws are not explicit. [41]

**\*29** To be sure, the immigration laws have changed a good deal since Massieu was handed down in 1996.

But the three main statutes that Judge Alito reasoned from remain on the books, and in substantively similar form.

The main one was 🚩8 U.S.C. § 1105a(c) (1996) ("[A]n order of deportation ... shall not be reviewed by any court if the alien has not exhausted the administrative remedies[.]").

It has since been revised, with the current version at 🚩8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if ... the alien has exhausted all administrative remedies.").

But the two statutes "state[ ] the same requirements in essentially the same language." 🚩Duvall v. Elwood, 336 F.3d 228, 231 (3d Cir. 2003). Indeed, the Third Circuit has held that Massieu's analysis still governs 🚩Section 1252(d)(1). See 🚩id. at 232.

And the two other statutes that Massieu relied on also remain on the books, tweaked here and there but substantively the same. Compare 🚩8 U.S.C. § 1105a(a) (1996) ("the sole and exclusive procedure for ... the judicial review of all final orders of deportation" is through a petition for review), and 🚩8 U.S.C. § 1252(b) (1996) ("[T]he [administrative] procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section."), with 🚩8 U.S.C. § 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review[.]"), and 🚩8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this section shall

be the sole and exclusive procedure for determining whether an alien may be ... removed from the United States.").

And the most relevant new, post-Massieu statute --- 🚩 Section 1252(b)(9) --- either does not apply to this case, per Chehazeh, or does not provide explicit enough direction. See footnote 37.

### E. Conclusion

Pause now briefly to see where things stand:

The Third Circuit in Chehazeh held that 🚩 Section 1252(b)(9) does not apply to cases like this one, in which no order of removal has been entered. Therefore, 🚩 Section 1252(b)(9) is irrelevant here, and does not strip this Court of jurisdiction. See Part IV.

But even if 🚩 Section 1252(b)(9) were understood to apply here, as EOHC might suggest, see Part V.A, that Section would apply only when sending a case to the immigration courts is consistent with the Thunder Basin requirement of "meaningful review."

That was the approach the Third Circuit took in EOHC, see Part V.B and Part V.C, and that is consistent with the Third Circuit's approach in Massieu. See Part V.D.

So assuming arguendo that 🚩 Section 1252(b)(9) applies here, the question is this: would this case get the required "meaningful review" if it starts out in immigration court, as opposed to here?

Take that up in the next Part.

## VI. Meaningful Review

Immigration courts are tasked with doing important work on behalf of our country. According to recent statistics, for example, there are almost four million pending immigration cases spread out across 700 or so immigration judges. See Pending Cases, New Cases, and Total Completions, Exec. Off. for Immigr. Rev., https://perma.cc/L659-S8P5 (accessed on Apr. 29, 2025); Office of the Chief Immigration Judge, Exec. Off. for Immigr. Rev., https://perma.cc/8H5S-EPW6 (accessed on Apr. 29, 2025).

*30 But different institutions are built for different tasks and given different tools.

Immigration courts are not legally permitted to provide the relief (striking down the Secretary of State's determination) that the Petitioner seeks here. See Part VI.A.

And immigration courts cannot be expected to undertake the fact-finding that may potentially be required to evaluate the Petitioner's claim that the Secretary's determination is unconstitutional. See Part VI.B.

To be sure, immigration courts routinely tee up constitutional issues for eventual review by federal courts of appeals --- even when the immigration courts themselves lack the power to remedy the alleged violation.

But the immigration courts cannot do that here --- in part because of a prior Board of Immigration Appeals decision. See Part VI.C.

What this adds up to: the immigration courts could not meaningfully develop this case, legally or factually. Therefore, the period that might be spent before those courts will not advance the ball.

In some circumstances, that may be just how it has to be. Cases can take a while to resolve. And sending cases to the immigration courts is typically required even when doing so will accomplish only a modest amount.

But in this case, what can be accomplished is much less than that.

And a period of delay while this case is pending before the immigration courts, knowing that there will be little or nothing to show for it --- that does not work.

The reason is this: the Petitioner's core argument is that his free speech rights are being violated, now. See Part VI.D.

And the Supreme Court has held over and over again, in numerous contexts, that meaningful review of First Amendment claims generally means rapid, prioritized review. See id.

That is not consistent with postponing federal court consideration of the Petitioner's First Amendment claims.

Begin seeing all of this just below.

### A. Legal Remedies

**[27]**  As has been discussed, the Petitioner claims that the Secretary of State's determination is a product of First Amendment retaliation, and that this Court should therefore enter an order to vacate it. <u>See</u> Motion for Preliminary Injunction at 9–10; <u>see also</u> Petition ¶¶ 88–90.

Can the immigration courts do this?

The Respondents say the answer is no. [42]

Under the heading "The IJ Cannot Vacate the Secretary of State's Determination or Issue the Requested Injunction," they say:

**\*31**  The authority of immigration judges comes from the INA and regulations. The INA provides that an immigration judge "shall conduct proceedings for deciding the inadmissibility or deportability of an alien." The immigration judge has the authority to determine removability and to adjudicate requests for certain forms of relief from removal. The INA and implementing regulations do not provide the immigration judge with general injunctive or equitable authority. Thus, an immigration judge cannot order the Secretary of State to take or not take any action regarding the type of foreign policy determination at issue here.

Respondents' Letter (Apr. 11, 2025) (ECF 190) at 2 (cleaned up).

*  *  *

But this way of thinking is too formalistic.

When a court is asked to put a stop to allegedly illegal behavior that is happening out in the world, the request is usually framed as an ask for an injunction.

But things are different when a judge is asked to issue an order as to a matter happening right before her, in her own courtroom.

Imagine a judge overseeing a criminal prosecution. Drugs were seized (but there was no warrant), and a confession was made (but there were no <u>Miranda</u> warnings).

The defendant might want an order from the court suppressing the evidence, so that the jury cannot learn of it. Order that the drugs be excluded as the fruit of a Fourth Amendment violation, the defendant will say. And order that the confession be put aside, as the product of a Fifth Amendment breach.

But the defendant, seeking an order, will not describe this as a request for an injunction (which is, after all, a kind of order). [43]

All of this implies that the right question here is not whether the immigration courts can <u>enjoin</u> the Secretary's determination as being the result of a violation of the First Amendment --- but rather whether the immigration courts can <u>suppress</u> the Secretary's determination as a violation of the First Amendment.

And a suppression framing makes sense on the facts of this case.

After all, the Secretary of State's determination is evidence (indeed, the only evidence) put forward in support of the Department of Homeland Security's effort to remove the Petitioner under 🗁 Section 1227(a)(4)(C)(i).

And evidence obtained at Time 2 is sometimes ordered suppressed at Time 3 because it was gathered at Time 1 in violation of the Fourth Amendment or the Fifth. So why not the First?

The immigration courts, as noted, do not have power to <u>enjoin</u> the Secretary of State's determination on the grounds that it violates the First Amendment.

**\*32**  But do they have the power to <u>suppress</u> the Secretary's determination on those same grounds?

*  *  *

Shifting the framing clarifies the question to ask. But it does not change the answer.

The reason: with a caveat taken up below in footnote 46, the Supreme Court has held that in removal proceedings the Fourth Amendment exclusionary rule is not available; evidence obtained in violation of the Fourth Amendment can

come in. See INS v. Lopez-Mendoza, 468 U.S. 1032, 1034, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984).

Part of the explanation is that the immigration courts, per the Supreme Court in Lopez-Mendoza, were built to quickly determine whether someone is removable --- not to ask and answer broader questions, such as whether someone else violated the Constitution. Lopez-Mendoza:

> The INS currently operates a deliberately simple deportation hearing system, streamlined to permit the quick resolution of very large numbers of deportation actions, and it is against this backdrop that the costs of the exclusionary rule must be assessed. The costs of applying the exclusionary rule, like the benefits, must be measured at the margin.

> [In 1984] [t]he average immigration judge handles about six deportation hearings per day. Neither the hearing officers nor the attorneys participating in those hearings are likely to be well versed in the intricacies of Fourth Amendment law. The prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these proceedings.

Id. at 1048.

In support of its approach, the Lopez-Mendoza Court quoted the Board of Immigration Appeals, which was also opposed to Fourth Amendment exclusion remedies in immigration courts. The Board, as quoted by the Supreme Court:

> Absent the applicability of the exclusionary rule, questions relating to deportability routinely involve simple factual allegations and matters of proof. When Fourth Amendment issues are raised at deportation hearings, the result is a diversion of attention from the main issues which those proceedings were created to resolve, both in terms of the expertise of the administrative decision makers and of the structure of the forum to accommodate inquiries into search and seizure questions. The result frequently seems to be a long, confused record in which the issues

> are not clearly defined and in which there is voluminous testimony.... The ensuing delays and inordinate amount of time spent on such cases at all levels has an adverse impact on the effective administration of the immigration laws.... This is particularly true in a proceeding where delay may be the only "defense" available and where problems already exist with the use of dilatory tactics.

Id. at 1048–49 (quoting Matter of Sandoval, 17 I. & N. Dec. 70, 80 (BIA 1979)).

Building the record for a Fourth Amendment suppression challenge would not always very dramatically "change and complicate" removal hearings. See id. at 1048, 104 S.Ct. 3479.

After all, in many cases the Fourth Amendment suppression evidence would come in wholly through the immigration agents who made the relevant arrest in the first place. See id. at 1043, 104 S.Ct. 3479 ("[T]he agency officials who effect the unlawful arrest are the same officials who subsequently bring the deportation action.").

*33 But even given that, the Supreme Court determined in Lopez-Mendoza that the "diversion of attention" implicit in Fourth Amendment suppression hearings weighed against allowing Fourth Amendment suppression motions to be made in immigration proceedings. See id. at 1048–49, 104 S.Ct. 3479.

[28] But if Fourth Amendment suppression motions cannot generally be made --- then surely First Amendment suppression motions have no place, either.

If a Fourth Amendment suppression hearing (typically involving testimony from arresting immigration agents) is a bridge too far, then a First Amendment suppression hearing (which in this case could conceivably seek testimony from our country's top officials) is also a bridge too far --- and then some.

* * *

The conclusion set out just above is buttressed from two sides.

First, look to the one on-point case in this area. The Second Circuit was asked whether immigration courts can consider a First Amendment suppression argument. Its answer was no. See Montero v. INS, 124 F.3d 381 (2d Cir. 1997) ("We decline [the] invitation to fashion an exclusionary rule for evidence obtained in violation of an individual's First Amendment rights.") (citing Lopez-Mendoza).

And second, look to what the immigration judge in this case said about the scope of her powers. [44]

Before the immigration judge, the Petitioner made various motions to compel discovery. For example, he moved to issue a subpoena to the Secretary of State, as well as to compel the production of certain documents. [45]

But the immigration judge denied those motions.

**\*34** She said the authority of immigration judges "is very limited to two things. Is [the Petitioner] removable from the United States, and does he have relief available to him from removal if he is found removable." Audio Recording of Hearing (April 8, 2025) ("April 8 Audio Recording") at 21:12 to 21:24; see Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

And the immigration judge suggested that to the extent any constitutional issues were being raised, she could not take them on. See April 11 Audio Recording at 1:35:35 to 1:36:00 ("I understand ... that you would like to challenge the authority of the Secretary of State ..., but you will need to take that up with Congress. This court is without jurisdiction to entertain challenges to the validity of such laws under the Constitution."); see also April 8 Audio Recording at 21:12 to 21:24; Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

Finally, as to seeking a subpoena for the Secretary of State, the immigration judge said of the Petitioner that he was "in the wrong court for that." April 8 Audio Recording at 20:55–58; see Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

* * *

In a nutshell:

The Petitioner seeks here an injunction vacating the Secretary of State's determination. But the immigration courts cannot

issue injunctions. And they cannot suppress evidence (like the Secretary's determination) on First Amendment grounds. That conclusion is based on an analogy to Fourth Amendment suppression, an on-point Second Circuit decision, and the immigration judge's approach here. [46]

**B. Factual Development**

**\*35** As noted just above, the immigration courts cannot give the Petitioner the legal relief he seeks as to the Secretary of State's allegedly unconstitutional determination. Whether through injunction or suppression --- the immigration courts cannot push aside the Secretary's determination.

But in some cases, a person is suing to get a statute invalidated as it applies to him.

And most of the time (if not all of the time) that is not something that an agency court is legally empowered to do.

But even in those sorts of circumstances, federal courts often require that the case be sent first to an administrative court. See Elgin, 567 U.S. at 17, 132 S.Ct. 2126; Thunder Basin, 510 U.S. at 215, 114 S.Ct. 771; Massieu, 91 F.3d at 426; accord, e.g., Hill, 825 F.3d at 1245; Tilton, 824 F.3d at 279, 290; Bennett, 844 F.3d at 176, 184; Bebo, 799 F.3d at 767, 771; Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin., 376 F.3d 239, 243–44 (4th Cir. 2004).

There are a number of reasons why.

One of them: even if the agency's courts cannot themselves deliver the requested remedy, they can prepare the field --- by finding the facts, so that a federal court of appeals will have a solid record to work from when it gets the case. See Elgin, 567 U.S. at 19–20, 132 S.Ct. 2126; accord, e.g., Bank of La., 919 F.3d at 927; Chau v. SEC, 665 F. App'x 67, 71 (2d Cir. 2016); Hill, 825 F.3d at 1249; Jarkesy, 803 F.3d at 21–22; Bebo, 799 F.3d at 773.

**[29]** But in this case, the immigration courts would not be able to do the fact-finding that a federal court of appeals would need down the road.

The Court explains why here.

* * *

To see the limits of the immigration courts' fact-finding, try to peer around the corner --- to predict the sorts of factual issues that may possibly come up as the case unfolds. [47]

One of those issues is suggested by the Respondents, and it provides a helpful example of the fact-finding difficulties that the immigration courts would encounter in this case.

The Petitioner claims that his detention is the product of First Amendment retaliation. See Motion for Preliminary Injunction at 3; see also Petition ¶¶ 88–90. But the Respondents say that this argument "is likely to fail." Opposition Brief at 28.

The reason why: to make out a retaliatory-detention claim under the First Amendment, the Respondents say, the Petitioner must show that there was no probable cause for his arrest. See Nieves v. Bartlett, 587 U.S. 391, 402, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019) (cited by the Opposition Brief at 28).

But, the Respondents argue, the Petitioner cannot make that showing. See Opposition Brief at 28. The Secretary of State's determination and the Petitioner's alleged failure-to-disclose on his lawful permanent resident application are said to be "facially valid reasons" to remove him from the country. Id. at 28.

Therefore, the Respondents' argument goes, federal officials had probable cause to detain the Petitioner --- and under Nieves, cited just above, his First Amendment argument hits a quick dead end. See id.

Moreover, the Respondents argue, the Petitioner has not tried to use the exception to all this that the Supreme Court suggested in Nieves. See id. at 28–29.

**\*36**  Under that exception, the Petitioner may not actually need to establish an absence of probable cause. Per the Nieves Court: "The no-probable-cause requirement should not apply when [the Petitioner] presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 587 U.S. at 407, 139 S.Ct. 1715.

Look just a bit over the horizon, and it seems possible that the Petitioner could try to press a selective-enforcement defense --- contending, presumably, that other "similarly situated individuals" have not been the subject of a Section 1227(a)(4)(C)(i) determination by the Secretary of State.

To make out this defense, the Petitioner would potentially seek some discovery --- as to others, for example, against whom enforcement actions may not have been taken, and perhaps as to the decision-making process of senior federal officials.

Can the immigration courts provide "meaningful" factual development as to those issues?

It is hard to see how they could.

The Supreme Court, after all, has suggested that even narrow-gauge Fourth Amendment suppression hearings are not a good fit for the tight focus of the immigration courts. See Lopez-Mendoza, 468 U.S. at 1046–50, 104 S.Ct. 3479.

And as noted above, the immigration judge in this case herself declined to permit any discovery. See April 8 Audio Recording at 20:55–58 (stating the Petitioner was "in the wrong court" for obtaining a subpoena of the Secretary). [48]

* * *

**\*37**  Given the limits of fact-finding in the immigration courts, federal courts have sometimes taken up immigration claims, rather than require them to wind their way through agency courts.

For example, in McNary v. Haitian Refugee Center, Inc., 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), the respondents challenged certain INS amnesty procedures in a federal district court. See 498 U.S. at 487–88, 111 S.Ct. 888. But did they have to go through the immigration courts first?

No, the Supreme Court held.

The case was a "pattern and practice case," because it challenged "[a] pattern of ... unconstitutional practices." Id. at 497, 111 S.Ct. 888 (cleaned up).

Pattern-and-practice cases require a "substantial amount of evidence," and an immigration judge adjudicating one particular case would not have been able to gather it. Id. This would leave the federal court of appeals in a bad spot; it "would be in [no] position to provide meaningful review of the type of claims raised." Id.

So the Supreme Court's decision: no need for the case to go to the immigration courts --- keep it in the federal district court. See id. at 494, 111 S.Ct. 888.

McNary is not directly on-point.

But it speaks to the idea that when it comes to "meaningful" development of the factual record --- and the knock-on question of whether adjudication in the immigration courts is required --- federal courts do not need to turn a blind eye to a common-sense reality. [49]

And that is this: immigration courts are mainly built for close-to-the-ground fact-finding. Not for fleshing out the record as to potentially sweeping claims --- related to "pattern and practice" issues, McNary, 498 U.S. at 497, 111 S.Ct. 888, for example, or selective enforcement.

And sweeping claims are plainly what the Petitioner is pressing here. [50]

* * *

**\*38**   As to the fact-finding difficulties here for the immigration courts, consider briefly a final added point.

One of the Petitioner's core arguments is that he is being retaliated against under a policy formulated by the most senior officials in the federal government. See Motion for Preliminary Injunction at 3; see also Petition ¶¶ 29–36.

More on that allegation later, in Part VIII.

For now, note that there is at least a potential argument under the Supreme Court's decision in Lozman v. Riviera Beach, 585 U.S. 87, 100–01, 138 S.Ct. 1945, 201 L.Ed.2d 342 (2018), that the existence of such a policy could undo the argument the Respondents have made here --- namely, the argument that probable cause is a full defense to an

arrest made in retaliation for First Amendment activity. See Opposition Brief at 28.

This means that the salience of the Nieves question (was there probable cause such that First Amendment retaliation may not matter?) could potentially turn under Lozman on the answer to an earlier and broader question (was there an official policy of retaliation?).

If fact-finding is one day required as to such a policy --- whether it exists, what its scope might be, whether it led to the Petitioner's detention --- it cannot be done in a "meaningful" way by the immigration courts, for reasons that have already been discussed (and that were the focus of the Supreme Court's "pattern and practice" decision in McNary).

But that is only the tip of the iceberg.

Deciding, for example, whether Lozman applies to a case like this one, involving only federal officials, may require some complex legal judgments about constitutional questions that have not yet been resolved in all federal circuits. See, e.g., Novak v. City of Parma, 932 F.3d 421, 429 (6th Cir. 2019) (suggesting that Lozman is only relevant as to claims against municipalities).

And that question may need to be answered at the threshold of any fact-finding, to determine the scope of discovery.

If Lozman applies, the Petitioner may try to prove up a policy --- and to seek out evidence accordingly.

And if Lozman does not apply, then maybe what matters is only proof as to probable cause and selective enforcement --- which may imply a different (though still potentially wide) scope for discovery.

* * *

Bottom line: the immigration courts cannot be expected to supply sufficiently substantial fact-finding as to the allegations in this case.

And the threshold questions that may determine the scope of any possible discovery seem to themselves require knowledge as to complex areas of constitutional law, areas that are removed from the legal issues the immigration courts typically consider. [51]

**C. Expertise**

**\*39**  The focus to this point has been on what the immigration courts could accomplish in this case.

Could they grant the Petitioner the legal relief he seeks? Could they substantially develop the factual record?

The Court's answer has been no to each question. See Part VI.A and Part VI.B.

The implications of this are taken up in Part VI.D, which considers whether the Petitioner could get the required "meaningful review" of his claim if it first goes to the immigration courts.

Before getting there, though, take a quick detour --- to see the impact here of a decision of the Board of Immigration Appeals.

\* \* \*

"Meaningful review" is the most important of the Thunder Basin factors. See Part V.B.2.

But there are two others.

\* \* \*

The first is whether the claims in question are "wholly collateral to the statute's review provisions." ⚑ Axon, 598 U.S. at 186, 143 S.Ct. 890 (cleaned up).

 **[30]**  The claim as to the Secretary's determination is not collateral. It is "the vehicle by which [the Petitioner] seek[s] to" challenge his removal proceedings, ⚑ Elgin, 567 U.S. at 22 ---, 132 S.Ct. 2126 and per the statutory "review provisions," those are the "challenge[s]" that are generally supposed to go before the immigration courts.

\* \* \*

The second Thunder Basin factor relates to whether the agency's expertise can be brought to bear if a certain claim goes to it first. See ⚑ Axon, 598 U.S. at 194, 143 S.Ct. 890; ⚑ Elgin, 567 U.S. at 22, 132 S.Ct. 2126; ⚑ Free Enter. Fund, 561 U.S. at 491, 130 S.Ct. 3138.

If agency expertise can be brought to bear, that is a reason to think Congress wanted claims of the relevant "type" to go to the agency's courts (here, the immigration courts).

 **[31]**  But in this case, "agency expertise" would have virtually no role to play as to any immigration court assessment of the Secretary of State's determination.

This Part VI.C explains why.

\* \* \*

Agency adjudicatory bodies are experts in the laws they routinely use, plus nearby bodies of law.

SEC adjudicators, for example, can be expected to be fluent in the Securities Act of 1933 and the Securities Exchange Act of 1934. And they are almost surely experts on related subjects, too. Common-law fraud, for example.

Immigration courts plainly have deep expertise in immigration law.

But the Petitioner claims that the Secretary of State's determination is the product of First Amendment retaliation. See Petition ¶¶ 8, 89; Motion for Preliminary Injunction at 10-18.

And First Amendment issues have little or no place on an immigration judge's docket. See Part VI.A. It follows that there is no reason to think immigration courts have special expertise in First Amendment law. See ⚑ Axon, 598 U.S. at 194, 143 S.Ct. 890 (describing constitutional claims as outside the administrative agency's area of expertise); ⚑ Free Enter. Fund, 561 U.S. at 491, 130 S.Ct. 3138 (similar).

But agency expertise can still potentially be brought to bear.

 **[32]**  Indeed, the Thunder Basin "agency expertise" factor can weigh in favor of upfront adjudication in the agency's courts --- even when the legal theory that undergirds the claim is not one as to which an agency adjudicator has any expertise. See ⚑ Elgin, 567 U.S. at 22-23, 132 S.Ct. 2126; ⚑ Rydie v. Biden, 2022 WL 1153249, at \*8 (4th Cir. Apr. 19, 2022).

 **\*40**  But while that is true in general, in this particular case the "agency expertise" factor does not point to the immigration courts.

\* \* \*

To see why, start with the idea that an agency adjudicator's decision, informed by special expertise, can helpfully move the case along by eliminating the need for later federal court intervention.

Take as an example 🚩 Elgin v. Department of Treasury, 567 U.S. 1, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012).

There, federal employees were fired because they did not register for the draft, and they sued. See 🚩 id. at 6–7, 132 S.Ct. 2126. Their argument: their termination for failure to register was unconstitutional because, among other things, the draft discriminated against men based on sex. See 🚩 id. at 7, 132 S.Ct. 2126.

Analyzing the <u>Thunder Basin</u> factors, the Supreme Court ruled that the case needed to first be adjudicated by the relevant agency, the Merit Systems Protection Board. [52] See 🚩 id. at 8, 132 S.Ct. 2126.

The Board did not have expertise on the underlying constitutional issue. See 🚩 id. at 22, 132 S.Ct. 2126. But the Court noted that the Board might be able to wrap up the case by applying its expertise to "threshold" issues, without the need for a court to later take up the constitutional question. See 🚩 id.

For example, one of the fired employees had not been formally fired --- instead, he argued that he had been "constructive[ly] discharge[d]." [53] 🚩 Id. at 23, 132 S.Ct. 2126.

If this employee was <u>not</u> in fact constructively discharged, the constitutional challenge to his firing would no longer exist --- because it could no longer be said that he was fired. See 🚩 id.

And that, per the Supreme Court, was a reason to let the case run down the agency-adjudication track. See 🚩 id. After all, the question of whether a person is or is not constructively discharged is "unique to the employment context" and therefore "falls squarely within the [Board's] expertise." 🚩 Id. at 22-23, 132 S.Ct. 2126. [54]

\* \* \*

With this background in mind, turn back now to this case.

Are there "threshold" issues here, 🚩⚠ id. at 22, that the immigration courts could resolve, and that might put an end to the Petitioner's First Amendment challenge?

**\*41** Yes, it would seem.

After all, the Secretary of State determined that there were "reasonable ground[s] to believe [the Petitioner's presence or activities in the United States] would have potentially serious adverse foreign policy consequences for the United States." 🚩 8 U.S.C. § 1227(a)(4)(C)(i).

Maybe the immigration courts could hold that there were in fact <u>not</u> "reasonable grounds" --- and if so, the Petitioner's claim would be resolved on that basis, without the need for a federal court to decide whether the Secretary's determination amounted to First Amendment retaliation.

And indeed, after the Third Circuit sent Massieu's case to the immigration courts, that is precisely what happened.

The immigration judge looked behind the curtain of the Secretary of State's "reasonable grounds" determination --- and said the evidence was not there. See In re Ruiz-Massieu, 22 I. & N. Dec. 833, 835-36 (BIA 1999).

But that was not the end of the road.

The Board of Immigration Appeals took it from there, and held that what the immigration judge had done was not allowed. Per the Board, the Secretary's determination under 🚩 8 U.S.C. § 1227(a)(4)(C)(i) is like a prior criminal conviction --- it must be treated as a given if it seems solid-enough on its face, with no possibility of getting under the hood and examining its underlying factual basis.

In the scheme adopted by Congress, the Secretary's determination as outlined in section 241(a)(4)(C)(i) [🚩 8 U.S.C. § 1227(a)(4)(C)(i)] of the Act is equivalent to a duly certified record of criminal conviction by a state or federal court....

[The alternative] would necessarily require the Immigration Judge and this Board to intrude into the realm of foreign policy....

For an example, we need only look to the opinion in the present case. The Immigration Judge held that the [Immigration and Naturalization] Service must produce more than clear, unequivocal, and convincing evidence that the Secretary of State held a facially reasonable opinion that the alien's presence would have adverse foreign policy consequences. She required the Service to convince her by clear, unequivocal, and convincing evidence that the Secretary's opinion is reasonable. The Immigration Judge found that the Service had not shown that the opinion of the Secretary of State is reasonable. Consequently, in the absence of further evidence, she substituted her judgment for that of the Secretary of State. This standard of inquiry would entangle the Immigration Court in matters of foreign policy and involve that court in weighing the importance of various factors in an area in which it has no special expertise. Such an in-depth examination could well require the Service to proffer secret or confidential information and expert witnesses, or involve a deposition of the Secretary of State. There is no indication that Congress contemplated an Immigration Judge, or even the Attorney General, overruling the Secretary of State on a question of foreign policy.

Id. at 844-45. [55]

**\*42** In short: "it is ... the opinion of the Secretary [of State] that decides the issue," id. at 845 n.13 --- and because of the above-quoted ruling from the Board of Immigration Appeals in Ruiz-Massieu, there would be next to nothing for an immigration court to do in this case. The reasonableness of the Secretary's determination might have been a "threshold" matter for the immigration courts. Elgin, 567 U.S. at 22, 132 S.Ct. 2126. But after the Ruiz-Massieu decision, no longer. [56]

\* \* \*

Are there other reasons why agency expertise might matter?

Yes. Take up here the main added possible reason, and then consider a second one below in footnote 57.

An agency's narrowing construction of a statute might potentially obviate the need for a federal court to later reach the relevant constitutional issues. See id. at 23, 132 S.Ct. 2126 (a "challenged statute may be one that the [agency] regularly construes, and its statutory interpretation could alleviate constitutional concerns"); see also Jarkesy, 803 F.3d at 29 ("[T]he [agency] could offer an interpretation of the securities laws in the course of the proceeding that might answer or shed light on [the plaintiff's] [constitutional] challenge. As our court has previously observed, there are precious few cases involving interpretation of statutes authorizing agency action in which our review is not aided by the agency's statutory construction.") (cleaned up); Am. Fed'n of Gov. Emps., AFL-CIO v. Trump, 929 F.3d 748, 761 (D.C. Cir. 2019) (similar).

Imagine, for example, if the immigration courts took first crack at this case --- and construed 8 U.S.C. § 1227(a)(4)(C)(i) as providing a basis for removal only if the Secretary of State's determination was not based on any sort of retaliation whatsoever.

That could switch things up, transforming a constitutional question into an immigration law question. The constitutional question (was the Secretary's determination the product of First Amendment retaliation?) would become one of immigration law (was the Secretary's determination the product of "any sort of retaliation," as defined by the immigration courts?).

And if so, it might make sense to allow the immigration courts to assess the case first --- under what will, by hypothesis, be their own standard.

But the Board of Immigration Appeals has already construed Section 1227(a)(4)(C)(i), and it has not opted to give it a limiting construction of any kind.

**\*43** And in any event, a limiting agency construction would carry less weight now that the Board of Immigration Appeals decisions no longer get strong deference. Compare Bautista v. Att'y Gen. of U.S., 744 F.3d 54, 58 (3d Cir. 2014), abrogated on other grounds by Torres v. Lynch, 578 U.S. 452, 136 S.Ct. 1619, 194 L.Ed.2d 737 (2016) (Board of Immigration Appeals decisions get Chevron deference), and Rodriguez-Avalos v. Holder, 788 F.3d 444, 448-49 (5th

Cir. 2015) (same), _with_ 📙 Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) ("Chevron is overruled.").

\* \* \*

Bottom line: the immigration courts would be unable to apply their expertise here to resolve any substantial threshold matter --- and they would be unable to interpret the immigration laws in a way that would later receive strong deference from a federal court.

In light of this, the Thunder Basin "agency expertise" factor tilts the scales toward the conclusion that Congress did not intend for immigration courts to handle this "type" of case in the first instance. [57]

### D. Conclusion

As to the Secretary of State's determination, the immigration courts cannot provide the Petitioner with the legal relief he seeks. See Part VI.A. They cannot be expected to knock out any fact-finding that might potentially be necessary. See Part VI.B. And they cannot bring their special expertise to bear in a substantial way. See Part VI.C.

Does this mean that if this case starts off in the immigration courts, the Petitioner cannot get "meaningful review" --- and that, under 📙 Section 1252(b)(9), this Court should therefore retain jurisdiction? [58]

To answer, go back for a moment to the key cases.

\* \* \*

Recall that, in Elgin, employees were fired for not signing up for the draft. See 📙 567 U.S. at 6–7, 132 S.Ct. 2126. The Supreme Court held that the employees could not sue first in the federal district court. They would have to go down the administrative track, per a statute --- even though they could not get constitutional relief there. See 📙 id. at 13–14, 132 S.Ct. 2126.

Or look back to Massieu.

The underlying statute, essentially the same one that is at issue here, was challenged as unconstitutional.

**\*44** But the immigration judge's hands were tied. She was "not authorized to consider the constitutionality of the statute." 📙 91 F.3d at 424.

The result? Same as in Elgin. The Third Circuit held that the noncitizen would have to go to the immigration courts and then over to the court of appeals, rather than seek immediate relief in the district court. See 📙 id. at 422.

\* \* \*

These precedents loom large. They suggest that going to the administrative courts is necessary --- even when they cannot be the litigation's main event.

But in the end, the Court's conclusion is this: neither the Supreme Court's Elgin decision nor the Third Circuit's Massieu decision dictates the outcome here.

Those cases are different than this one.

\* \* \*

The first difference has already been discussed.

In Elgin and Massieu, the administrative courts could realistically be expected to push things forward.

They could gather facts. They could bring to bear their distinctive expertise.

The cases would take longer to make it to federal court --- a first trip there, to the federal court of appeals, could go forward only after the administrative adjudication was done.

But the time in Elgin and Massieu would have been well spent. The administrative courts' work (fact-finding, using their expertise) would have set the table for the federal court of appeals to make its constitutional decision.

But in this case, the time in the immigration courts cannot be expected to advance the ball.

If there needs to be fact-finding here, it may potentially be sprawling, and it may potentially involve sensitive evidence, or (renewed) requests to depose senior officials. See Part VI.B.

And the scope of discovery may depend not on questions of immigration law, but on questions of constitutional law, both procedural (for example: what are the limits on subpoenaing a cabinet official?) and substantive (for example: is there a "policy" exception under Lozman to the Nieves First Amendment–retaliation framework?). See id.

This is not the kind of fact-finding work the immigration courts have been built for. See id.

And in this case, the immigration courts would also have no real chance to deploy their special expertise. The Board of Immigration Appeals has already held that the Secretary of State's determination is conclusive. This binds the immigration courts. And it means that, for those courts at least, there is no room to examine the underlying basis of the Secretary's determination. See Part VI.C.

There is, in short, little that the immigration courts can be expected to accomplish in this case.

The requirement of "meaningful review" under Thunder Basin, Elgin, and Massieu can accommodate a slower road to federal court. But those cases envision that along the way things will get done. Facts will be found, law will be interpreted, expertise will be used. See 🚩 Thunder Basin, 510 U.S. at 214–15, 114 S.Ct. 771; 🚩 Elgin, 567 U.S. at 22–23, 132 S.Ct. 2126; 🚩 Massieu, 91 F.3d at 426.

The work in the administrative court may end the case. And if not, then the time will have been used. The journey (in the administrative courts) will shape the final destination (review in federal court).

But Elgin and Massieu do not purport to speak to a case like this one. In those cases, the administrative court route meant that extra time would pass --- but for a purpose.

**\*45** Here, the situation would be different. Time would pass, yes, and perhaps a great deal. But there would be little to show for it.

\* \* \*

Take now a second way in which this case is different from Elgin or Massieu.

Start with the basic distinguishing point, see Part VI.D.1, and then look to its implications from three related perspectives. See Part VI.D.2 to Part VI.D.4.

### 1. Public Concern

The Petitioner alleges that the Secretary of State's determination amounts to retaliation for his First Amendment–protected statements.

There was nothing like that in 🚩 Elgin. The petitioners there were federal employees who had not registered for the draft. See 🚩 567 U.S. at 6–7, 132 S.Ct. 2126.

And there was nothing like that in 🚩 Massieu, where the plaintiff was a former senior Mexican official whose presence had become a thorn in the side of U.S.-Mexico relations. See 🚩 Massieu, 915 F. Supp. at 712 (quoting Letter from Warren Christopher, Sec'y of State, to Janet Reno, Att'y Gen.) (Oct. 2, 1995) (failure to return the plaintiff "to Mexico ... would be a major setback for ... our combined efforts to chart a new and effective course of U.S.–Mexican relations"). [59]

Before getting to why this difference matters, note briefly the Petitioner's speech-related allegations.

That he had spoken at press conferences and on TV. See Petition ¶ 26. That he had helped lead two university student groups, at least one of which puts on public lectures. See id. ¶ 23. And that the subject of all this was the current violence in the Middle East and the Petitioner's views on it --- Israel has committed a "genocide," the Petitioner has said, id. ¶ 22; Columbia University, where he was a student, is "financing and in other ways facilitating it," he has said, id.; and the United States is on the wrong side of the line. See id. ¶ 29.

Per the Supreme Court, speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." 🚩 Snyder v. Phelps, 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011).

Was the Petitioner's alleged speech about a "public concern"?

**[33]**  Speech "deals with matters of public concern when it can be fairly considered as relating to any matter of political ... concern to the community." 🚩 Id.

**[34]**  The Petitioner's public statements about the Middle East conflict meet that test. See, e.g., 🚩 id. at 454, 131 S.Ct. 1207 (holding that protest signs as to United States military policy were "political" and "of public import"); see also 🚩 Rankin v. McPherson, 483 U.S. 378, 386, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); Navab-Safavi v. Glassman, 637 F.3d 311, 313, 316 (D.C. Cir. 2011); 🚩 Dunn v. Carroll, 40 F.3d 287, 291–92 (8th Cir. 1994).

**\*46**  **[35]**  And speech can be a matter of public concern when it is "a subject of legitimate news interest," 🚩 Snyder, 562 U.S. at 452, 131 S.Ct. 1207, including as to "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." 🚩 Time, Inc. v. Hill, 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); accord, e.g., 🚩 Lane v. Franks, 573 U.S. 228, 241, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014); 🚩 Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 103–04 (3d Cir. 2022); 🚩 O'Laughlin v. Palm Beach Cnty., 30 F.4th 1045, 1051–52 (11th Cir. 2022).

The Petitioner's public statements meet that test, too

In short: the Petitioner's speech was on a subject of "public concern" --- and that sort of speech gets "special protection." 🚩 Snyder, 562 U.S. at 452, 131 S.Ct. 1207.

* * *

**[36]**  Moreover, the Petitioner alleges not only that he was detained by immigration officials because of his speech --- but also that this detention is having an effect now, in the present.

A direct effect --- because detention prevents the Petitioner from speaking publicly. See Petition ¶¶ 89, 99. [60]

And an indirect effect --- because detention deters the Petitioner (and others) from speaking. See id. ¶ 89. [61]

This sort of here-and-now impact on speech weighs heavily.

**[37]**  That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 🚩 Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); see 🚩 Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys., 938 F.3d 424, 442 (3d Cir. 2019); 🚩 B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 323 (3d Cir. 2013); see also 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2025); cf. 🚩 Tandon v. Newsom, 593 U.S. 61, 64, 141 S.Ct. 1294, 209 L.Ed.2d 355 (2021); 🚩 Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020); 🚩 Dombrowski v. Pfister, 380 U.S. 479, 485–86, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); 🚩 Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 178 (3d Cir. 2002).

**[38]**  And this is because "[t]he timeliness of political speech" --- the type of speech at issue here --- "is particularly important." 🚩 Elrod, 427 U.S. at 374 n.29, 96 S.Ct. 2673 (citing 🚩 Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 182, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); 🚩 Wood v. Georgia, 370 U.S. 375, 391, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)).

**[39]**  Our law's response to a here-and-now impact on political speech has been the same across the board: no unnecessary delay.

Deal thoughtfully and thoroughly with the speech issue. But deal with it on a faster-than-usual timeline.

**\*47**  Begin seeing this below, and its import for this case.

## 2. First Amendment Speed

Move here through four separate legal contexts, each distinct from the next, in which the unifying thread was only this: here-and-now speech impacts cannot be left out there, waiting too long for judicial review.

### a) Administrative Proceedings

Look first to Oestereich v. Selective Service System Local Board No. 11, Cheyenne, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968).

There, a student protested against the Vietnam War. See id. at 234, 89 S.Ct. 414. Soon afterwards, the draft board withdrew an exception he was entitled to and called him up for induction into the military. See id. at 234–35, 89 S.Ct. 414.

The student sued to stop his enlistment; the district court dismissed his complaint, and the court of appeals affirmed. See id. at 235, 89 S.Ct. 414. The reason: judicial review would be available, if only later on. See Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne, 390 F.2d 100, 100 (10th Cir.).

The Supreme Court reversed. See Oestereich, 393 U.S. at 239, 89 S.Ct. 414.

A statute barred judicial review of the draftee's classification before he was inducted. That was "unambiguous," the Supreme Court said. Id. at 235, 89 S.Ct. 414.

And there was no doubt that judicial review would someday be available, as the court of appeals had said --- either as "a defense in a criminal prosecution" brought against the student for not registering, or on a "habeas corpus [petition] after induction." Id.

But the Supreme Court held that a literal reading of the law might be "out of harmony ... with constitutional requirements." Id. at 238, 89 S.Ct. 414. The draft board's actions, the Court explained, were no different in this sense "from a case where induction of a[ ] ... clearly exempt person is ordered ... to retaliate against the person because of his political views." Id. at 237, 89 S.Ct. 414.

And given this concern about "retaliat[ion]" for "political views," the Supreme Court did not make the student wait for his day in court, either as a habeas petitioner after his enlistment or as a criminal defendant after his refusal to enlist.

See id. at 238, 89 S.Ct. 414. Rather, per the Court, he could go to court right away. See id.

### b) State Prosecutions

The next example starts with this: a long-standing statute that tells federal courts that they cannot generally enjoin a state court proceeding. See 28 U.S.C. § 2283.

But sometimes, very rarely, to ward off a First Amendment chill --- they can.

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), civil rights activists faced criminal prosecution. See id. at 482, 85 S.Ct. 1116. State prosecutors accused them of belonging to a Communist front --- allegations that allegedly "frightened off potential members and contributors." Id. at 488, 85 S.Ct. 1116.

In federal district court, the activists sought an injunction against the officials. See id. at 482, 85 S.Ct. 1116. The court dismissed their complaint, see id., but the Supreme Court reversed. See id. at 483, 85 S.Ct. 1116.

There was good reason not to intervene in the prosecution. Federalism concerns, always important, were top of mind. See id. at 484, 85 S.Ct. 1116. So too were less-intrusive ways of resolving the case. State courts and prosecutors, after all, are sworn to honor the Constitution, just as federal officials are, see id., and any miscarriage of justice could be promptly appealed, perhaps up to the Supreme Court. See id. at 485, 85 S.Ct. 1116. In the meantime, a state court might moot the matter by acquitting the defendants. See id.

*48 But all of that would come too late, the Supreme Court said. By then, the First Amendment harm would have been done.

"The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." Id. at 487, 85 S.Ct. 1116. "Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect

on protected expression." Id. at 494, 85 S.Ct. 1116. The Supreme Court ordered the district court to enjoin prosecution. See id. at 497, 85 S.Ct. 1116.

To be sure, Dombrowski has been whittled a long way back.

Under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), Dombrowski no longer means that a chilling effect can "by itself justify federal intervention." Id. at 50, 91 S.Ct. 746. Nonetheless, Younger reiterated that intervention may be proper when there is bad faith or harassment on the part of a state.[62] See id. at 53, 91 S.Ct. 746. And even without that, "[t]here may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown." Id.

But Dombrowski and Younger remain relevant.

In those cases, as in Oesterich, the need in the First Amendment context for speed was a powerful counterweight --- heavy enough, at least sometimes, to overcome important countervailing concerns, including the need for federal courts to wait, out of respect for the judgment of state officials and judges (in Dombrowski); of federal draft boards (in Oesterich); and, in both cases, the judgment of Congress, which had passed on-point statutes that told the courts to hold back.

### c) The Supreme Court

Turn now to the Supreme Court, and one of the statutes passed by Congress that shapes its jurisdiction, 28 U.S.C. § 1257.

Section 1257 allows the Supreme Court to hear "[f]inal judgments ... rendered by the highest court of a State." Id. (emphasis added).

But when a First Amendment "chill" may be in the air, the Supreme Court has read Section 1257 as allowing review of a non-final judgment. See, e.g., Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 55–57, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989); Nat'l Socialist Party of Am. v. Vill. of Skokie, 432 U.S. 43, 44, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977); Neb. Press Ass'n v. Stuart, 423 U.S. 1327, 1329, 96 S.Ct. 251, 46 L.Ed.2d

237 (1975) (Blackmun, J., in chambers); Mia. Herald Pub. Co. v. Tornillo, 418 U.S. 241, 246–47 & n.6, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); Mills v. Alabama, 384 U.S. 214, 221–22, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (Douglas, J., concurring).

For an example, look to Fort Wayne Books.

There, two bookshops sold graphic magazines. See State v. Sappenfield, 505 N.E.2d 504, 504 (Ind. Ct. App. 1987), aff'd and remanded sub nom. Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989). State prosecutors charged the shops' owner with distributing obscene material. And that provided a basis for state-law RICO charges. See Fort Wayne Books, Inc., 489 U.S. at 53, 109 S.Ct. 916.

The trial court threw out the racketeering counts for being unconstitutionally vague. See id. The Indiana Court of Appeals reversed --- and the Indiana Supreme Court decided not to take up the case. See id.

**\*49**  The federal Supreme Court granted certiorari and then paused to take stock of its jurisdiction. See id. at 54, 109 S.Ct. 916.

The jurisdictional question was a hard one. In criminal law, the rule of finality generally requires a conviction and a sentence before an appeal can be taken. See id. But neither box was checked. See id. Normally, then: no Supreme Court jurisdiction under the statute. See id.

But the Supreme Court determined that the First Amendment required "immediate review," meriting an exception to the general rule. See id. at 55, 109 S.Ct. 916.

A too-long wait, the Court explained, could chill speech. "Whichever way we were to decide on the merits, it would be intolerable to leave unanswered, under these circumstances, an important question of freedom of the press under the First Amendment." Id. at 56, 109 S.Ct. 916. Leaving the question unsettled "could only further harm the operation of a free press." Id.

#### d) Prior Restraints

One more example.

**[40]** A prior restraint is government censorship that cuts off speech before it makes it to the public. It is a restraint (of speech) that is prior (to publication).

**[41]** Prior restraints are "immediate and irreversible," Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and presumptively unconstitutional. See Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

**[42]** Nonetheless, the First Amendment allows for some prior restraints --- but only when judicial review is almost immediately available. See Vance v. Universal Amusement Co., 445 U.S. 308, 309, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); Se. Promotions, Ltd., 420 U.S. at 560, 95 S.Ct. 1239; Freedman v. Maryland, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

Why? To quickly dissipate any freedom-of-speech chill.

Take as the example the Freedman case.

A few years before, the Court had decided that the First Amendment allowed some prior restraints on movies. See Freedman, 380 U.S. at 54, 85 S.Ct. 734 (citing Times Film Corp. v. City of Chi., 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961)).

Now, in Freedman, the Court considered the constitutionality of a Maryland law that prohibited screening a disapproved movie "unless and until," in the Court's words, "the exhibitor undertakes a time-consuming appeal to the Maryland courts and succeeds in having the Board's decision reversed." Id. at 54–55, 81 S.Ct. 391.

That did not clear the bar.

The Court held that a movie-censorship scheme could survive constitutional scrutiny only under various conditions. One: fast recourse to a court. See id. at 58–59, 81 S.Ct. 391.

But the Maryland law "provide[d] no assurance of prompt judicial determination," id. at 60, 81 S.Ct. 391, and the only reported appeal of a movie-censorship decision at that point showed that it took six months --- longer than the two days the Court suggested was appropriate in another state's scheme. See id. at 55, 60, 81 S.Ct. 391. Fear of a "chilling effect" drove the Court's thinking. See id. at 59–61, 81 S.Ct. 391. And the Maryland statute was struck down as unconstitutional.

#### e) Implications

These cases are, intentionally, pulled from all over the map. They show something that suffuses our law, in many of its different corners --- that when it comes to here-and-now First Amendment injuries, the law requires a faster pace.

**\*50** And note this: in many ways, the questions taken up by the Supreme Court in the cases set out above were harder than the issue before the Court today.

To accommodate the First Amendment's need for faster-than-usual judicial review, must a state law be struck down as unconstitutional, as in the case of the Maryland licensing scheme?

Must an exception be carved into a federal law, like the "unambiguous" statute that determined when a federal court could take the draft-registration case? Or the Supreme Court's jurisdictional statute? Or the statute that tells federal courts not to enjoin state court proceedings?

These are big lifts.

**[43]** **[44]** Declaring a statute unconstitutional is always a fateful act, the very last resort. See, e.g., Mistretta v. United States, 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). And statutes are generally to be read as they were written, not with judge-made exceptions bored into them.

But as in the cases sketched out above, the Supreme Court time and again has done those very things, to accommodate the First Amendment's need for a quicker pace.

For the questions addressed in this Opinion, much less is at stake.

No one says here that too much delay means that a statute must be struck down as violating the First Amendment. And no one says that a law on the books must be re-read, so as to match up with constitutional values.

Rather, delay matters here only as a reason to do something much less intrusive than all that --- as a way of understanding how to apply the law that we <u>already</u> have.

 [45]  That law requires consideration of whether later federal court review would still be "meaningful" enough. See Part V.

Here, it would not be.

Come back again to what the Supreme Court has said: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod, 427 U.S. at 373, 96 S.Ct. 2673</u>. And: "[t]he timeliness of political speech" --- which is in play here --- "is particularly important." <u>Id. at 374 n.29, 96 S.Ct. 2673</u>.

For judicial review to be "meaningful," it must hew to these principles.

But judicial review that tells the Petitioner to wait until the immigration courts are done does not do that.

Not because First Amendment concerns always compel this result. But because they do here, in this case.

One core reason why: for reasons that are particular to this case, <u>see</u> Part VI.A to Part VI.C, the time spent in the immigration courts would accomplish next to nothing.

The Petitioner would not be able to seek the legal relief he asks for. <u>See</u> Part VI.A. The factual record could not be substantially developed. <u>See</u> Part VI.B. The immigration courts' special expertise could not be brought to bear. <u>See</u> Part VI.C. [63]

**\*51**  **[46]**  Delay to ensure thoughtful consideration of hard issues is permissible. Necessary, even. [64]

But not delay that may be long. That will serve little real practical purpose. And that we can see, now, will come and go with little to show for the wait. [65]

### 3. <u>AADC</u>

To see the "meaningful review" issue here from another angle, look to a case, <u>AADC</u>, that bubbled up through the federal courts during the 1980s and 1990s.

**\*52**  Federal officials sought to deport eight noncitizens, at first on grounds related to their speech. See <u>AADC, 525 U.S. at 473, 119 S.Ct. 936</u>. But the speech-related charges were dropped. See <u>id</u>. And what was left behind included removal charges based on two of the noncitizens' membership in an alleged terror organization, plus six of the noncitizens' status violations, for issues like overstaying a visa and failing to maintain student status. See <u>id. at 473, 119 S.Ct. 936</u>. (There was evidence that all eight noncitizens were involved in helping to finance the terror group. See <u>id. at 475, 119 S.Ct. 936</u>.)

As here, various statutes seemed to require going to the immigration courts before a federal court could get involved.

 [47]  But the noncitizens argued to the Supreme Court that federal court review "would come too late to prevent the 'chilling effect' upon ... First Amendment rights" --- and so the statutes that funneled cases to the immigration courts should be read in light of the "doctrine of constitutional doubt," [66] and "interpret[ed] ... in such fashion as to permit immediate review of the[ ] [First Amendment] claims." <u>Id. at 488, 119 S.Ct. 936</u>.

But the Supreme Court, per Justice Scalia, rejected this argument.

How? By breaking new ground and resolving a consequential legal question --- holding that the eight noncitizens had no underlying First Amendment selective-enforcement claim because they had no legal status in the United States. See <u>id. at 489, 119 S.Ct. 936</u>. [67]

With that holding made, the doctrine of constitutional doubt could no longer impact how jurisdiction-channeling statutes might be interpreted --- because there was no longer any possibility of a constitutional violation.

Why did the Court choose to resolve the First Amendment selective-enforcement claim?

The answer is not crystal clear. But it seems likely to have been this: because the Court viewed the alternative on the table as presenting an even closer question of constitutional law.

And that brings things back to this case.

The alternative before the AADC Court was to hold that a federal court could not hear the noncitizens' here-and-now First Amendment claim until the immigration courts got first crack. Justice Ginsburg argued for this position in her concurrence, see id. at 492, 119 S.Ct. 936 (Ginsburg, J., concurring), based on a narrowed-down reading of some of the cases discussed above in Part VI.D --- narrowed readings that evidently did not convince the Court. Per the majority:

> Instead of resolving this constitutional question [about First Amendment selective enforcement], Justice Ginsburg chooses to resolve the constitutional question whether Congress can exclude the courts from remedying an alleged First Amendment violation with immediate effects, pending the completion of administrative proceedings. It is not clear to us that this is easier to answer than the question we address --- as is evident from the fact that in resolving it Justice Ginsburg relies almost exclusively on cases dealing with the quite different question of federal-court intervention in state proceedings. (Even in that area, most of the cases she cites where we did not intervene involved no claim of present injury from the state action --- and none involved what we have here: an admission by the Government that the alleged First Amendment activity was the basis for selecting the individuals for adverse action. Cf. Dombrowski v. Pfister, 380 U.S. 479, 487–488, n. 4, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).) The one case not involving federal-state relations in fact overrode a congressional requirement for completion of administrative proceedings --- even though, unlike here, no immediate harm was apparent. See Oesterreich v. Selective Serv. System Local Bd. No. 11, 393 U.S. 233, 89

S.Ct. 414, 21 L.Ed.2d 402 (1968). Justice Ginsburg counts the case as one for her side on the basis of nothing more substantial than the Court's characterization of the agency action at issue as "blatantly lawless," id., at 238, 89 S.Ct. 414. See post, at 948 (opinion concurring in part and concurring in judgment).

**\*53** Nor is it clear that the constitutional question Justice Ginsburg addresses has narrower application and effect than the one we resolve. Our holding generally deprives deportable aliens of the defense of selective prosecution. Hers allows all citizens and resident aliens to be deprived of constitutional rights (at least where the deprivation is not "blatantly lawless") pending the completion of agency proceedings.

Id. at 488 n.10 (cleaned up).

Justice Scalia's majority opinion, as quoted at length above, plainly rested on the idea that there was a real possibility that it is unconstitutional to divert people with here-and-now First Amendment claims into the immigration courts, at the cost of pushing off into the future their day in federal court.

And the question seemed vexed enough that the Supreme Court, rather than wade in, worked to skirt the issue, by resolving another novel constitutional claim --- whether noncitizens without lawful status can press a First Amendment selective-enforcement claim.

If, per the Supreme Court, delayed consideration in federal court of a First Amendment claim might be unconstitutional --- then that is a strong argument for taking what is a much smaller step, for opting not to delay federal court consideration of a First Amendment claim in the first place.

And all the more so in this case.

Not just because of how little can realistically be accomplished here in the immigration courts. See Part VI.A to Part IV.C.

But also because of how this case lines up against AADC.

In AADC, there were allegations of membership in a terror group and evidence of financial support to it. See 525 U.S. at 474–75, 119 S.Ct. 936. Here, no such information has been put before the Court.

And in AADC, the noncitizens did not have lawful status. See id. at 488, 491–92, 119 S.Ct. 936. Here, the Petitioner does, see Petition ¶¶ 1, 9, 21 --- and that could make a meaningful First Amendment difference, as the Court held in AADC. See 525 U.S. at 488, 491–92, 119 S.Ct. 936.

In short: if delayed federal court uptake of a First Amendment claim raised a serious constitutional issue in AADC, is that not a powerful reason to steer away from such delay here?

### 4. Axon

Finally, look to the Supreme Court's recent decision in Axon Enterprise, Inc. v. Federal Trade Commission, 598 U.S. 175, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023).

Axon was a case like this one. It involved a set of statutes that seemed to require that the case be sent to the administrative courts, before any federal court involvement. See id. at 181, 143 S.Ct. 890.

To decide where the case should start off, the Supreme Court asked "whether preclusion of district court jurisdiction 'could foreclose all meaningful judicial review.' " Id. at 190, 143 S.Ct. 890 (quoting Thunder Basin, 510 U.S. at 212–13, 114 S.Ct. 771).

The Axon Court's answer: it depends.

Typically, a party can get meaningful judicial review even if a district court never becomes involved in the case. Review of agency action by a court of appeals, following an administrative proceeding --- is generally enough. See id. at 190, 143 S.Ct. 890.

But not always.

Not, per the Supreme Court, when there is a "here-and-now" injury --- one that will be "impossible to remedy once the proceeding is over, which is when appellate review kicks in." Id. at 191, 143 S.Ct. 890.

In Axon, the plaintiffs argued that they were "being subjected to unconstitutional agency authority --- a proceeding by an

unaccountable [FTC] ALJ." Id. (cleaned up). That was a here-and-now constitutional injury, the Supreme Court held. See id.

**\*54** A court of appeals could later vacate any FTC order that might issue, but it could never unwind the clock and undo the harm of being subjected to the FTC proceeding in the first place. "Judicial review ... would come too late to be meaningful." Id.

But is that not also true of having speech allegedly frozen (through detention) and chilled (because of the fear that detention causes)?

Yes.

If being subjected to proceedings before an allegedly unconstitutional decision-maker is a here-and-now injury, as Axon held --- then so too is it a here-and-now injury to allegedly lose out on core First Amendment rights.

\* \* \*

To see the point in sharper relief, move away for a moment from First Amendment issues.

Administrative law has sometimes allowed claimants to bypass agency adjudicators and try to remedy harms now --- if those claims could not realistically be addressed later, at the moment when the federal court would ordinarily step in.

In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for example, the Supreme Court allowed the respondent to bring a due-process challenge to the lack of a pre-termination hearing for disability benefits --- despite the Social Security Act requiring the exhaustion of administrative remedies. See id. at 327–28, 96 S.Ct. 893. In light of the respondent's physical state and need for benefits, the Court observed that "an erroneous termination would damage him in a way not recompensable through retroactive payments." Id. at 331, 96 S.Ct. 893.

And in Kreschollek v. Southern Stevedoring Co., 78 F.3d 868 (3d Cir. 1996), a longshoreman got hurt on the job and was cut off from his disability payments. See Id. at 870. The Third Circuit allowed him to challenge the constitutionality

of part of a federal statute in the district court, rather than wait to be heard in a court of appeals after the administrative process. See id. Making him wait would be like having no "effective judicial review" at all, since the longshoreman would be without any income in the meantime. Id. at 874–75.

These harms, which seem (and are) irreparable, opened the doors to federal courthouses, even though that meant skipping over agency adjudication.

What do harms of this sort have in common?

The underlying principles can be boiled down in a number of different ways.

But the First Circuit has captured part of the doctrine well. It noted that under Thunder Basin, "effective" judicial review becomes unavailable --- such that immediate judicial review makes sense --- "where the compliance costs are so onerous that complying with the regulation [while the administrative proceeding continues] will cause irreparable harm." E. Bridge, LLC, 320 F.3d at 90 (collecting cases).

If this is right, is not alleged suppression of political speech the archetypal "irreparable harm"? And if so, is that not an argument for allowing those sorts of claims to go straight to federal court?

\* \* \*

The basic remedy for unconstitutional curbs on political speech is an injunction, and often an early one. The harm is irreparable. It needs to stop now. Letting the speech suppression go on, with only the promise of a delayed and after-the-fact damages remedy --- that does not cut it.

Cases routinely hold this. See N.Y. Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Schrader v. Dist. Att'y of York Cnty., 74 F.4th 120, 128 (3d Cir. 2023); Amalgamated Transit Union Loc. 85, 39 F.4th at 108; Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth., 975 F.3d 300, 317 (3d Cir. 2020); Ne. Pa. Freethought Soc'y, 938 F.3d at 442; Hawk, 725 F.3d at 323; K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 113 (3d Cir. 2013); Stilp v. Contino, 613 F.3d 405, 409

& n.4 (3d Cir. 2010); Swartzwelder v. McNeilly, 297 F.3d 228, 231, 242 (3d Cir. 2002); Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998); In re Asbestos Sch. Litig., 46 F.3d 1284, 1294–95 (3d Cir. 1994); GJJM Enters., LLC v. City of Atl. City, 293 F. Supp. 3d 509, 520 (D.N.J. 2017); Am. Broad. Cos., Inc. v. Wells, 669 F. Supp. 2d 483, 489 (D.N.J. 2009); Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist., 233 F. Supp. 2d 647, 666 (D.N.J. 2002), aff'd, 386 F.3d 514 (3d Cir. 2004); LCN Enters., Inc. v. City of Asbury Park, 197 F. Supp. 2d 141, 153 (D.N.J. 2002), as amended (Apr. 5, 2002); Lysaght v. State of N.J., 837 F. Supp. 646, 653–54 (D.N.J. 1993); ⚠ Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs, 802 F. Supp. 1223, 1237–38 (D.N.J. 1992); Telco Commc'ns, Inc. v. Barry, 731 F. Supp. 670, 684 (D.N.J. 1990); Gannett Satellite Info. Network, Inc. v. Twp. of Pennsauken, 709 F. Supp. 530, 535 (D.N.J. 1989); E-Bru, Inc. v. Graves, 566 F. Supp. 1476, 1480 (D.N.J. 1983).

**\*55** And this is a core commitment of our law, at work in any number of other ways. [68]

Many of the cited cases are in the end simply about timing.

Over and over again in First Amendment cases, courts issue injunctions --- because a person whose speech is suppressed cannot be asked to wait until the far end of the road for a remedy. The harm along the way is irreparable. It cannot be fixed later.

But if it is too much to wait from the beginning of a case (when, say, a preliminary injunction might be entered) until its end (when there might be a damages payout or permanent relief) --- then what of waiting months or even years for the case to get off the ground in the first place, while it winds its way through the immigration courts?

\* \* \*

Per the Supreme Court in Axon, bypassing administrative courts can be allowed when there is a "here-and-now" injury that will be "impossible to remedy" "once the [administrative] proceeding is over." 598 U.S. at 191, 143 S.Ct. 890.

That implies that this case should be heard, now, in federal court.

First Amendment harms, as alleged here, are routinely said to cause "irreparable injury." In <u>Axon</u>'s phrase, they cause injuries that are "impossible to remedy."

 **\*56**  First Amendment harms, as alleged here, are often said to warrant preliminary and early relief. Because in <u>Axon</u>'s words, later, "once the proceeding is over," will be too late.

And First Amendment harms, as alleged here, are classic in-the-moment injuries. <u>Axon</u> speaks of "here-and-now" injuries. See 🚩 id. at 191, 143 S.Ct. 890. And that is what First Amendment injuries are, and have always been understood to be.

In <u>Axon</u>, the Supreme Court concluded, the claimants "will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over." 🚩 Id. at 192, 143 S.Ct. 890.

So too here.

The Petitioner says his First Amendment rights are now being violated. He will lose them and he will keep losing them if he must wait for federal court review. In the Court's judgment: he does not have to. The Petitioner's claims may or may not be meritorious. But our law allows them to be heard, now, in federal court.

\* \* \*

🚩 Section 1252(b)(9) does not bar jurisdiction because it does not apply to pre-order-of-removal cases like this one. <u>See</u> Part IV.

But if 🚩 Section 1252(b)(9) <u>does</u> apply to cases like this one, it divests jurisdiction only when later federal court review would be "meaningful." Here, it would not be. Therefore, 🚩 Section 1252(b)(9) does not strip this Court of jurisdiction to review the Petitioner's challenge to the Secretary of State's determination. <u>See</u> Part V and Part VI.

**VII.** 🚩 **Section 1252(g)**
Move on now to another statute.

The Respondents say that 🚩 Section 1252(g) prevents consideration of the Petitioner's First Amendment claim as to the Secretary's determination. <u>See</u> Opposition Brief at 14.

🚩 Section 1252(g) reads:

> [N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

🚩 8 U.S.C. § 1252(g).

The Supreme Court construed this provision in <u>AADC</u> --- and narrowly.

 **[48]**  The Supreme Court rejected the parties' understanding of 🚩 Section 1252(g) "as covering all or nearly all deportation claims." <u>AADC</u>, 🚩 525 U.S. at 478, 119 S.Ct. 936. Unlike 🚩 Section 1252(b)(9), 🚩 Section 1252(g) was not an expansive "zipper clause." 🚩 Id. at 482, 119 S.Ct. 936.

> In fact, what 🚩 § 1252(g) says is much narrower. The provision applies only to three discrete actions that the Attorney General [69] may take: her decision or action to <u>commence</u> proceedings, <u>adjudicate</u> cases, or <u>execute</u> removal orders.

🚩 Id. at 482, 119 S.Ct. 936 (emphasis in original) (cleaned up).

<u>AADC</u>'s view of 🚩 Section 1252(g) as a tightly drawn provision has been reaffirmed by a Supreme Court plurality.

See 🚩Jennings, 583 U.S. at 294, 138 S.Ct. 830 (AADC "did not interpret [🚩Section 1252(g)'s] language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves.").

**\*57** And the Third Circuit has landed on the same approach, emphasizing just how narrow-gauged 🚩Section 1252(g) is. See 🚩Tazu v. Att'y Gen. U.S., 975 F.3d 292, 296 (3d Cir. 2020) ("🚩Section 1252(g) does not sweep broadly. It reaches only these three specific actions, not everything that arises out of them."); see also, e.g., 🚩Chehazeh, 666 F.3d at 133-35; 🚩Garcia v. Att'y Gen. of U.S., 553 F.3d 724, 728-29 (3d Cir. 2009).

\* \* \*

**[49]** 🚩Section 1252(g) does not bar consideration here of the Secretary of State's determination.

The reason is this: the determination is not one of the "three specific actions," 🚩Tazu, 975 F.3d at 296, covered by the statute, and it is not an exercise of "prosecutorial discretion." AADC, 🚩525 U.S. at 489, 119 S.Ct. 936.

\* \* \*

Cross the last two "specific actions" off the list.

The Secretary of State's determination is not "a decision or action" to "execute," 🚩8 U.S.C. § 1252(g), a removal order. Indeed, no such order has been entered.

And the Secretary's determination is not "a decision or action" to "adjudicate" a case. Id. The Secretary is not a judicial officer, and the relevant statutes do not suggest he has the power to control immigration judges.

\* \* \*

Come now to the last of the three "specific actions."

Is the Secretary of State's determination a "decision or action by the [the Secretary of Homeland Security] to commence proceedings"?

To ask this question is to answer it.

The determination is an "action." See Part IV.A.3(a). But it is an action by the Secretary of State, not what 🚩Section 1252(g) requires: an "action by the [Secretary of Homeland Security]."

There is no way to whistle past this textual problem. See 🚩Est. of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (referencing the "basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written").

The textual problem cinches things --- and it is also a surface indication of a deeper issue.

Per the Supreme Court, 🚩Section 1252(g)'s aim was to give the Secretary of Homeland Security the space she needs to make the choices she must --- about enforcement priorities, for example, or allocation of finite resources. These are classic questions of prosecutorial discretion, and they are generally for prosecutors to work through for themselves.

Per the Supreme Court: "🚩Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." AADC, 🚩525 U.S. at 485 n.9, 119 S.Ct. 936. [70]

But the Secretary of State does not exercise prosecutorial discretion here. He takes his step --- he makes his determination --- and then it is over to the Secretary of Homeland Security, for her to make her choice.

There were, in short, two distinct moving pieces here --- (a) the Secretary of State's determination as to the Petitioner, and then (b) the act of "prosecutorial discretion" that followed.

🚩Section 1252(g), by its terms, covers only (b). But what the Petitioner is challenging is (a).

**\*58** The two distinct steps are there on the face of the Secretary's memo, which marks the handover from the

Secretary of State's area of responsibility to the Secretary of Homeland Security's.

The memo is addressed from him to her. See Determination at 1.

It reports the Secretary of State's conclusion. See id. ("I have determined that ... [the Petitioner] ... [is a] deportable alien[.]").

And it then looks to the next steps --- which are the Secretary of Homeland Security's to undertake. See id. ("I understand that [a Homeland Security component] now intends to initiate removal charges[.]").

And all of this makes sense under the various relevant statutes.

A Section 1227(a)(4)(C)(i) determination from the Secretary of State makes a noncitizen "deportable." 8 U.S.C. § 1227(a)(4)(C)(i).

"Deportable" means can be deported, "[ ]able" to be deported.

 [50] Who then decides whether someone who can be deported will be removed? The Secretary of Homeland Security.

> Any alien ... in and admitted to the United States shall, upon the order of the [Secretary of Homeland Security], be removed if the alien is within one of more of the following classes of deportable aliens.

8 U.S.C. § 1227(a) (emphasis added). [71]

In a nutshell: the Secretary of State's determination was its own step; it was taken separate from, and before, the Secretary of Homeland Security's "decision or action to commence proceedings." AADC, 525 U.S. at 482, 119 S.Ct. 936 (cleaned up).

But jurisdiction is stripped by Section 1252(g) only as to the decision made by the Secretary of Homeland Security, see

id. --- and the Petitioner's challenge here is not to that. Rather, it is to the earlier decision, made by the Secretary of State.

Jurisdiction is not stripped. See, e.g., N. Am. Butterfly Assoc. v. Wolf, 977 F.3d 1244, 1260 (D.C. Cir. 2020); Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 29 (D.D.C. 2018); Young Sun Shin v. Mukasey, 547 F.3d 1019, 1024 (9th Cir. 2008); Wong v. United States, 373 F.3d 952, 965 (9th Cir. 2004), abrogated on other grounds by Wilkie v. Robbins, 551 U.S. 537, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007); Humphries v. Various Fed. USINS Emps., 164 F.3d 936, 944 (5th Cir. 1999); Castellar v. Nielsen, 2018 WL 786742, at *10 (S.D. Cal. Feb. 8, 2018); Abdur-Rahman v. Napolitano, 814 F. Supp. 2d 1087, 1096 (W.D. Wa. 2010); Hafeez v. Dorochoff, 2007 WL 4300582, at *2 (N.D. Ill. Nov. 30, 2007); cf. Tazu, 975 F.3d at 298.

**VIII. The Policy**

The Court has considered and rejected the Respondents' argument that, under Section 1252(b)(9) and Section 1252(g), it lacks jurisdiction over the Petitioner's challenge to the Secretary of State's determination. See Part IV to Part VII.

Citing the same statutes, the Respondents also say there is no jurisdiction over the Petitioner's request for an injunction to stop a certain alleged policy. See Opposition Brief at 1, 8, 14.

This argument does not work. To see why, start with the background.

\* \* \*

 *59 The Petitioner alleges that the Respondents have "adopted a policy ... to retaliate against and punish noncitizens like [the Petitioner] for their participation in protests concerning Israel's military campaign in Gaza." Petition ¶ 2.

In particular:

> On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like [the Petitioner] for their participation in

protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestor.

Id. ¶ 44.

Per the Petitioner, he was detained by federal officials "as a first implementation of the policy and a 'blueprint' for future investigations and deportations of prominent student activists." 🚩 Id. at 13, 132 S.Ct. 2126 (cleaned up).

The alleged policy, in short, is broader than the Secretary's determination as to the Petitioner, since it is said to include determinations as to others. It is also broader than the Petitioner's detention, since it is said to envision detention of others.

* * *

The argument that 🚩 Section 1252(b)(9) and 🚩 Section 1252(g) strip jurisdiction as to the alleged policy is not persuasive.

This is for the reasons explained above as to the Secretary's determination, see Part IV to Part VII, plus some others.

These do not need to be belabored, but tick through them quickly here.

**[51]**  First, while the Secretary's determination amounts to a 🚩 Section 1252(b)(9) "action," see Part IV.A.3(a), it is a good deal harder to say that a policy is an "action" --- especially a policy that, as alleged, does not have sharply marked edges. Cf. Opposition Brief at 8 (describing the alleged policy as "an ill-defined initiative").

Second, if 🚩 Section 1252(b)(9) applies here, meaningful fact-finding as to the policy will be harder yet in the immigration courts. See Part VI.B. The policy, for example, is broader than the Secretary's determination, and therefore could require discovery as to a broader range of subjects. [72]

**[52]**  Third and finally, 🚩 Section 1252(g) focuses on exercises of "prosecutorial discretion." See Part VII. But the alleged policy is an extra step removed from the decision of the Department of Homeland Security to initiate removal proceedings here. The Secretary of State's determination came before the Department of Homeland Security's removal-proceedings decision. And the policy is alleged to predate the determination.

* * *

**\*60  [53]**  In short, there is no jurisdictional bar to the Court taking up here the Petitioner's request for an injunction to stop the alleged policy. [73]

## IX. Conclusion

In circumstances like this one, federal courts have recently split as to whether jurisdiction is stripped. Compare 🚩 Taal v. Trump, 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025) (yes), with 🏳 Ozturk v. Trump, 2025 WL 1145250, at *15 (D. Vt. Apr. 18, 2025) (no).

This Court concludes that jurisdiction is not stripped over the Petitioner's claims that the Secretary's determination and the alleged policy are unconstitutional.

🚩 Section 1252(b)(9) is irrelevant. It takes away federal district court jurisdiction only after an order of removal has been entered. But none has been entered here. See Part IV.

And even if 🚩 Section 1252(b)(9) might apply when, as here, no order has been entered, that provision strips jurisdiction only when delayed review would amount to "meaningful review." See Part V. Here, it would not. See Part VI.

As to 🚩 Section 1252(g), that pulls away jurisdiction over "specific actions" by the Secretary of Homeland Security --- not over actions by the Secretary of State, like his

determination here, and not over across-the-board policies, like the one alleged here. See Part VII and Part VIII.

This Court has habeas jurisdiction over this case. See Khalil, 2025 WL 1019658. And as set out in this Opinion, that jurisdiction is intact. It has not been removed.

**\*61**  Orders as to next steps in this case will follow shortly.

**All Citations**

--- F.Supp.3d ----, 2025 WL 1232369

---

## Footnotes

1    Mahmoud Khalil. A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" ⚑ 8 U.S.C. § 1101(a)(20).

2    Removing a lawful permanent resident from the United States generally requires a hearing. See ⚑ 8 U.S.C. § 1229a. Those typically go forward before an immigration judge. See ⚑ id. § 1229a(a)(1); 8 C.F.R. § 1240.10(a). An immigration judge is an "attorney[ ] whom the Attorney General appoints as [an] administrative judge[ ] ... to conduct specified classes of proceedings, including [removal] hearings under section 240 of the [Immigration and Nationality Act]." ⚑ 8 C.F.R. § 1003.10(a).

3    The Board of Immigration Appeals "function[s] as an appellate body charged with the review of ... administrative adjudications under the [Immigration and Nationality Act]." ⚑ 8 C.F.R. § 1003.1(d)(1). It can hear appeals from a variety of decisions made by immigration judges. See ⚑ id. § 1003.1(b). The Attorney General can review the decisions of the Board of Immigration Appeals. See ⚑ id. § 1003.1(d)(7)(i), ⚑ (h). Sometimes, the Attorney General opts to do so. See, e.g., Matter of Coronado Acevedo, 28 I. & N. Dec. 648 (A.G. 2022); Matter of B-Z-R-, 28 I. & N. Dec. 563 (A.G. 2022); ⚑ Matter of A-C-A-A-, 28 I. & N. Dec. 84 (A.G. 2020); Matter of O-F-A-S-, 28 I. & N. Dec. 35 (A.G. 2020).

4    In addition to the ⚑ Section 1227(a)(4)(C)(i) charge, federal officials have also pressed a second charge in immigration court against the lawful permanent resident, for allegedly not disclosing certain information when he applied for lawful permanent resident status. See Additional Charges of Inadmissibility/Deportability at 1. Federal officials are also seeking to remove the lawful permanent resident from the United States based on the failure-to-disclose charge. See id. The immigration judge has scheduled a proceeding for next month on that charge.

5    The Respondents are listed in the Petition as: President of the United States Donald Trump; Acting Field Office Director of New York, United States Immigration and Customs Enforcement, William P. Joyce; Warden of Elizabeth Contract Detention Facility Yolanda Pittman; Acting Director of United States Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

6    The Respondents asked the Court of Appeals to review this decision, and the Petitioner has opposed that request. See Petition for Permission to Appeal an Interlocutory Order of the United States District Court for the District of New Jersey Pursuant to ⚑ 28 U.S.C. § 1292(b) at ⚑ 1-2, Khalil v. President U.S. (No. 25-08019);

Opposition to Petition for Permission to Appeal an Interlocutory Order of the U.S. District Court for the District of New Jersey Pursuant to ⚑ 28 U.S.C. § 1292(b) at ⚑ 1-3, Khalil v. President U.S. (No. 25-08019).

7    Two things. First, the Petitioner also argues that the Secretary's determination is unconstitutionally vague. See Motion for Preliminary Injunction at 23-24. (But note that the Petitioner does not argue in his petition that ⚑ Section 1227(a)(4)(C)(i) is itself unconstitutionally vague.) Second, in a footnote in one of his legal briefs, the Petitioner references the second charge against him, the one based on his alleged failure to make certain disclosures in his lawful-permanent-resident application. See Petitioner's Reply in Support of Motion for Preliminary Injunctive Relief ("Reply Brief") (ECF 175) at 16 n.11. But there is no reference to this in the habeas petition. See Salas v. Warren, 2019 WL 3423534, at *1 n.1 (D.N.J. July 30, 2019) (declining to consider claims that the petitioner raised in his traverse, rather than his petition); Quang Van Nguyen v. Wenerowicz, 2013 WL 6473264, at *6 (E.D. Pa. Dec. 10, 2013) (similar, as to claims first raised in a reply brief); accord, e.g., ⚑ Carrascosa v. McGuire, 520 F.3d 249, 264 (3d Cir. 2008); St. John v. Ashcroft, 43 F. App'x 281, 282 (10th Cir. 2002); Bracken v. Dormire, 247 F.3d 699, 702 (8th Cir. 2001). Nor does the legal brief purport to seek relief from the Court based on the second charge. No challenge to the second charge is before the Court.

8    For example, there has been no discovery to this point, or testimony.

9    Another statute is invoked, too. See Opposition Brief at 20–21. But it is mostly irrelevant here, and is therefore taken up only later, in Part VIII.

10    The text refers to immigration courts because, as noted in footnote 3, certain rulings from immigration judges can be appealed to the Board of Immigration Appeals. Review by a federal court of appeals generally takes place only after the Board of Immigration Appeals has ruled. See, e.g., ⚑ Dia v. Ashcroft, 353 F.3d 228, 234 (3d Cir. 2003). If this Court has jurisdiction and is responsible for initially handling the case, any appeal would be to the federal court of appeals for the Third Circuit. See ⚑ 28 U.S.C. § 1291. If this Court does not have jurisdiction and the immigration courts therefore do the ground-floor review, then any appeal would be to the federal court of appeals for the circuit that covers Louisiana, where the Petitioner is held; that is the Fifth Circuit. See ⚑ 8 U.S.C. § 1252(b)(2).

11    In a case called ⚑ Chehazeh v. Attorney General of the United States, 666 F.3d 118 (3d Cir. 2012).

12    ⚑ EOHC v. Secretary United States Department of Homeland Security, 950 F.3d 177 (3d Cir. 2020).

13    The decision is ⚑ Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

14    There is also a third statute. Its impact is marginal, and it is considered briefly in Part VIII.

15    The sources for the statements in the text are laid out here. As to when the "judicial review" alluded to in ⚑ Section 1252(b)(9) takes place: that review is of "an order of removal under subsection (a)(1)," id. § 1252(b); subsection (a)(1) clarifies that an "order of removal" is "a final order of removal," id. § 1252(a)(1) (emphasis added); and an order of removal becomes "final" on the earlier of "a determination by the Board of Immigration Appeals affirming such order" or "the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." Id. § 1101(a)(47)(B); ⚑ Yusupov v. Att'y Gen. of U.S., 518 F.3d 185, 195 (3d Cir. 2008), as amended (Mar. 27, 2008). As to where "judicial review"

will go forward: in a federal court of appeals, see 🚩 8 U.S.C. § 1252(a)(5), and in particular in the court of appeals that sits in "the judicial circuit in which the immigration judge completed the proceedings." 🚩 Id. § 1252(b)(2); see Castillo v. Att'y Gen. of U.S., 109 F.4th 127, 129 (3d Cir. 2024). And critically: court of appeals review will be the "[e]xclusive means of review." 🚩 8 U.S.C. § 1252(a)(5). Exclusive means exclusive. The federal "judicial review" described in 🚩 Section 1252(b)(9) will happen only in a court of appeals. That rules out a place in the process for the district court.

16    Recall: that is assessed below, in Part IV.B and Part IV.C.

17    🚩 Section 1252(b)(9)'s key terms are not defined by the statute. See 🚩 8 U.S.C. § 1101(a) (defining other terms in the statute). Therefore, the Court looks to the ordinary and contemporary meanings of the words Congress used in the Section. See 🚩 Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227, 134 S.Ct. 870, 187 L.Ed.2d 729 (2014). This includes referring to time-of-enactment dictionaries, both general and legal. See, e.g., 🚩 Sandifer, 571 U.S. at 227, 134 S.Ct. 870; 🚩 Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566–67, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012); see also Khalil, ––– F.Supp.3d at –––––, 2025 WL 972959, at *17.

18    🚩 Section 1252(b)(9) was first passed in 1996, and its current version dates to 2005. Why the focus on 1996? Because that is when the relevant sentence of 🚩 Section 1252(b)(9) was passed. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009. In 2005, more words were added to 🚩 Section 1252(b)(9) to specify that it reached habeas jurisdiction. See REAL ID Act of 2005, Pub. L. No. 109-13, 199 Stat. 305. But none of those words is at issue in this Opinion.

19    To be sure, courts sometimes analyze a word with reference to its neighbor. See 🚩 Jones v. United States, 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (cleaned up); see also 🚩 Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961); Amy Coney Barrett, Congressional Insiders and Outsiders, 84 U. Chi. L. Rev. 2193, 2197 n.11 (2017). And so it might be argued here that "proceeding" (which undoubtedly has a legal meaning) should be taken to overspill itself, and to color the meaning of the neighboring "action" --- leaving "action" with some legalistic hues (a civil action, a lawsuit). But that does not work. If "action" and "proceeding" are each assigned a legal-shaded meaning, the words become redundant. Courts often look to contextual clues to avoid superfluous readings. See, e.g., United States v. Kaluza, 780 F.3d 647, 659 (5th Cir. 2015). But they have rejected contextual arguments that create redundancy. See, e.g., Waetzig, 145 S. Ct. at 699; 🚩 Arcadia v. Ohio Power Co., 498 U.S. 73, 78, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990).

20    That is in essence what the Secretary's determination says here. See Determination at 1–2.

21    And also: this conclusion gets support from two statements about 🚩 Section 1252(b)(9) in AADC. There, the Supreme Court said that 🚩 Section 1252(b)(9) "channels judicial review of all" relevant "decisions and actions," 🚩 525 U.S. at 483, 119 S.Ct. 936 (emphasis in original), to the immigration courts and the court of appeals. And 🚩 Section 1252(b)(9) is a "zipper" clause, that "says 'no judicial review in deportation cases unless this section provides judicial review.' " 🚩 Id. at 482, 119 S.Ct. 936. These statements strengthen the conclusion that the Secretary's determination is covered by 🚩 Section 1252(b)(9). But they should not

be treated as definitively fixing the meaning of Section 1252(b)(9). First, subsequent cases have limited these statements. Justice Alito's Jennings plurality opinion, for example, construed Section 1252(b)(9) as allowing for judicial review of prolonged immigration detention in a federal district court, see 583 U.S. at 294–95 ---, 138 S.Ct. 830 and that would seem to be at odds with the quotes from AADC. Second, the AADC statements about Section 1252(b)(9) were dicta; the holding in AADC was about the meaning of a different immigration-related provision, 8 U.S.C. § 1252(g). See 525 U.S. at 473, 119 S.Ct. 936. And third, when the AADC Court said that Section 1252(b)(9) covers "all" actions and decisions, see id. at 483, 119 S.Ct. 936, it was rejecting an argument that Section 1252(g) covers all actions from the beginning ("commence[ment]") to the end ("execut[ion]" of removal orders). See AADC, 525 U.S. at 482-83, 119 S.Ct. 936. Section 1252(g) could not mean that, the Court reasoned, because Section 1252(b)(9) already does. See id. at 483, 119 S.Ct. 936. But even if 1252(b)(9) covers all actions between commencement and execution, it might arguably have nothing to say about the Secretary of State's determination --- because that is a pre-commencement step. All of this said, though, the AADC statements tip the scales, at least to an extent, toward the conclusion that the Secretary's determination is covered by Section 1252(b)(9). After all, Supreme Court dicta carry special weight. See, e.g., Singh v. Uber Techs. Inc., 939 F.3d 210, 223 (3d Cir. 2019). And the AADC Section 1252(b)(9) statements are not pure dicta; they take some steps down the road in the "holding" direction. This is because the AADC Court's broad reading of Section 1252(b)(9) may have been a necessary element of the Court's actual holding, as to the scope of Section 1252(g). See 525 U.S. at 483, 119 S.Ct. 936. And logically necessary and explicitly invoked steps along the way to a holding can be binding. See, e.g., Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

22    See The Mary Ann, 21 U.S. 8 Wheat. 380, 387, 5 L.Ed. 641 (1823) ("[T]hose rules for construing statutes, which are dictated by good sense, and sanctioned by immemorial usage, ... require that the intent of the Legislature shall have effect, which intent is to be collected from the context[.]"); United States v. Fisher, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) ("It is undoubtedly a well established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole."); accord Gundy v. United States, 588 U.S. 128, 141, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019); Nat'l Broad. Co. v. United States, 319 U.S. 190, 214-16, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Durousseau v. United States, 10 U.S. (6 Cranch) 307, 314, 3 L.Ed. 232 (1810); Oneale v. Thornton, 10 U.S. (6 Cranch) 53, 68, 3 L.Ed. 150 (1810); see also 1 William Blackstone, Commentaries *59.

23    And note: in the context of Section 1252(b), courts routinely reason from the language Congress used in the various statutory headings. See EOHC v. Sec'y U.S. Dep't of Homeland Sec., 950 F.3d 177, 186 (3d Cir. 2020) ("That is also why the provision is captioned 'Consolidation of Questions for Judicial Review.'") (cleaned up); see also Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 810 (9th Cir. 2020); Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 9 (1st Cir. 2007); Singh v. Gonzales, 499 F.3d 969, 977 (9th Cir. 2007); Saint Fort v. Ashcroft, 329 F.3d 191, 198 (1st Cir. 2003); Mahadeo v. Reno, 226 F.3d 3, 12 (1st Cir. 2000); Flores-Miramontes v. INS, 212 F.3d 1133,

1139 (9th Cir. 2000); Cath. Soc. Servs., Inc. v. INS, 182 F.3d 1053, 1060 (9th Cir. 1999), on reh'g en banc, 232 F.3d 1139 (9th Cir. 2000); cf. Cunningham v. Cornell Univ., 2025 WL 1128943, at *6, ––– U.S. ––––, 145 S.Ct. 1020, ––– L.Ed.2d –––– (U.S. Apr. 17, 2025) (in a different context, looking to statutory headings to resolve possible doubt about statutory construction).

24    But it might be argued: this cannot be all. Even without Section 1252(b)(9), few district judges would have imagined that they could review an issue that is brought to them while a court of appeals is already handling the overall case. But this ignores the state of the law before Section 1252(b)(9) was passed in 1996. See, e.g., Delligatti, 145 S. Ct. at 806–07 (looking to a "[legal] principle [that] was well established" when a statute was enacted to inform interpretation of the statute). In 1983, the Supreme Court held that "final orders" of removal "include[ ] all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." INS v. Chadha, 462 U.S. 919, 938, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (cleaned up). This leaves behind a good many issues. It might have been taken to imply that the court of appeals, when it reviews a final order of removal, takes up only a subset of questions ("all matters on which the validity of the final order is contingent") --- with room left for a district court to look into other issues related to a case that is brought before it. See Nasrallah v. Barr, 590 U.S. 573, 582, 140 S.Ct. 1683, 207 L.Ed.2d 111 (2020) (making a closely similar point in another immigration-law context). Section 1252(b)(9), where it applies, shuts the door on that sort of thinking --- because it says that review in the court of appeals occupies virtually the whole playing field of possible issues, well beyond those that the order of removal was "contingent" on. Court of appeals review covers "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien." 8 U.S.C. § 1252(b)(9).

25    In short passages here and there, various Justices have weighed in. A dissent from Justice Breyer, joined by Justices Ginsburg and Sotomayor, suggests that Section 1252(b)(9) applies only to review of orders of removal that have already been entered. "Jurisdiction ... is unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only 'with respect to review of an order of removal under § 1252(a)(1).' The respondents challenge their detention without bail, not an order of removal." Jennings, 583 U.S. at 355, 138 S.Ct. 830 (Breyer, J., dissenting) (cleaned up). On the other hand, a dissent from Justice Thomas, joined by Justice Alito, seems to suggest the opposite view, that Section 1252(b)(9) limits district-court review even before an order of removal has been entered. "[Section] 1252(b)(9) covers all 'questions of law and fact' that an immigration judge must decide as a result of the Government's decision to initiate removal proceedings against an alien." Nasrallah, 590 U.S. at 590, 140 S.Ct. 1683 (Thomas, J., dissenting). And note that a concurrence from Justice Thomas, joined by Justice Gorsuch, necessarily rests on the idea that Section 1252(b)(9) applies even before orders of removal are entered. See Jennings, 583 U.S. at 319–21, 138 S.Ct. 830 (Thomas, J., concurring). For more on Jennings, see Part IV.A.3(d).

26    In the district court, one of the noncitizens sought certification of a subclass under 8 U.S.C. § 1231(a), which governs the "[d]etention ... of aliens ordered removed." See Jennings, 583 U.S. at 291, 138 S.Ct. 830. But the court of appeals held that this subclass could not be certified, see id., and the Supreme Court

did not revisit that decision. See ⚑id. at 291–92, 138 S.Ct. 830. So the case before the Court concerned only detention of people who had not been ordered finally removed.

27    As a general matter, the Marks rule can apply to jurisdictional holdings. See, e.g., ⚑United States v. Donovan, 661 F.3d 174 (3d Cir. 2011); ⚑United States v. Johnson, 467 F.3d 56 (1st Cir. 2006); ⚑United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006). It just does not shed light here, as will be seen in a moment. (Note that the Marks rule may be especially hard to apply to a jurisdiction-stripping statute, because it is not obvious what the right baseline is. Are the "narrower grounds" those that narrow the reach of the statute (and therefore expand federal court jurisdiction)? Or are the "narrower grounds" those that expand the reach of the statute (and therefore narrow federal court jurisdiction)? Cf. ⚑Johnson, 467 F.3d at 63–64.)

28    The second point in the text is abstract. Unpack it a bit more here. The complexity is this: AB may typically get analyzed before conclusion CD is reached; but whether AB is necessary to conclusion CD --- that depends. To see why, imagine this statute: "if a person is an employee, she cannot be discriminated against --- and if she is discriminated against, the employer is liable and must pay." Under the statute, whether a person is an employee will usually be analyzed before deciding whether she has been discriminated against. But is a holding as to whether she is an employee logically implicit in a holding as to whether the employer must pay? Sometimes yes, sometimes no. If the court holds she was discriminated against and that the employer must pay, then that must logically rest on a particular resolution of the prior question, as to whether the person was an employee. After all, if she was not an employee, how could the employer have broken the statute and now be expected to pay? But if the court holds she was not discriminated against, and the employer need not pay, that does not logically need to have been based on any particular decision on the question of whether the person was an employee. Why not? Because the ruling (no pay) would come out the same way regardless of how the employee question was answered. Another way to see this is to think about arguments made arguendo. Justice Alito in Jennings could have said "assuming arguendo that ⚑Section 1252(b)(9) can generally apply to pre-order-of-removal cases, the statute's language does not apply to this case --- and so there is no jurisdiction strip here." But for his part, Justice Thomas in Jennings could not have said "assuming arguendo that ⚑Section 1252(b)(9) can generally apply to pre-order-of-removal cases, its language applies to this case --- and so there is a jurisdiction strip here." For Justice Alito's bottom-line conclusion, the categorical question of whether ⚑Section 1252(b)(9) applies is not logically necessary and therefore can be assumed away arguendo; for Justice Thomas' bottom-line conclusion, the categorical question is logically necessary --- and therefore cannot be bracketed for later.

29    Recall: if a claim must first go to the immigration courts, federal court review of the claim will happen only later, in a federal court of appeals, after the immigration courts have done their work.

30    This was during the period when the federal government applied a protocol to send noncitizens to Mexico while they waited for removal proceedings. See ⚑EOHC, 950 F.3d at 181.

31    This was a pre-order-of-removal claim.

32    After the passage of the Immigration and Nationality Act of 1952, there was some back and forth over where deportation orders might be reviewed. See ⚑Brownell v. We Shung, 352 U.S. 180, 186, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); ⚑Shaughnessy v. Pedreiro, 349 U.S. 48, 51, 75 S.Ct. 591, 99 L.Ed. 868 (1955); ⚑Heikkila v. Barber, 345 U.S. 229, 235–36, 73 S.Ct. 603, 97 L.Ed. 972 (1953). But this was mostly smoothed out by the passage of the 1961 amendments to the INA, which made review in the federal courts of appeals

the "sole and exclusive procedure" for judicial review of final orders of deportation. See Act of Sept. 26, 1961, Pub. L. No. 87-301, 75 Stat. 650, 651.

33   This question is mainly answered as matter of statutory interpretation --- with an eye, for example, on text and purpose. See ⚑ Elgin, 567 U.S. at 10, 132 S.Ct. 2126; ⚑ Free Enter. Fund, 561 U.S. at 489, 130 S.Ct. 3138; ⚑ Thunder Basin, 510 U.S. at 207, 114 S.Ct. 771; ⚑ Adorers, 897 F.3d at 195; accord, e.g., ⚑ Cochran, 20 F.4th at 199–205; ⚑ Bank of La., 919 F.3d at 923; ⚑⚠ Hill v. SEC, 825 F.3d 1236, 1242 (11th Cir. 2016); ⚑⚠ Tilton v. SEC, 824 F.3d 276, 281 (2d Cir. 2016); ⚑⚠ Bennett v. SEC, 844 F.3d 174, 181 (4th Cir. 2016); ⚑⚠ Bebo v. SEC, 799 F.3d 765, 769 (7th Cir. 2015).

34   Saying yes to this question would bypass Congress' broader choice to send claims to the agency's courts. But it would do so on the theory that Congress would have wanted a particular "type" of claim to go forward first in the federal district court if that is the way to get "meaningful review." See ⚑ Thunder Basin, 510 U.S. at 212—13, 114 S.Ct. 771.

35   EOHC also cited a source that mentioned one of the other two Thunder Basin factors. Compare ⚑ Thunder Basin, 510 U.S. at 212, 114 S.Ct. 771 ("[t]his Court previously has upheld district court jurisdiction over claims considered wholly collateral to a statute's review provisions"), with ⚑ EOHC, 950 F.3d at 186 (citing the appellants' reply brief at 16 --- which noted that "claims independent of or collateral to the removal process are excluded").

36   Too much should not be made of the fact that EOHC did not cite Thunder Basin or explicitly invoke its two-step analysis. EOHC cited Elgin, see ⚑ EOHC, 950 F.3d at 188, and that is a key case in the Thunder Basin line. More fundamentally, the question of whether review will be "meaningful" --- and therefore whether federal court review should be deferred in favor of agency review --- has long been a part of administrative law's DNA. See ⚑ Axon, 598 U.S. at 192, 143 S.Ct. 890; ⚑ McNary v. Haitian Refugee Ctr., 498 U.S. 479, 496, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); ⚑ Mathews v. Eldridge, 424 U.S. 319, 341, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); ⚑ Goldberg v. Kelly, 397 U.S. 254, 262–63, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). It long predates Thunder Basin and was clearly part of the EOHC court's thinking. Compare ⚑ EOHC, 950 F.3d at 186 (citing ⚑ McNary for the proposition that there was no jurisdiction-stripping over certain claims when "meaningful judicial review ... would [otherwise] be foreclosed"), with ⚑ Thunder Basin, 510 U.S. at 213–14, 114 S.Ct. 771 (reasoning from McNary).

37   And such a conclusion is not surprising. After all, the argument that there is an "explicit" congressional directive as to where cases should go rests largely on ⚑ Section 1252(b)(9). But Chehazeh held that in this "type" of case, a pre-order-of-removal case, ⚑ Section 1252(b)(9) is inapplicable. And in any event, the Justices have suggested a range of different views as to whether ⚑ Section 1252(b)(9) applies before entry of an order of removal. See footnote 25. That suggests that the explicitness test is not met, especially against the backdrop of the various presumptions against jurisdiction-stripping that EOHC leaned on. See ⚑ 950 F.3d at 184.

38    On the merits, Judge Barry held that ⚑8 U.S.C. § 1251(a)(4)(C)(i) (now ⚑8 U.S.C. § 1227(a)(4)(C)(i)) is unconstitutionally vague. See 🚩Massieu, 915 F. Supp. at 703. The Petitioner here has not made that argument. See footnote 7.

39    See Part IV.B and Part IV.C.

40    EOHC and Massieu are no outliers. Federal courts often rely on Thunder Basin to decide whether a claim should be heard in immigration courts or in the federal district court. See, e.g., ⚑Miriyeva v. U.S. Citizenship & Immigr. Servs., 9 F.4th 935, 939 (D.C. Cir. 2021); ⚑Adi v. Mayorkas, 2022 WL 267989, at *7 (N.D. Ill. Jan. 28, 2022); ⚑O.A. v. Trump, 404 F. Supp. 3d 109, 136 (D.D.C. 2019); ⚑Ramirez v. U.S. Immigr. & Customs Enf't, 338 F. Supp. 3d 1, 37 (D.D.C. 2018); ⚑Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 30–31 (D.D.C. 2018); ⚑Jafarzadeh v. Duke, 270 F. Supp. 3d 296, 308 (D.D.C. 2017); see also ⚑J.E.F.M. v. Lynch, 837 F.3d 1026, 1035–36 (9th Cir. 2016); ⚑Aguilar, 510 F.3d at 11; cf. ⚑Duron v. Johnson, 898 F.3d 644, 647 (5th Cir. 2018).

41    And the point can be seen more directly, too. For the key proposition, Massieu cited a federal-common-law rule and a treatise, not an explicit statutory provision.

> Even where an alien is attempting to prevent an exclusion or deportation proceeding from taking place in the first instance and is thus not, strictly speaking, attacking a final order of deportation or exclusion, it is well settled that "judicial review is precluded if the alien has failed to avail himself of all administrative remedies," one of which is the deportation or exclusion hearing itself. See, e.g., ⚑Xiao v. Barr, 979 F.2d 151, 153 (9th Cir. 1992); see also 3 Charles Gordon & Stanley Mailman, Immigration Law and Procedure § 81.02[2], at 81–26–28 (1996) ("A person against whom a deportation proceeding is brought may feel that the proceeding is unjustified and illegal but generally has no right to go to court immediately to stop the proceeding. Congress has provided an administrative device for passing upon an alien's deportability, and generally there must be a final administrative ruling before judicial review can be initiated.").

> ⚑Massieu, 91 F.3d at 421.

42    Were the Petitioner seeking to invalidate ⚑Section 1227(a)(4)(C)(i) on constitutional grounds, which he is not, see footnotes 7 and 38, the immigration courts would lack the power to do that, too. See 🚩In re Salazar-Regino, 23 I. & N. Dec. 223, 231 (BIA 2002) ("We have long declared that we lack authority to rule on the constitutionality of the statutes we administer."); see also ⚑Johnson v. Robison, 415 U.S. 361, 368, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies."); accord, e.g., Brienza-Schettino v. Att'y Gen. of U.S., 221 F. App'x 140, 144–45 (3d Cir. 2007); ⚑Nehme v. INS, 252 F.3d 415, 421 (5th Cir. 2001); ⚑Liu v. Waters, 55 F.3d 421, 426 (9th Cir. 1995).

43    One reason is this: an injunction generally issues only based on a sense, among other things, that the public interest demands it. See, e.g., ⚑Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010); ⚑Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); ⚑eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); see also Samuel L. Bray, The System of Equitable Remedies, 63 UCLA L. Rev. 530, 585–

86 (2016). A defendant wants to argue that drugs should be suppressed because the search was illegal. He does not want to <u>also</u> have to argue that suppressing the drugs is a good from the perspective of the public interest. (And equitable claims are especially difficult to make out in any number of other ways, too. For example, at least some suppression orders likely could not issue as injunctions because the defendant, seeking to suppress what is his own contraband, see 🚩⚠️ Rakas v. Illinois, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), could not make the "clean hands" showing that equity typically requires. See 🚩 Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); 🚩 Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 387, 64 S.Ct. 622, 88 L.Ed. 814 (1944); <u>see also</u> Bray at 581.)

44    In deciding whether "meaningful review" can be conducted before an administrative court, federal courts routinely look to what the administrative court has in fact actually done. Take 🚩⚠️ Jarkesy v. SEC, 803 F.3d 9 (D.C. Cir. 2015). There, an investment advisor filed suit in a federal district court, pressing constitutional claims. Could an SEC administrative law judge provide meaningful review? Yes, the D.C. Circuit answered. See 🚩⚠️ Id. at 28. How to know? Because the D.C. Circuit had <u>read</u> the administrative law judge's decisions and observed that she had "considered and rejected" the plaintiff's arguments. 🚩⚠️ Id. Another example: in 🚩 Aguilar v. U.S. Immigration and Customs Enforcement Division, 510 F.3d 1 (1st Cir. 2007), the First Circuit asked whether the petitioners could have gotten "effective relief" for their right-to-counsel claims through the immigration courts. Yes, the First Circuit held. 🚩 Id. at 14. "The proof" was that during the removal proceedings "each petitioner who requested a continuance for the purpose of retaining counsel received one." 🚩 Id. And a final example. The Fifth Circuit considered whether the Federal Deposit Insurance Corporation's administrative proceedings could adequately assess claims that the "enforcement proceedings were tainted by constitutional violations." See 🚩 Bank of La., 919 F.3d at 926. Yes. Part of why: the administrative law judge, per the Fifth Circuit, had written a "lengthy, detailed, and well-reasoned opinion" on the claims, such that it was clear that the proceedings qualified as "meaningful judicial review." 🚩 Id.

45    It appears that this was likely understood as connected to a First Amendment issue. <u>See</u> April 11 Audio Recording at 23:50 to 25:24.

46    A final note. In 🚩 Lopez-Mendoza, a plurality of the Court, not a majority, said this: "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." 🚩 468 U.S. at 1050–51, 104 S.Ct. 3479. This left the door open, and a number of circuits have held that suppression is indeed available in immigration courts when the Fourth Amendment is violated in sufficiently "egregious" or "widespread" ways. See, e.g., 🚩 Corado-Arriaza v. Lynch, 844 F.3d 74, 77 (1st Cir. 2016); 🚩 Almeida-Amaral v. Gonzales, 461 F.3d 231, 235 (2d Cir. 2006); 🚩 Yoc-Us v. Att'y Gen. U.S., 932 F.3d 98, 111 (3d Cir. 2019); 🚩 Yanez-Marquez v. Lynch, 789 F.3d 434, 450 (4th Cir. 2015); 🚩 Puc-Ruiz v. Holder, 629 F.3d 771, 778 (8th Cir. 2010); 🚩 Martinez-Medina v. Holder, 673 F.3d 1029, 1033–34 (9th Cir. 2011). Other circuits have suggested openness to such an exception. See, e.g., 🚩 United States v. Navarro-Diaz, 420 F.3d 581, 587 (6th Cir. 2005). Maybe it could be argued that the "egregious" exception leaves room for First Amendment suppression in this case? The argument would presumably run like this: (a) the Lopez-Mendoza plurality allowed for the possibility of an "egregious" Fourth Amendment suppression exception, (b) the exception does in fact exist, (c) it should be extended to the First Amendment suppression context in general, and (d) to this "egregious"

case in particular. If this argument is persuasive, then maybe the immigration courts <u>could</u> provide a First Amendment suppression remedy here. But the argument does not work. The reason: link (b) in the chain cannot hold up. The immigration judge here is in Louisiana, so any review will be to the Fifth Circuit, <u>see</u> 8 U.S.C. § 1252(b)(2), whose precedent will control. <u>See</u> Ballesteros v. Ashcroft, 452 F.3d 1153, 1157 (10th Cir. 2006). And the Fifth Circuit has flatly held that "[i]t is well established that the fourth amendment exclusionary rule is not to be applied in deportation proceedings." Mendoza-Solis v. INS, 36 F.3d 12, 14 (5th Cir. 1994). (Some other Fifth Circuit cases seem to go the other way, and to treat an "egregious" Fourth Amendment suppression exception as a part of the law. But one is dicta in a <u>Bivens</u> case. <u>See</u> De La Paz v. Coy, 786 F.3d 367, 376 (5th Cir. 2015). And the rest are cases not selected for publication. <u>See</u> Escobar v. Holder, 398 F. App'x 50, 53 (5th Cir. 2010); Gonzalez-Reyes v. Holder, 313 F. App'x 690, 695 (5th Cir. 2009); Verduzco-Contreras v. Gonzales, 160 F. App'x 406, 408 (5th Cir. 2005). Under the Fifth Circuit's rules, <u>see</u> 5th Cir. R. 47.5, unpublished cases are out of bounds.)

47　The discussion in this section assumes that fact-finding is necessary. But the Court has not developed views on whether this case can be resolved on the papers, or will require evidentiary development.

48　Selective enforcement can be raised as a kind of defense to a defense, as in <u>Nieves</u>: does selective enforcement undermine the probable cause defense to a First Amendment retaliation claim? But selective enforcement can also be raised in more garden-variety affirmative contexts: was a person targeted for immigration enforcement in the first place based on selective enforcement? <u>See</u> Ragbir v. Homan, 923 F.3d 53, 62, 67 (2d Cir. 2019), <u>cert. granted, judgment vacated sub nom.</u> Pham v. Ragbir, ––– U.S. ––––, 141 S. Ct. 227, 208 L.Ed.2d 1 (2020); <u>AADC</u>, 70 F.3d at 1052; Massieu, 91 F.3d at 418. Can the immigration courts draw on their experience when it comes to building out the <u>second</u> sort of selective-enforcement case to develop a factual record as to selective enforcement that is raised in the <u>first</u> context? Not really. The reason is that affirmative selective-enforcement claims are very rarely handled by the immigration courts. For nearly 30 years, such claims have largely been unavailable to noncitizens without lawful status in the United States. <u>See</u> AADC, 525 U.S. at 488, 119 S.Ct. 936 ("[A]n alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."). And even before <u>AADC</u> foreclosed many selective-enforcement claims, immigration courts generally steered clear of them --- largely to avoid trenching on federal immigration officials' discretion. <u>See</u> Matter of Merced, 14 I. & N. Dec. 644, 645 (BIA 1974); Matter of Lennon, 15 I. & N. Dec. 9, 12 (BIA 1974), <u>overruled on other grounds by</u> Matter of Esqueda, 20 I. & N. Dec. 850 (BIA 1994); Matter of Geronimo, 13 I. & N. Dec. 680, 681 (BIA 1971); <u>see also</u> Corredor v. Holder, 481 F. App'x 442, 444 (10th Cir. 2012); Cortez-Felipe v. INS, 245 F.3d 1054, 1057 (9th Cir. 2001); <u>AADC</u>, 70 F.3d at 1055; Johns v. Dep't of Just., 653 F.2d 884, 889 (5th Cir. 1981); Lopez–Telles v. INS, 564 F.2d 1302, 1304 (9th Cir. 1977) ("The immigration judge is not empowered to review the wisdom of the INS in instituting the proceedings. His powers are sharply limited[.]").

49　<u>See generally</u> Tennessee v. Dep't of Educ., 104 F.4th 577, 606 (6th Cir. 2024) (suggesting that "practical realities" influence whether there is "meaningful review" under <u>Thunder Basin</u>).

50　As briefly alluded to above, immigration courts are high-volume affairs. As of March 2025, there were around 3.9 million cases in the backlog. <u>See</u> Pending Cases, New Cases, and Total Completions, Exec. Off. for Immigr. Rev., https://perma.cc/L659-S8P5 (accessed on Apr. 29, 2025). Roughly 360,000 of those cases were added in 2025. <u>See id</u>. This has an everyday impact. Per a 2022 congressional report, some immigration judges reported having nearly 5,000 pending cases; others reported they heard 80 cases each day. Holly Straut-Eppsteiner, Cong. Rsch. Serv., R47077, <u>U.S. Immigration Courts & the Pending Cases</u>

<u>Backlog</u> 22 (2022); <u>cf.</u> <u>Malets</u> v. <u>Garland</u>, 66 F.4th 49, 59 (2nd Cir. 2023) ("We have repeatedly recognized the extraordinary caseload burdens faced by IJs."); 🚩 <u>Abulashvili</u> v. <u>Att'y Gen. of U.S.</u>, 663 F.3d 197, 208 (3d Cir. 2011) ("We readily acknowledge that an IJ's position is an impossibly demanding and challenging one."). The typical fact-finding in these cases does not appear extensive. When a person is detained, the first hearing seems to typically be the only one. <u>See</u> Ingrid Eagly & Steven Shafer, <u>Detained Immigration Courts,</u> 110 Va. L. Rev. 691, 756 (2024). (Part of why: while discovery tools exist, <u>see</u> 🚩 8 C.F.R. §§ 1003.10(b), 1003.35, they are rarely used in practice. <u>See</u> Geoffrey Heeran, <u>Shattering the One-Way Mirror: Discovery in Immigration Court, 79 Brook. L. Rev. 1569, 1582–84 (2014).</u>)

51    The "meaningful review" test is designed to get a handle on what Congress' intent for a certain "type" of case might have been. <u>See</u> 🚩 <u>Thunder Basin</u>, 510 U.S. at 212, 114 S.Ct. 771. In terms of how factual development might go forward --- would Congress have wanted a case like this one to be handled by the immigration courts? The first proposed subpoena here was to a cabinet official, and the allegations in this case quote statements made about the Petitioner by the President. <u>See</u> Petition ¶¶ 73, 74. It is unclear at this point whether discovery might be needed here. <u>See</u> footnote 47. But if it is, note that the federal courts have evolved any number of potentially relevant doctrines in this area. <u>See, e.g.,</u> 🚩 <u>United States</u> v. <u>Morgan</u>, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (as to an agency action, a cabinet secretary "should never have been subjected to" a deposition); 🚩 <u>In re U.S. Dep't of Educ.</u>, 25 F.4th 692, 700 & n.1 (9th Cir. 2022) (suggesting that "[t]he rules for when a court may allow the questioning of a cabinet secretary" "rest on a constitutional foundation") (cleaned up); <u>see also</u> 🚩 <u>In re United States</u>, 985 F.2d 510, 512 (11th Cir. 1993); 🚩 <u>Simplex Time Recorder Co.</u> v. <u>Sec'y of Lab.</u>, 766 F.2d 575, 586 (D.C. Cir. 1985); 🚩 <u>Kyle Eng'g Co.</u> v. <u>Kleppe</u>, 600 F.2d 226, 231 (9th Cir. 1979). These aim to strike a fine balance between the legitimate needs of parties seeking evidence and the legitimate needs of senior federal officials --- whose time is pressed and whose work files are likely to be especially sensitive, such that they will require special judicial protection as to any discovery. It seems unlikely that Congress would have thought that a case of this "type," raising these sorts of evidentiary issues, should go before the immigration courts, which lack experience with them.

52    "The Merit Systems Protection Board ... is a[n] ... agency in the executive branch charged with protecting federal employees against improper employment-related actions," including "favoritism, or engaging in reprisals against whistleblowers." Jon O. Shimabukuro & Jennifer A. Staman, Cong. Rsch. Serv., R45630, <u>Merit Systems Protection Board (MSPB): A Legal Overview</u> (2019) (summary page).

53    Constructive discharge refers to "[a]n employer's creation of working conditions that leave a particular employee or group of employees little or no choice but to resign." <u>Discharge</u>, sense 7, <u>Black's Law Dictionary</u> (12th ed. 2024) (defining "constructive discharge").

54    For other cases making this same point, see, for example, 🚩 <u>Bank of La.</u> v. <u>FDIC</u>, 919 F.3d 916, 929 (5th Cir. 2019) ("[T]he [agency] could have mooted the [plaintiff's] constitutional claims by finding the [plaintiff] innocent of the statutory violations it was accused of committing."), and ⚠️ <u>Jarkesy</u> v. <u>SEC</u>, 803 F.3d 9, 29 (D.C. Cir. 2015) ("[T]he agency could moot the need to resolve [the constitutional question] by finding that he did not commit the securities-law violations of which [the plaintiff] stands accused.").

55    <u>Ruiz-Massieu</u> is binding on immigration judges, <u>see</u> 🚩 8 C.F.R. § 1003.1(g)(1), and serves as precedent for future Board of Immigration Appeals proceedings regarding the same issue. <u>See</u> 🚩 <u>id.</u> § 1003.1(g)(2); <u>see also</u> April 11 Audio Recording at 1:34:30 to 1:36:00 (holding that <u>Ruiz-Massieu</u> bound the immigration court).

56    There might _sometimes_ be fact-finding work for the immigration courts to do in cases like this one. For example, there may be a dispute as to whether the Secretary personally made the relevant determination. That could take fact-finding, and the immigration courts could do it. Cf. In re Ruiz-Massieu, 22 I. & N. Dec. at 845 n.13. And that possibility was part of why Judge Alito thought the Massieu case should be sent to the immigration courts. See Massieu, 91 F.3d at 426. But no one seems to be disputing the Secretary of State's personal involvement here. Indeed, the Petitioner goes the other way --- and affirmatively alleges that there was a good deal of personal involvement from the Secretary in this case. See Petition ¶¶ 2-3, 33, 75, 80, 83. (Note that the Secretary does not _always_ need to be personally involved in passing on a determination. Only when his determination is based on speech that would be First Amendment–protected. See 8 U.S.C. §§ 1227(a)(4)(C)(ii), 1182(a)(3)(C)(iii). But the immigration courts have no special expertise on that First Amendment gating question.)

57    Per the Supreme Court in Axon, the expertise factor "reflect[s] ... the point of special review provisions --- to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." 598 U.S. at 186, 143 S.Ct. 890. But "the point" of the structure created by Congress for immigration claims was not just to build up and lean on expertise --- but also to keep the tide of immigration cases from swamping the federal courts and displacing a good deal of their work on other cases. See Robbie Clarke, Reaffirming the Role of the Federal Courts, 17 Wash. & Lee J. Civ. Rts. & Soc. Just. 463, 474–75 & n.65 (2011). But any precedent that might be set by this case does not implicate such concerns. It is much too unusual for that. Because of the Board of Immigration Appeals' Ruiz-Massieu decision, for example, there is virtually nothing for the immigration courts to do here. And the sensitive and sprawling nature of the discovery that might potentially be required makes this case an especially serious misfit for immigration courts fact-finding.

58    Recall: the Court here is proceeding on the assumption that Section 1252(b)(9) applies in the first place. See Part IV.

59    The Massieu complaint alleged that "the deportation proceeding evidence[d] selective enforcement in retaliation for Mr. Ruiz Massieu's exercise of his First Amendment right to criticize the Mexican political system." Massieu, 915 F. Supp. at 689. But that was the first and last appearance of the First Amendment in Massieu. It was not invoked in the opinion of the district court, in the appellants' or appellee's briefs on appeal, or in the opinion of the court of appeals. See generally Massieu, 915 F. Supp. 681; Massieu, 91 F.3d 416; Appellants' Brief, Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414627; Appellee's Brief, Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414626; Appellants' Reply Brief, Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414628.

60    See generally Falcone v. Dickstein, 92 F.4th 193, 210 (3d Cir. 2024) ("There is no dispute that an arrest constitutes conduct sufficient to deter a person of ordinary firmness from exercising her constitutional rights.") (cleaned up), cert. denied sub nom. Murray-Nolan v. Rubin, ––– U.S. ––––, 144 S. Ct. 2560, 219 L.Ed.2d 1227 (2024); cf. Speech First, Inc. v. Whitten, ––– U.S. ––––, 145 S. Ct. 701, 703, ––– L.Ed.2d –––– (2025) (Thomas, J., dissenting from the denial of certiorari) (discussing various things that "may cause students to self-censor") (cleaned up).

61    Since the 1960s, the law has called this sort of First Amendment deterrence a "chilling effect." See Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); see also, e.g.,

🔖Counterman v. Colorado, 600 U.S. 66, 75, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023) (describing that certain rules may "chill, or deter, speech outside their boundaries").

62    The Dombrowski Court did not define "bad faith" but suggested it includes "discriminatory enforcement or the use of impermissible criteria for prosecution, such as a defendant's ... political beliefs." Owen M. Fiss, Dombrowski, 86 Yale L.J. 1103, 1115 (1977) (citing 🔖Dombrowski, 380 U.S. at 490, 85 S.Ct. 1116).

63    A caveat. There is some relief that may be available to the Petitioner --- applying for asylum, for example, or the withholding of removal. If an immigration judge grants any of this relief, that could be "potentially dispositive," as Massieu suggested. 91 F.3d at 425. It is unclear how any such requests for relief might play out, or whether they would become unavailable if this Court retains jurisdiction. But one way or another, the possibility of asylum or withholding moves the needle, but not far enough to alter the conclusion here.

64    See 🔖N.Y. Times Co. v. United States, 403 U.S. 713, 753, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Harlan, J., dissenting) (arguing that "difficult" First Amendment questions "should have led the Court to shun such a precipitate timetable"); 🔖id. at 752, 91 S.Ct. 2140 (Burger, C.J., dissenting) ("We all crave speedier judicial processes but when judges are pressured as in these cases the result is a parody of the judicial function."); 🔖Tunick v. Safir, 209 F.3d 67, 88 (2d Cir. 2000) (certifying case to state court while acknowledging that "in many First Amendment cases ... the constitutional rights involved are significantly damaged, if not altogether lost, by the delay entailed in certification"); cf. United States v. Coburn, 2025 WL 729969 (D.N.J. Mar. 6, 2025).

65    It is hard to say how long the immigration courts would take. See footnote 50. And averages would almost surely fail to tell the story, in part because courts tend to prioritize important constitutional cases. See, e.g., Care One, LLC v. NLRB, 680 F. Supp. 3d 540, 549 (D.N.J. 2023). But this much is clear: if this case does not go to the immigration courts, federal court review will continue now. If it goes to the immigration courts first, the process has more steps to it --- immigration judge, then Board of Immigration Appeals, and only then a federal court, a court of appeals. And in the end, the immigration courts route may be longer than that. The Respondents have suggested that one way to do any needed fact-finding here might be for the federal court of appeals, when it gets the case, to remand it to a federal district court --- which would then presumably send it back up to the court of appeals for a decision. See Respondents' Letter (Apr. 10, 2025) (ECF 185) at 3. It is not clear why the Respondents mention this possibility. Maybe because of a felt sense that, if this case requires fact-finding, the immigration courts may not be the right forum. See Part VI.B. But one way or another, a fact-finding remand only folds in another round of back and forth --- and therefore an extra dollop of delay. (And note another potential issue. When the factual record is not well developed coming out of the immigration courts, federal courts of appeals sometimes bounce the case back down for fact-finding by an immigration court or a federal district court. But the Supreme Court has suggested this may not be allowed in cases like this one --- and the problem may be jurisdictional. See 🔖AADC, 525 U.S. at 488 n.10, 119 S.Ct. 936. This might imply a serious, down-the-road issue with going the immigration courts route --- a lack of solid factual development by the time the case hits the federal court of appeals (because the immigration courts are not built for fact-finding in a case like this) but with no ready way to fix the problem (because a remand may encounter a non-waivable legal hurdle).)

66    This doctrine "counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts." 🔖FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009).

67    The selective-enforcement question was so new that no on-point precedents existed to guide the Court.

68    Two examples. First, another part of the First Amendment, the Free Exercise Clause, works in much the same way. In Roman Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020), for instance, the Supreme Court considered some of New York's Covid-era restrictions on First Amendment–protected religious activity. The Court explained that the harm was "unquestionably ... irreparable." Id. at 18, 141 S.Ct. 63 (quoting Elrod, 427 U.S. at 373, 96 S.Ct. 2673). So long as the state's rules were in place, religious obligations could not be properly fulfilled. See id. at 19, 141 S.Ct. 63. The plaintiffs might have later won on the merits; but their eventual win would have come too late to undo the harm suffered to their religious life while time passed. So the Court moved to preliminarily enjoin New York's restrictions on religious services, reaffirming along the way that First Amendment injuries are here-and-now injuries. See id. at 69. And a second example: in opinions on applications for emergency stays, Justices have routinely reiterated the urgency of First Amendment relief. See CBS, Inc. v. Davis, 510 U.S. 1315, 1318, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994) (Blackmun, J., in chambers); Neb. Press Ass'n, 423 U.S. at 1329, 96 S.Ct. 251; Neb. Press Ass'n v. Stuart, 423 U.S. 1319, 1323, 96 S.Ct. 237, 46 L.Ed.2d 199 (1975) (Blackmun, J., in chambers); Times-Picayune Pub. Corp. v. Schulingkamp, 419 U.S. 1301, 1309, 95 S.Ct. 1, 42 L.Ed.2d 17 (1974) (Powell, J., in chambers). In CBS, Inc., for instance, a state court enjoined a news outlet from airing footage of a meat-packing plant, reasoning that it was wrongfully obtained and could lead to the plant's closure. See 510 U.S. at 1315–16, 114 S.Ct. 912. The news outlet then applied to the Supreme Court for an emergency stay, hoping to air the tape that evening. See id. at 1315, 114 S.Ct. 912. Sitting as a Circuit Justice, Justice Blackmun granted the stay. "[I]ndefinite delay of the broadcast will cause irreparable harm to the news media that is intolerable under the First Amendment," he wrote. Id. at 1318, 114 S.Ct. 912.

69    The reference to "Attorney General" should now be read as "Secretary of Homeland Security," given the post-Section 1252(g) creation of the Department of Homeland Security. See Johnson v. Guzman Chavez, 594 U.S. 523, 527 n.1, 141 S.Ct. 2271, 210 L.Ed.2d 656 (2021); La. Forestry Ass'n Inc. v. Sec. U.S. Dep't of Lab., 745 F.3d 653, 660 n.3 (3d Cir. 2014); 6 U.S.C. § 557.

70    See generally United States v. Texas, 599 U.S. 670, 679, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023) (noting that the "principle of enforcement discretion over arrests and prosecutions extends to the immigration context," and describing the "problems raised by judicial review of the Executive Branch's arrest and prosecution policies").

71    In exercising her power, the Secretary of Homeland Security generally has wide discretion. See, e.g., Arizona v. United States, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012); AADC, 525 U.S. at 483-84, 119 S.Ct. 936; Texas v. United States, 809 F.3d 134, 165-66 (5th Cir. 2015); Martinez-Garcia v. Ashcroft, 366 F.3d 732, 735 (9th Cir. 2004); Costa v. INS, 233 F.3d 31, 37 (1st Cir. 2000).

72    Fact-finding complexities may be part of why courts routinely hold that claims about a broad government policy --- like the one alleged here --- are not barred by Section 1252(b)(9), and therefore should go forward in federal court from the start. See Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 19, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020); Texas v. United States, 126 F.4th 392, 417 (5th Cir. 2025); Casa de Md. v. U.S. Dep't of Homeland Sec. 924 F.3d 684, 697 (4th Cir. 2019); Nava v. Dep't of Homeland

Sec., 435 F. Supp. 3d 880, 885–86, 895 (N.D. Ill. 2020); O.A., 404 F. Supp. 3d at 135–38; cf. Daud v. Gonzales, 207 F. App'x 194, 200 (3d Cir. 2006).

73    The Respondents also invoke another jurisdictional bar, 8 U.S.C. § 1226(e), but only as to the Petitioner's request for an injunction to release him from detention. See Opposition Brief at 20–21. This has no bearing here now. Section 1226(e) bars judicial review as to detention "under this section," a section that covers detention "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(e) (emphasis added); see generally e.g., Jennings, 583 U.S. at 306, 138 S.Ct. 830; Velasco Lopez v. Decker, 978 F.3d 842, 848 (2d Cir. 2020); Quinteros v. Warden Pike Cnty. Corr. Facility, 784 F. App'x 75, 76–77 (3d Cir. 2019); Hernandez v. Sessions, 872 F.3d 976, 981–82 (9th Cir. 2017); Padilla-Ramirez v. Bible, 882 F.3d 826, 829–30 (9th Cir. 2017); Sylvain v. Att'y Gen. of U.S., 714 F.3d 150, 154 (3d Cir. 2013); Castellanos v. Holder, 337 F. App'x 263, 268 n.3 (3d Cir. 2009); Gayle v. Napolitano, 2013 WL 1090993, at *2 (D.N.J. Mar. 15, 2013); Baguidy v. Elwood, 2012 WL 5406193, at *4 (D.N.J. Nov. 5, 2012). If the Court holds that the Constitution forbids removal of the Petitioner based on a particular charge, then, apart from an appeal from that holding, there will no longer be a "pending ... decision on whether the alien is to be removed from the United States" --- because the "decision" would have been made by this Court's determination that it would be unconstitutional to remove him. Therefore, at that point, there will be no available argument that Section 1226(e) bars release. To be sure, Section 1226(e) might be relevant if the Court were to consider ordering the release of the Petitioner without first finding that a charge against him is unconstitutional. But that circumstance can be addressed when and if it comes up.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.